1  Matthew C. Helland, CA State Bar No. 250451
2  helland@nka.com
   NICHOLS KASTER, LLP
3  One Embarcadero Center, Suite 720
   San Francisco, CA 94111
4  Telephone: (415) 277-7235
   Facsimile: (415) 277-7238
5
6  Rebekah L. Bailey, CA State Bar No. 25855
   E. Michelle Drake, MN Bar No. 0387366*
7  Kai Richter, MN Bar No. 0296545*
   Sarah W. Steenhoek, MN Bar No. 0390258*
8  *(**pro hac vice** applications forthcoming)
   NICHOLS KASTER, PLLP
9  4600 IDS Center
   80 South 8th Street
10 Minneapolis, MN 55402
11 Telephone: (612) 256-3200
   Facsimile: (612) 215-6870
12
13 Attorneys for Plaintiff and the Putative Classes

**ORIGINAL
FILED**

MAY 1 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LB

14 ## IN THE UNITED STATES DISTRICT COURT
   ## NORTHERN DISTRICT OF CALIFORNIA

15 **Cv 12 2506**

16 Stephen Ellsworth, as an individual and as a
   Representative of the classes and on behalf of
17 the general public,

18                              Plaintiff,

19       vs.

20 U.S. Bank, N.A.,

21                              Defendant.

**CLASS ACTION COMPLAINT FOR
DAMAGES, RESTITUTION AND
INJUNCTIVE RELIEF**

(1) Violation of California's Unfair
    Competition Law (Business and
    Professional Code § 17200 *et seq.*)

(2) Breach of Contract

(3) Breach of the Covenant of Good Faith
    and Fair Dealing

**DEMAND FOR JURY TRIAL**

22
23
24
25
26
27
28

1    Plaintiff Stephen Ellsworth ("Plaintiff"), on behalf of himself and the putative classes set

2  forth below, and in the public interest, brings the following Complaint against Defendant U.S.

3  Bank, N.A. ("U.S. Bank" or "Defendant"):

4                          **PRELIMINARY STATEMENT**

5    1.    Plaintiff and the Putative Class members have mortgages secured by residential

6  property, and were required to purchase flood insurance by U.S. Bank.

7    2.    U.S. Bank has systematically violated the legal rights of Plaintiff and other

8  Putative Class members in two fundamental respects, as set forth below.

9    3.    First, U.S. Bank unfairly, unjustly, and unlawfully profited from force-placing

10  flood insurance on Plaintiff's property and the property of other Putative Class members, by

11  charging Plaintiff and other class members amounts in excess of the net costs incurred by U.S.

12  Bank for such flood insurance and by arranging for kickbacks, commissions, or other

13  compensation for U.S. Bank and/or its affiliates in connection with force-placed (also known as

14  lender-placed) flood insurance.

15    4.    Second, U.S. Bank unfairly, unjustly, and unlawfully force-placed backdated flood

16  insurance policies on Plaintiff and other Putative Class members.

17    5.    U.S. Bank engaged in this conduct in bad faith, knowing that its actions were

18  contrary to applicable law, reasonable commercial standards of fair dealing, and the reasonable

19  expectations of borrowers upon entering into their mortgage agreements.

20    6.    Based on U.S. Bank's conduct as described herein, Plaintiff asserts claims against

21  U.S. Bank for (1) violation of California's Unfair Competition Law, Business and Professional

22  Code § 17200 et. seq. ("UCL"); (2) breach of contract; and (3) breach of the covenant of good

23  faith and fair dealing.

24    7.    To the extent that Plaintiff's claims are based on allegations of improper kickbacks

25  or commissions in connection with lender-placed insurance, Plaintiff asserts these claims on

26  behalf of a Proposed California Lender-Placed Class consisting of all persons who have or had a

27  loan or line of credit with U.S. Bank secured by their residential property in the State of

28

1  California, and who were charged for lender-placed flood insurance by U.S. Bank and/or paid
2  such charges to U.S. Bank, in whole or in part, on or after May 16, 2008.

3      8.      To the extent that Plaintiff's claims are based on allegations of improperly
4  backdated insurance, Plaintiff asserts these claims on behalf of a Proposed Backdated Insurance
5  Sub-Class consisting of all persons in the Proposed California Lender-Placed Class who were
6  charged for backdated lender-placed flood insurance by U.S. Bank and/or paid such charges to
7  U.S. Bank on or after May 16, 2008.[1]

8      9.      Plaintiff and the Putative Classes seek injunctive relief, corresponding declaratory
9  relief, monetary relief, and other appropriate relief for U.S. Bank's unlawful conduct, as
10  described herein.

11                              **THE PARTIES**

12      10.      Individual and representative Plaintiff Stephen Ellsworth resides in Napa,
13  California.  Plaintiff is a member of each of the Putative Classes as defined below.

14      11.      Defendant U.S. Bank, N.A. is a national banking association headquartered in
15  Cincinnati, Ohio.  U.S. Bank does business in California and several other states throughout the
16  country.

17                        **JURISDICTION AND VENUE**

18      12.      This Court has original jurisdiction under the Class Action Fairness Act
19  ("CAFA"), 28 U.S.C. § 1332(d)(2).  Plaintiff is a citizen of the State of California, and Defendant
20  is a citizen of a different state.  The amount in controversy in this action exceeds $5,000,000.00,
21  and there are more than 100 members of the Putative Classes.

22      13.      Venue is proper in the United States District Court, Northern District of California,
23  pursuant to 28 U.S.C. § 1391.  Plaintiff resides in this District, Defendant regularly conducts
24  business in this District, and Plaintiff's property is located in this District.

25
26
27

---

[1] Plaintiff reserves the right to amend his proposed class definitions or to propose other classes (or subclasses) in his class certification motion, after having an opportunity for discovery.

-3-

**INTRADISTRICT ASSIGNMENT**

14.     Pursuant to L.R. 3-2(c) and (d), this action is properly assigned to the San Francisco or Oakland Divisions of the Northern District of California because a substantial portion of the events giving rise to the dispute occurred in Napa, California.

**FACTUAL ALLEGATIONS**

*Origination of Plaintiff's Mortgage Loan*

15.     On or about July 2, 2007, Plaintiff obtained a mortgage loan from U.S. Bank in the amount of $393,892, secured by a deed of trust on his homestead. *See Exhibit 1.*

16.     U.S. Bank, N.A. is the lender-in-interest to Plaintiff's mortgage loan, and it services the loan through its U.S. Bank Home Mortgage division.

*Flood Insurance Requirements for Plaintiff's Property*

17.     Under the National Flood Insurance Act ("NFIA" or "Act"), lenders are required to ensure that any improved property in a Special Flood Hazard Area ("SFHA") that secures a loan or line of credit is covered by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act ($250,000), whichever is less.  42 U.S.C. § 4012a(b)(1).

18.     In the event that the required amount of insurance is not maintained, the NFIA authorizes lenders to purchase flood insurance for the borrower in the required amount. *See* 42 U.S.C. § 4012a(e)(1)-(2).   This is known as "lender-placed" or "force-placed" insurance coverage.

19.     However, the Act does not authorize lenders to purchase backdated insurance coverage for periods of time that already have expired, nor does it authorize lenders to enrich themselves by accepting kickbacks or commissions in connection with force-placed policies.

20.     Similarly, Plaintiff's deed of trust allows U.S. Bank to force-place flood insurance coverage if Plaintiff fails to maintain the required amount of coverage (*see Exhibit 1, ¶ 5*), but only authorizes U.S. Bank to "do and pay for whatever is reasonable and appropriate" to protect its interest in the property. *Id., ¶ 9.*

1  *U.S. Bank Force-Places Backdated Coverage and Improperly Takes a Commission for Itself*

2       21.    On or about June 9, 2010, nearly three years after Plaintiff originated his loan, U.S.

3  Bank sent Plaintiff a "Notice of Temporary Flood Insurance Placed by Lender Due to

4  Cancellation, Expiration, or Missing Policy Information" ("Initial Notice"), claiming that

5  Plaintiff's property was located in a SFHA and that he was required to purchase flood insurance.[2]

6  *See Exhibit 2.*

7       22.    The Initial Notice informed Plaintiff that U.S. Bank already had purchased a forty-

8  five day flood insurance binder for his property through American Security Insurance Company

9  ("ASIC"). The effective date of this binder was July 3, 2009 -- almost an entire year before the

10  notice was sent.

11      23.    The Initial Notice also stated that "[a]t the end of the forty-five day binder period,

12  this temporary coverage will convert to a full year policy and the annual premium will be added

13  to your escrow account." Additionally, the Initial Notice stated that "[i]n many instances, the

14  insurance we purchase for you may be more expensive than you are able to obtain on your own."

15      24.    On or about August 18, 2010, U.S. Bank sent Plaintiff a second "Notice of Flood

16  Insurance Placed by Lender Due to Cancellation, Expiration, or Missing Policy Information"

17  ("Second Notice"). *See Exhibit 3.* In the Second Notice, U.S. Bank informed Plaintiff that it had

18  purchased a "full year flood insurance policy" from ASIC. The premium cost for this policy was

19  $2,250. *See Exhibit 4.* This force-placed flood insurance coverage was backdated more than a

20  year to reflect an effective policy period of July 3, 2009 through July 3, 2010. *Id.* As a result, the

21  coverage was expired on the date it was purchased.

22      25.    Although not disclosed in either letter, U.S. Bank and/or its affiliates received a

23  kickback or commission from ASIC on this lender-placed coverage. The commissions paid by

24  ASIC to lenders and/or their affiliates on force-placed coverage are the subject of numerous

25  reported cases. *See, e.g., McNeary-Calloway v. JP Morgan Chase Bank, N.A.,* No. C-11-03058

26  ──────────────────────

27  [2] U.S. Bank initially did not require Plaintiff to carry flood insurance when he entered into his
   mortgage, but subsequently claimed that such coverage was required. Plaintiff has since obtained

28  a letter of map amendment from the Federal Emergency Management Agency ("FEMA")
   establishing that Plaintiff's home is not in a SFHA.

1   JCS, 2012 WL 1029502, at *23 (N.D. Cal. Mar. 26, 2012); *Hofstetter v. Chase Home Fin. LLC,*

2   No. 10-1313, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011); *Gipson v. Fleet Mortgage Group,*

3   232 F. Supp. 2d 691, 705-06 (S.D. Miss. 2002).   Moreover, the commission arrangements

4   between major banks and insurance firms (including ASIC's parent company, Assurant) have

5   been reported in *American Banker* magazine. *See Exhibit 5.*

6       26.   Plaintiff paid the $2,250 premium out of escrow and was never reimbursed for this

7   backdated insurance coverage.

8       27.   On or about April 9, 2012, Plaintiff sent a letter to U.S. Bank, notifying U.S. Bank

9   that he believed it had acted in an unfair manner in breach of his deed of trust. *See Exhibit 6.*

10  Plaintiff did not receive a response from U.S. Bank.

11                          **CLASS ACTION ALLEGATIONS**

12      28.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

13  Rules of Civil Procedure.

14      29.   Plaintiff asserts his improper commission claims in Counts 1-3 on behalf of a

15  proposed California Lender-Placed Class, defined as follows:

16      **Proposed California Lender-Placed Class**: All persons who have or had a loan or line of

17      credit with U.S. Bank secured by their residential property in the State of California, and

18      who were charged for lender-placed flood insurance by U.S. Bank and/or paid such

19      charges to U.S. Bank, in whole or in part, on or after May 16, 2008.

20      30.   Plaintiff asserts his improper backdating claims in Counts 1-3 on behalf of a

21  proposed Backdated Insurance Sub-Class, defined as follows:

22      **Proposed Backdated Insurance Sub-Class**: All persons in the Proposed California

23      Lender-Placed Class who were charged for backdated lender-placed flood insurance by

24      U.S. Bank and/or paid such charges to U.S. Bank, in whole or in part, on or after May 16,

25      2008.

26      31.   Numerosity:   The Putative Classes are so numerous that joinder of all class

27  members is impracticable.   Hundreds or thousands of U.S. Bank's customers satisfy the definition

28  of the Putative Classes.

-6-

32.  Typicality:  Plaintiff's claims are typical of the members of the Putative Classes.  Among other things: (1) Plaintiff's loan documents are typical of those of other Putative Class members; (2) the form letters that Plaintiff received are typical of those received by other Putative Class members; (3) U.S. Bank treated Plaintiff consistent with other Putative Class members in accordance with U.S. Bank's uniform policies and practices; (4) it was typical for U.S. Bank and/or its affiliates to receive kickbacks or commissions in connection with lender-placed flood insurance; and (5) it was typical for U.S. Bank to backdate lender-placed flood insurance policies.

33.  Adequacy:  Plaintiff will fairly and adequately protect the interests of the Putative Classes, and has retained counsel experienced in complex class action litigation, including flood insurance litigation. *See Hofstetter*, 2011 WL 1225900, at \*9 (finding counsel of record to be adequate and appointing counsel as class counsel in class action lawsuit asserting similar claims).

34.  Commonality:  Common questions of law and fact exist as to all members of the Putative Classes and predominate over any questions solely affecting individual members of the Putative Classes, including but not limited to:

    a)  whether U.S. Bank's conduct as described herein is unfair and violates the UCL;

    b)  whether U.S. Bank's conduct as described herein violates the terms of its deeds of trust and/or mortgage contracts;

    c)  whether U.S. Bank owes its customers a duty of good faith and fair dealing, and if so, whether U.S. Bank breached this duty by, *inter alia*, (1) accepting kickbacks or commissions in connection with force-placed insurance, and (2) purchasing backdated flood insurance coverage for periods of time that already had elapsed;

    d)  the appropriateness and proper form of any declaratory or injunctive relief;

    e)  the appropriateness and proper measure of restitution; and

1            f)  the appropriateness and proper measure of monetary and other damages

2                sustained by the Putative Classes.

3      35.     This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because

4  U.S. Bank has acted or refused to act on grounds that apply generally to the Putative Classes, so

5  that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes

6  as a whole.

7      36.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because

8  questions of law and fact common to the Putative Classes predominate over any questions

9  affecting only individual members of the Putative Classes, and because a class action is superior

10  to other available methods for the fair and efficient adjudication of this litigation. U.S. Bank's

11  conduct described in this Complaint stems from common and uniform policies and practices,

12  resulting in unnecessary flood insurance premiums and related charges that are readily calculable

13  from U.S. Bank's records and other class-wide evidence. Members of the Putative Classes do not

14  have an interest in pursuing separate individual actions against U.S. Bank, as the amount of each

15  class member's individual claims is small compared to the expense and burden of individual

16  prosecution. Class certification also will obviate the need for unduly duplicative litigation that

17  might result in inconsistent judgments concerning U.S. Bank's practices. Moreover, management

18  of this action as a class action will not present any likely difficulties. In the interests of justice

19  and judicial efficiency, it would be desirable to concentrate the litigation of all Putative Class

20  members' claims in a single forum.

21      37.     Plaintiff intends to send notice to all members of the Putative Classes to the extent

22  required by Rule 23. The names and addresses of the Putative Class members are available from

23  U.S. Bank's records.

**FIRST CLAIM FOR RELIEF**

24

**CALIFORNIA UNFAIR COMPETITION LAW**

25  **California Business & Professional Code § 17200 *et seq.***

26      38.     Plaintiff alleges and incorporates by reference the allegations in the preceding

27  paragraphs.

28

-8-

1     39.    U.S. Bank was required to adhere to the requirements of the UCL when

2   conducting business with Plaintiff and other Putative Class Members.

3     40.    The UCL prohibits, among other things, any unfair business act or practice.

4     41.    U.S. Bank engaged in unfair business practices in violation of the UCL by, among

5   other things:

6             a.  Arranging for kickbacks, commissions, or other compensation for itself and/or

7                 its affiliates in connection with lender-placed flood insurance;

8             b.  Purchasing backdated flood insurance coverage at borrowers' expense.

9     42.    The practice of backdating insurance has been condemned by the National

10  Association of Insurance Commissioners. *See Exhibit 5*. It also is inconsistent with the advance

11  notice requirements of the NFIA in connection with force-placed insurance. *See* Flood Insurance

12  Questions & Answers, 74 Fed. Reg. at 35,934 ("The ability to impose the costs of force placed

13  flood insurance on a borrower commences 45 days after notification to the borrower of a lack of

14  insurance or of inadequate insurance coverage. Therefore, lenders may not charge borrowers for

15  coverage during the 45-day notice period.").[3]  Accordingly, this Court and other courts have

16  determined that backdating force-placed insurance policies may be unfair and/or unlawful. *See,*

17  *e.g.*, *McNeary-Calloway*, 2012 WL 1029502, at \*23-29; *Williams v. Wells Fargo Bank, N.A.*, No.

18  11-21233 CIV, 2011 WL 4901346, at \*2, 4  (S.D. Fla. Oct. 14, 2011); *Am. Bankers Ins. Co. v.*

19  *Wells*, 819 So.2d 1196 (Miss. 2001).

20    43.    Courts also have condemned the practice of engaging in self-dealing in connection

21  with force-placed insurance.  *See, e.g.*, *McNeary-Calloway*, 2012 WL 1029502, at \*23-29;

22  *Williams*, 2011 WL 4901346, at \* 2, 4; *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d

23  1273, 1278–79 (S.D. Fla. 2009); *Gipson*, 232 F. Supp. 2d. at 707; *Stevens v. Citigroup, Inc.*, No.

24

---

[3] The Office of the Comptroller of the Currency recently proposed amending this guidance to allow lenders to charge borrowers for flood insurance coverage during the 45-day notice period, if the borrower has given the lender "express authority" to do so. *See* Loans in Areas Having Special Flood Hazards; Interagency Questions & Answers Regarding Flood Insurance, 76 Fed. Reg. 64,175, 64,180-81 (Oct. 17, 2011).  However, there is no question that charging a borrower for coverage (or increased coverage) that is "effective" before the 45-day notice period even begins is inappropriate.

1  CIV.A 00-3815, 2000 WL 1848593, at *1, 3 (E.D. Pa. Dec. 15, 2000). Moreover, the practice of

2  accepting commissions in connection with force-placed flood insurance is inconsistent with the

3  NFIA, which only allows lenders and servicers to "charge the borrower for the cost of premiums

4  and fees *incurred* by the lender or servicer for the loan in purchasing the insurance." 42 U.S.C. §

5  4012(e)(2); *see also* 12 C.F.R. § 22.3.

6      44.    U.S. Bank systematically engaged in these unfair business practices to the

7  detriment of Plaintiff and other Putative Class Members.

8      45.    The harm caused by these business practices vastly outweighs any legitimate

9  utility they possibly could have.

10      46.    Plaintiff and other members of the Putative Classes have been injured and have

11  suffered a monetary loss as a result of U.S. Bank's violations of the UCL.

12      47.    Plaintiff and other members of the Putative Classes are entitled to restitution and

13  injunctive relief for U.S. Bank's violations of the UCL.

14      48.    As a result of U.S. Bank's violations of the UCL, Plaintiff and other members of

15  the Putative Classes are also entitled to a recovery of attorney's fees and costs to be paid by U.S.

16  Bank, as provided by Code of Civil Procedure section 1021.5 and other applicable law.

17                  **SECOND CLAIM FOR RELIEF**

18                  **BREACH OF CONTRACT**

19      49.    Plaintiff alleges and incorporates by reference the allegations in the preceding

20  paragraphs.

21      50.    U.S. Bank is the lender-in-interest to Plaintiff's deed of trust and is bound by the

22  terms of his deed of trust.

23      51.    Plaintiff's deed of trust limits the lender's discretion to force-place insurance and

24  charge the borrower for force-placed insurance. Pursuant to Paragraph 9 of the deed of trust, U.S.

25  Bank may only "do and pay for whatever is reasonable and appropriate to protect Lender's

26  Interest in the Property and rights under [the] Security Instrument[.]" *See Exhibit 1.*

27      52.    This language does not allow U.S. Bank to purchase backdated flood insurance, or

28  to charge gross premiums for flood insurance instead of net premiums (after accounting for

1   commissions paid to U.S. Bank and/or its affiliates).   Purchasing backdated insurance and

2   steering a portion of the premiums to the lender (or the lender's affiliate) as commissions are

3   neither appropriate nor necessary to protect the Lender's legitimate interests or rights.   Nor are

4   such actions otherwise authorized by the deed of trust. *See, e.g., McNeary-Calloway*, 2012 WL

5   1029502, at *23 ("Nothing in the contract necessarily authorizes charges regardless of amount

6   and regardless of whether Defendants receive a portion of the premiums.  Nor does anything in

7   the contract authorize backdating [force-placed insurance] policies to cover periods of time where

8   no loss occurred.").

9        53.    Plaintiff's deed of trust is a uniform security instrument, and is typical of the deeds

10   of trust of other Putative Class members.

11       54.    U.S. Bank has breached the deeds of trust and/or mortgage contracts of Plaintiff

12   and other Putative Class members by charging borrowers for backdated policies and by accepting

13   commissions in connection with force-placed insurance.

14       55.    These breaches were willful and not the result of mistake or inadvertence.  U.S.

15   Bank systematically and pervasively force-placed backdated policies and accepted commissions

16   in connection with force-placed insurance.

17       56.    As a direct result of this unlawful conduct, Plaintiffs and the Putative Class

18   members have been injured, and have suffered actual damages and monetary losses, in the form

19   of increased insurance premiums, interest payments, and/or other charges.

20       57.    Plaintiff and the Putative Classes are entitled to recover their damages and other

21   appropriate relief for the foregoing contractual breaches.

22                          **THIRD CLAIM FOR RELIEF**

23       **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

24       58.    Plaintiff alleges and incorporates by reference the allegations in the preceding

25   paragraphs.

26       59.    U.S. Bank owed Plaintiff and the Putative Class members a duty of good faith and

27   fair dealing, by virtue of U.S. Bank's contractual relationship with them.

28

60. U.S. Bank breached this duty by, among other things (1) purchasing backdated flood insurance coverage at borrowers' expense; and (2) arranging for kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with lender-placed flood insurance.

61. U.S. Bank willfully engaged in the foregoing conduct in bad faith, for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiff and other Putative Class members.

62. The foregoing conduct was willful and not the result of mistake or inadvertence. As set forth above, U.S. Bank systematically and pervasively force-placed backdated policies and accepted commissions in connection with force-placed insurance.

63. As a direct result of U.S. Bank's breaches of the implied covenant of good faith and fair dealing, Plaintiff and other Putative Class members have been injured, and have suffered actual damages and monetary losses, in the form of increased insurance premiums, interest payments, and/or other charges.

64. Plaintiff and the Putative Classes are entitled to recover their damages and other appropriate relief for the foregoing breaches of the implied covenant of good faith and fair dealing.

## **PRAYER FOR RELIEF**

65. WHEREFORE, Plaintiff, on behalf of himself and the Putative Classes, prays for relief as follows:

a) Determining that this action may proceed as a class action under Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure;

b) Designating Plaintiff as class representative for the Putative Classes;

c) Designating Plaintiff's counsel as counsel for the Putative Classes;

d) Issuing proper notice to the Putative Classes at U.S. Bank's expense;

e) Declaring that U.S. Bank's actions as described above violate the UCL;

f) Declaring that U.S. Bank breached its contracts with Plaintiff and the Putative Class members;

-12-

CLASS ACTION COMPLAINT

g) Declaring that U.S. Bank breached its duty of good faith and fair dealing to Plaintiff and the Putative Class members;

h) Awarding appropriate equitable relief, including but not limited to an injunction requiring U.S. Bank to reverse all unlawful, unfair, or otherwise improper charges for flood insurance coverage, prohibiting U.S. Bank and its affiliates from earning commissions or other compensation on force-placed flood insurance policies, prohibiting U.S. Bank from purchasing backdated flood insurance coverage, and ordering U.S. Bank to cease and desist from engaging in further unlawful conduct in the future;

i) Awarding restitution as provided by the UCL;

j) Awarding actual damages and interest;

k) Awarding reasonable attorneys' fees and costs and expenses to the extent permitted by law; and

l) Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

66.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Putative Classes demand a trial by jury.


Dated: May 16, 2012

NICHOLS KASTER, LLP

By:     _Matthew C. Helland_

Matthew C. Helland

NICHOLS KASTER, PLLP

Attorneys for Plaintiff and the Putative Classes

-13-

# Exhibit 1

Recording Requested By:

    US BANK N.A.

Return To:

    U.S. BANK N.A.
    1550 AMERICAN BLVD EAST
    BLOOMINGTON MN 55425


Prepared By:
    CAREY LEWANDOWSKI
    US BANK N.A.
    16900 WEST CAPITOL DRIVE
    BROOKFIELD, WISCONSIN  53005

———————————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST

LOAN:# Redacted


## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JULY 2,2007
together with all Riders to this document.
(B) "Borrower" is

STEPHEN M ELLSWORTH (UNMARRIED)




Borrower is the trustor under this Security Instrument.
(C) "Lender" is US BANK N.A.

Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES OF AMERICA

CALIFORNIA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01

 -6(CA) (0005).01

Page 1 of 16      Initials: _____

VMP MORTGAGE FORMS - (800)521-7291



Lender's address is 4801 FREDERICA STREET, OWENSBORO, KY 42301

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is   OLIVIA TODD

(E) "Note" means the promissory note signed by Borrower and dated   JULY 2, 2007
The Note states that Borrower owes Lender   THREE HUNDRED NINETY THREE THOUSAND EIGHT
HUNDRED NINETY TWO AND   NO/100                                                     Dollars
(U.S. $   393,892.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than AUGUST 1, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
     **PUBLIC RECORDS**     of   **NAPA COUNTY**         :
    [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.**

Parcel ID Number:  Redacted               which currently has the address of
Redacted                                [Street]
NAPA                 [City] , California  Redac   [Zip Code]
("Property Address"):

 TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

 BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

 THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

 UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

 **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all

Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage**

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall

Initials: 

Form 3005  1/01

not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider executed by Borrower and recorded with it.

Witnesses:

_____                          _____ (Seal)
                                                         STEPHEN  M  ELLSWORTH        -Borrower


_____                          _____ (Seal)
                                                                                     -Borrower


_____ (Seal)                         _____ (Seal)
                         -Borrower                                                   -Borrower


_____ (Seal)                         _____ (Seal)
                         -Borrower                                                   -Borrower


_____ (Seal)                         _____ (Seal)
                         -Borrower                                                   -Borrower

State of California
County of

} ss,

On                                    before me,

personally appeared

STEPHEN M ELLSWORTH (UNMARRIED)

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____(Seal)

# Exhibit 2



usbank.com

June 09, 2010

Insurance Exposure Date:
07/03/2009

Flood Zone:
AE

STEPHEN M ELLSWORTH
Redacted
NAPA, CA Reda

Property Address:
Redacted
NAPA, CA Reda

## NOTICE OF TEMPORARY FLOOD INSURANCE PLACED BY LENDER
## DUE TO CANCELLATION, EXPIRATION, OR MISSING POLICY INFORMATION

Dear Mortgagor(s):

Our records indicate your property is located in a Special Flood Hazard Area (SFHA) as designated by the Federal Emergency Management Agency (FEMA). As of the date of this notice, we have been unable to verify a new or renewed flood policy covering your property. Under the Flood Disaster Protection Act of 1973, as amended, and as indicated in your mortgage agreement, you are required to purchase and maintain flood insurance on secured improved property located in a SFHA.

You should, at your expense, obtain flood insurance in an amount at least equal to:

1. the replacement cost of your dwelling, or
2. the maximum amount of coverage available through the National Flood Insurance Program, currently $250,000; or
3. the total unpaid balance of your loan(s), plus the total line amount of all lines of credit, secured by the above referenced property.

Please note: If your property is covered by a condominium owners association master policy, flood insurance coverage must be for the replacement cost of your unit, up to a maximum of $250,000.

Please take action now to ensure compliance with the federal laws noted above by forwarding proof of your flood insurance coverage to the address shown below or fax a copy to 1-937-327-7707. You may also provide this information to us by visiting our website at www.usbankhomemortgage.com. Please be sure your policy includes a Mortgagee Clause or Lenders Loss Payable Endorsement in favor of:

U. S. BANK NATIONAL ASSOCIATION
C/O U. S. BANK HOME MORTGAGE
ITS SUCCESSORS AND/OR ASSIGNS
P O BOX 7298
SPRINGFIELD, OH  45501-7298
Account Number:  7884526679

You have 45 days to purchase flood insurance, and if you do not provide adequate proof of flood insurance coverage within 45 days of this letter, as a federally regulated lender, U.S. Bank National Association is required to lender place coverage. We will purchase the necessary flood insurance for you and the annual premium will be added to your escrow account.



2107F2-0410

Z28080

If your own agent or company cannot help you purchase flood insurance, we have arranged for you to obtain a premium quotation for federal flood insurance from American Bankers Insurance Company (American Bankers). American Bankers is a federally designated National Flood Insurance Program carrier. They can offer you a standard federal government policy, with or without contents coverage, at the same rate charged by any local agency or company. They can be reached at (888) 222-4101, Monday through Friday, 7:30 a.m. - 5:00 p.m. Pacific Time. Enclosed is a flood insurance questionnaire you should complete prior to contacting American Bankers.

U. S. Bank National Association has secured temporary flood insurance coverage in the form of a forty-five day binder, effective as of the above exposure date. This coverage is provided by AMERICAN SECURITY INSURANCE COMPANY. This binder cannot be renewed. At the end of the forty-five day binder period, this temporary coverage will convert to a full year policy and the annual premium will be added to your escrow account. If you do not have an escrow account, one will be established for you. Your monthly payments will increase due to the cost of this coverage. The premium for this full year policy is shown below.

INSURANCE BINDER DETAILS

| | |
|---|---|
| Insurance Effective Date: | 07/03/2009 |
| Amount of Insurance: | $250,000 |
| Annual Premium: | $2,250.00 |

Any policy we purchase on your property may be canceled at any time by giving us proof of other acceptable insurance. You will be charged for only the days this policy was in force. Any unused premium will be credited to your escrow account. In many instances, the insurance we purchase for you may be more expensive than you are able to obtain on your own. The policy provides coverage only for physical damage to the building due to flood and does not include supplemental coverages such as personal liability and contents.

U. S. Bank National Association is committed to providing you the best service in the mortgage industry. If you have any questions, please contact our Customer Service Center at 1-800-365-7772, Monday through Friday, 8:00 a.m. to 5:00 p.m., Central Time.

Sincerely,

Insurance Department

Exhibit 3



usbank.com

August 18, 2010

**Insurance Exposure Date:**
07/03/2009

**Flood Zone:**
AE

STEPHEN M ELLSWORTH
Redacted
NAPA, CA Reda

**Property Address:**
Redacted
NAPA, CA Reda

## NOTICE OF FLOOD INSURANCE PLACED BY LENDER
## DUE TO CANCELLATION, EXPIRATION, OR MISSING POLICY INFORMATION

Dear Mortgagor(s):

Approximately 45 days ago, we notified you that we were unable to verify a new or renewed flood insurance policy covering your property. The notice also explained that you must provide evidence of your flood coverage and failure to provide would result in U. S. Bank National Association purchasing flood insurance on your behalf.

We also notified you that we purchased a flood insurance binder for the above referenced property. Since we still have not received evidence of flood coverage from you, we purchased the full year flood insurance policy for you. Enclosed is the annual policy provided by AMERICAN SECURITY INSURANCE COMPANY. The annual premium is shown on the policy and will be added to your escrow account. If you do not have an escrow account, one will be established for you. Your monthly payments will increase due to the cost of this coverage.

This policy may be canceled at any time if you provide evidence of acceptable flood insurance coverage. You will be charged for only the days this policy was in force. Any unused premium will be credited to your escrow account. This policy provides coverage only for physical damage to the building due to flood and will not include supplemental coverages such as personal liability or contents.

If you have flood insurance, please forward proof of coverage to the address shown below or fax a copy to 1-937-327-7707. You may also provide this information to us by visiting our website at www.usbankhomemortgage.com. Please be sure your policy includes a Mortgagee Clause or Lenders Loss Payable Endorsement in favor of:

> U. S. BANK NATIONAL ASSOCIATION
> ITS SUCCESSORS AND/OR ASSIGNS
> C/O U. S. BANK HOME MORTGAGE
> P O BOX 7298
> SPRINGFIELD, OH 45501-7298
> Account Number: 7884526679

U. S. Bank National Association is committed to providing you the best service in the mortgage industry. If you have any questions, please contact our Customer Service Center at 1-800-365-7772, Monday through Friday, 8:00 a.m. to 5:00 p.m., Central Time.

Sincerely,

Insurance Department



2107F3-1209

ZZ8060

# Exhibit 4

08/16/2010

| AGENCY | | |
| Major | Sub | Minor |
| 7702 | 0000 | |

**AMERICAN SECURITY INSURANCE COMPANY**
Atlanta, Georgia 30302
Residential Property
**FLOOD COVERAGE**
Additional Insured Endorsement

POLICY
NUMBER: Redacted

LOAN
NUMBER: Redacted

ADDITIONAL INSURED – NAME AND ADDRESS
(Street No., City, State, Zip) :

STEPHEN M ELLSWORTH
Redacted
NAPA, CA Reda

NAMED INSURED MORTGAGEE – Name and Address:

U. S. BANK NATIONAL ASSOCIATION
ITS SUCCESSORS AND/OR ASSIGNS
C/O U. S. BANK HOME MORTGAGE
P O BOX 7298
SPRINGFIELD, OH 45501-7298
1-800-365-7772

| POLICY PERIOD | | TERM | AMOUNT OF INSURANCE : | | $250,000 |
|---|---|---|---|---|---|
| EFFECTIVE DATE: 07/03/2009 | EXPIRATION DATE: 07/03/2010 | 12 | PROVISION FOR MUNICIPAL INSURANCE PREMIUM TAXES | TAX CODE | |
| EFFECTIVE TIME: 12:01 A.M. | | | | TOTAL TAX AND/OR SURCHARGE | |
| DESCRIBED LOCATION (if different from mailing address above) | | | ANNUAL PREMIUM AMOUNT | | $2,250.00 |
| Redacted NAPA, CA Reda | | | ANNUAL TOTAL CHARGED | | $2,250.00 |

MSP-RFL-J (10/88),MSP-R-FL (10/88),MSP-FL-ICC-END (8/00),MSP-RCFL-OI-END (6/08)
MSP-RFL-CFL-END(12/06)

Subject to the terms and provisions of the Mortgage Service Program, Residential Property Mortgagee's Flood Policy, including but not limited to the Residential Property Flood coverage form attached hereto, it is agreed that the insurance applies to the property described above and to any person shown as an Additional Insured(s) with respect to such property, subject to the following additional provisions:

(a) The Named Insured Mortgagee is authorized to act for the Additional Insured(s) in all matters [pertaining to this insurance including receipt of Notice of Cancellation; and return premium, if any.

(b) The Named Insured is authorized to advance all funds to be recovered from the Additional Insured(s) for the insurance afforded.

(c) Loss, if any, shall be adjusted with and payable to the Named Insured Mortgagee, and the Additional Insured(s) as their interests may appear, either by a single instrument so worded or by separate instruments payable respectively to the Named Insured Mortgagee and the Additional Insured, at the company's option.

**DEDUCTIBLE**
For all perils, the sum of $750 shall be deducted from the amount which would otherwise be recoverable for each loss separately occurring; however, any building or structure located in a "V" zone or with the elevation of the lowest floor below the Base Flood Elevation (BFE) defined in the Federal National Flood Insurance Program, a $750 deductible applies. These deductibles shall apply separately to each building or structure.

**THIS POLICY ONLY COVERS BUILDINGS AND STRUCTURES. IT DOES NOT COVER YOUR CONTENTS OR PERSONAL PROPERTY.**

VA - Section "a" is amended to read: The Named Insured Mortgagee, named in Item 1 of the policy declaration is authorized to act for the Additional Insured(s) in all matters pertaining to this insurance and returned premiums if any, but excluding receipt of Notice of Cancellation.

| MSP-R-FL-A (10-88) | CLAIMS INFORMATION ONLY 1-800-652-1262 | ALL OTHER INQUIRIES 1-800-365-7772 | FPR331 |

Exhibit 5

# AMERICAN BANKER.

## Ties to Insurers Could Land Mortgage Servicers in More Trouble

**By** Jeff Horwitz
NOV 9, 2010 12:00pm ET

**Correction:** *An earlier version of this story incorrectly stated that Bank of America did not comment for the record. The bank's comment is now included.*

**When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.**

Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.

Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.

Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

"There's no arm's-length transaction here, and that creates all sorts of incentives for the servicer to force-place excessive insurance and overcharge consumers for policies that provide minimal benefit," said Diane Thompson, of counsel for the National Consumer Law Center. "Servicers and insurers have turned this into a gravy train."

Sometimes the arrangements resemble simple kickbacks: Court documents show that a subsidiary of the country's largest specialty insurer paid undisclosed "commissions" for the rights to a servicer's force-placed business.

State court filings show alleged abuse in which banks charged borrowers for unnecessary insurance and backdated policies providing coverage retroactively. Often the insurance was acquired only after banks stopped advancing the premiums of delinquent borrowers' escrowed policies, causing those cheaper and more comprehensive policies to expire. In response to questions from American Banker, federal and state officials said that some practices that industry trade groups defend may not be legal.

"It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed," said Brian Sullivan, spokesman for the Department of Housing and Urban Development. Foreclosure defense and legal aid attorneys say force-placed insurance is found on most of the severely delinquent loans in this country. If so, the cost to investors may well be in the billions of dollars.

"This is clearly not in the investors' interest," said Amherst Securities analyst Laurie Goodman, who in May noted the potential for misconduct with Bank of America's force-placed-insurer subsidiary, Balboa Insurance Group. "Servicers are getting a huge chunk of money from force-placed insurance, and investors pay for it by higher loss severity at the liquidation of the loan."

With little regulatory oversight or even private investor awareness, force-placed insurance has helped make drawn-out foreclosures lucrative for servicers — far more so, in some cases, than helping a borrower return to performing status. As the intermediary between borrower and investor, servicers appear to be benefiting themselves at the expense of both.

## Backdated Coverage
When attorney Jeffrey Golant took on his first forced-placement case, he thought he was looking at an administrative mistake.

A solo practitioner in Pompano Beach, Fla., Golant splits his time between foreclosure defense and insurance cases. He had been referred his first forced-placement case by his mother, Margery Golant — also a longtime foreclosure defense attorney — in May of 2008 when the dispute veered into insurance territory.

The problems should have been quick to sort out, Golant recalls. His client was current on her mortgage and claimed the lapse of insurance coverage on her home was the result of her previous insurer's error. Much of the new policy's coverage was redundant, Golant said, duplicating flood and wind policies that had remained in place. Moreover, billing her for expensive retroactive hurricane protection, for a year when there had been no significant storms, struck Golant as inherently ridiculous.

"I really thought they'd added an extra digit," he said.

But the servicer that had requested the policy — nominally Zions Bancorp., though like many regional banks, the company outsources its servicing and does not involve itself in loan-level decisions — wouldn't back down. The backdating was appropriate because "Had there been damage to your property during the uninsured time … you would have benefited significantly," the servicer said in one letter.

The Mortgage Bankers Association told American Banker that retroactive coverage is necessary to prevent gaps in insurance. But asked for an opinion on backdating a policy by nine months, the National Association of Insurance Commissioners told American Banker that insurance is "prospective in nature." Therefore, policies "should not be back-dated to collect premiums for a time period that has already passed," the trade group for state insurance regulators said.

The case got stranger when Golant's client visited the address listed for the insurer in an unsuccessful attempt to sort things out, he said. While the people there claimed to represent the servicer, they were operating out of an office belonging to a force-placed policy insurer since acquired by QBE Insurance Group.

Golant didn't understand why the insurer would be speaking on behalf of the servicer. But shortly after he began asking questions about the relationship between servicer and insurer, the case settled. Confidentially. At the insurer's request.

With the matter resolved, it would have made sense for a Florida solo practitioner who handles as many as 50 cases at any one time to move on. Golant, however, started investigating the connections between multibillion-dollar banks and specialty insurers.

"Frankly, it was their speed and willingness to settle that made me think they were not at all confident about the arrangement," Golant said. "I was still in the dark. But I got curious."

Collaborating with his mother, Golant says he began to take on more force-placed insurance cases, often agreeing to bill the borrower only if he won. Cases he pointed out to American Banker show no shortage of questionable alleged practices. In some instances, servicers force-placed insurance on borrowers in excess of their mortgage's face value and property's overall worth. (A representative of the Mortgage Bankers Association said the industry often is required to reinsure a property up to the cost of its replacement value, even if that's in excess of the mortgage.)

In other instances, servicers force-placed duplicative insurance on residents of condominium associations that insured their members' properties. In yet more, servicers had stopped advancing the premiums for a delinquent borrower's escrowed private insurance, allowing it to expire. When it did, they bought far more expensive force-placed insurance to replace it, and began advancing the premiums on that. This — a common practice, Golant says — was not just harmful to borrowers. It was inexplicable from the point of view of protecting investors.

What all the cases had in common was astronomically priced force-placed insurance, he said. There is no doubt that borrowers who aren't paying for their own insurance pose a heightened insurance risk. But servicers were billing Golant's clients for policies that cost as much as 10 times as much as the insurance they replaced. In one example confirmed by American Banker, an $80,000 property standing on a $40,000 lot was force-placed with a policy costing $10,000. Put another way, one year of insurance payments would strip away 13% of the structure's total value.

It wasn't just off-brand and subprime servicers who were tacking the high-priced policies on to borrowers' mortgage bills. It was the country's biggest banks, from JPMorgan Chase & Co. to Wachovia, now part of Wells Fargo & Co. Why did they seem so eager to purchase high-priced insurance on the homes of already struggling borrowers?

Golant got his answer in a case in which EverBank Financial Corp's servicing arm had allegedly allowed a borrower's $4,000 escrowed insurance to lapse in error and then replaced it with a policy costing more than $33,000. In response to written questions, a subsidiary of Assurant, one of the country's biggest specialty insurers, revealed that it hadn't kept all the money that EverBank's

servicing operation had paid it. Instead it immediately paid EverInsurance, the servicer's subsidiary, a $7,100 "commission" and left the door open to further compensation.

For Golant, this set off alarm bells: instead of trying to place affordable insurance on his client's home, EverBank had taken what was at minimum a $7,100 cut. That was more money than EverBank would ever collect from actually servicing the loan, and EverBank had done nothing to earn it — except let Assurant write a high-priced policy on his client's house. (According to the MBA data cited by MortgageDaily.com, servicers earned on average $51 per loan last year.)

"The 'commissions' that [Assurant] paid ... were in fact kickbacks," the attorney wrote in a complaint still being litigated. "This incentivized EverHome to select the most expensive force-placed coverage available, and to force-place insurance as frequently as possible."

EverBank is in the process of going public, and could not comment because of SEC restrictions on its public statements, a spokeswoman for the bank said. But, at least in substance, its relationship with an insurer is hardly unique. Agreements providing banks with commissions on force-placed insurance appear to be standard for many players, including one of the country's largest — Wells Fargo.

Wells declined an on-record interview for this story, though it acknowledged relationships with three force-placed insurers and provided other guidance. JPMorgan Chase did not speak on record with *American Banker*. A spokesman for Bank of America said by email it buys forced-placed insurance only "after several attempts have been made to notify borrowers that their insurance has lapsed and to remind them of their obligation to maintain continuous coverage." B of A is seeking a buyer for Balboa, which it inherited with its 2008 acquisition of Countrywide Financial Corp.

But the MBA defended commissions on force-placed business. It is common practice for an insurer to pay fees for business referrals, said Vicki Vidal, a vice president at the trade group. Asked if those commissions inflated the price that homeowners or investors ultimately paid, she said they did not.

"The rate is separate from the commission," Vidal said, adding that state insurance regulators can set limits on what premiums are allowed.

**Circular Arrangement**
Commission fees aren't the only way major servicers profit on the force-placed policies in their portfolio. Some, including JPMorgan Chase, have adopted a roughly equivalent if slightly more sophisticated method of profiting from force-placed reinsurance: They reinsure it.

Evidence of the practice comes from Assurant's Securities and Exchange Commission filings as well as the banking companies' boilerplate language for notifying borrowers of their intent to bill them for a force-placed policy.

JPMorgan Chase's force-placed insurance "will have significantly higher premiums than standard insurance premiums," the banking company noted in one letter to a borrower last year, and "Some or all of these premiums will be reinsured through an insurance company that is an affiliate of Chase."

JPMorgan Chase declined to specify what insurer it typically works with, but Assurant's annual report describes precisely such a relationship from an insurer's perspective. In an effort to align its interests with its servicer customers, the company will often reinsure the policies it writes with the same servicer that requested them.

"Such arrangements allow significant flexibility in structuring the sharing of risks and profits on the underlying business," Assurant notes.

The interests of the two parties are so aligned, in fact, that in many cases there ceases to be a clear difference between the entity purchasing insurance and the entity selling it.

According to both Assurant's SEC filings and the marketing materials of a subsidiary of rival QBE Insurance Group, the insurers don't just write policies on request — they also enter into long-term agreements to detect uninsured properties in their clients' servicing portfolios and perform other back-office functions. It was precisely such an arrangement that Golant's first client ran into when she tried to visit her servicer, he says — the insurance company employees had taken over the servicer's role.

Like the direct commission payments that Golant discovered, reinsurance deals cut servicers in on insurer profits. They also come with another potential advantage for the insurer: they provide an incentive for the servicer not to pursue claims, creating an apparent conflict of interest. As a representative of investors, the servicer should vigorously pursue any and all claims arising from its forcibly insured portfolio. But because the servicer reinsures the policies it purchases, any claims it brings could potentially come out of its own profits.

For insurers, opening the door to this circular arrangement has its drawbacks. Assurant warns in investor filings that having reinsuring business with the client that provided the policy, rather than a reinsurer of the company's own choosing, can pose a credit risk: the bank fails to eat its share of claims. Assurant mitigates this danger, it says, by requiring some of its client-counterparties to obtain letters of credit from other financial institutions.

The more vexing issue for Assurant, however, seems to be that giving the servicers part of the deal leaves less for the company. In a section discussing risks arising from servicer industry consolidation, Assurant warns that giant servicers are compressing margins and that it may receive a lower share of premiums if it provides them with bigger reinsurance deals.

Nonetheless, Assurant sees force-placed insurance as its future. The unit handling force-placed insurance has accounted for $811 million of its $879 million in profits during the last two years, and its "business strategy is to pursue long-term growth in creditor-placed homeowners insurance" as well as expand that business into auto insurance and related areas.

Assurant declined to be interviewed for this story, and did not address questions on conflict of interest concerns. But the company, which also provides health, corporate and other types of insurance, issued a statement defending its general force-placed business practices.

"Lender-placed insurance programs are regulated in all states and we comply with those regulations," the statement reads in part. "We believe our rates to be among the lowest in the industry."

QBE Insurance, the parent of the insurer involved in Golant's first force-placed case, did not respond to requests for comment.

The MBA's Vidal denied that reinsurance deals posed a conflict of interest, suggesting they may only cover catastrophic losses.

"Don't get the impression that everyone has reinsurance capacity," she said. "But to the extent they do, they're obviously getting paid for absorbing a portion of the risk."

**"No Incentive" To Shop**
Force-placed insurance isn't inherently objectionable. It makes sense that the coverage's price must be higher than on voluntarily purchased insurance to account for a higher risk — if a hurricane comes through, a homeowner with a stake in a property is more likely to board up the windows than one in foreclosure. In many states regulators provide at least some oversight and limits on acceptable rates. Moreover, force-placing insurance isn't optional for servicers: investor contracts usually require it.

"Realistically, we're doing whatever investors are telling us to do," Vidal said.

But it would be possible for servicers to treat force-placing as a last-ditch form of investor protection conducted at the lowest cost possible. Instead, they have consistently chosen force-placed insurance deals that reward themselves at the expense of their clients — and have sometimes given insurers unfettered access to write policies on their portfolios. Banks have put little effort into justifying their force-placed practices because they were rarely asked about them.

"[T]he cost may be considerably more expensive than insurance you can obtain," says a September letter from SunTrust Banks Inc.'s mortgage unit to a borrower, which cites the baffling — but often repeated — line that high prices are necessary because the policy is underwritten "without inspection." (As a general matter, insurers do not routinely inspect residential properties in the course of underwriting, according to Thompson of the National Consumer Law Center, though a representative of one large insurer told American Banker that it always reserves the right to.) SunTrust declined to comment for this story.

Such practices have been in place for years, yet force-placed insurance has received very little attention outside of the servicing industry. Given the current volume of foreclosure activity and the unprecedented attention that ground-level servicing operations are now receiving, however, that could change.

The Dodd-Frank Act stipulates that charges for force-placed insurance must be "bona fide and reasonable," and correspondence with the National Association of Insurance Commissioners suggest that state regulators are aware of the potential for conflicts of interest in insurer selection. Asked whether pricing in the field is competitive, a representative of the NAIC responded that servicers have "no incentive to select a competitively priced product, but instead would be more

concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction."

In response to a query by American Banker on possible interest in the force-placed insurance market, the Office of the U.S. Trustee, which oversees bankruptcy trustees and the administration of cases, referred without comment to an Indiana bankruptcy case in which it has asked Wells Fargo to produce documents "that support the belief that Debtors had failed to maintain insurance" and "premium notices; invoices; canceled checks; policies of insurance; insurance binders; and, requests for quotes or bids for insurance."

Wells is obligated to respond later this month.

Neither the U.S. Trustee's query of Wells nor the views of other regulators have filtered down to ground-level servicing practices, said consumer advocates like Thompson.

Golant, who hopes to begin deposing insurance industry officials in his force-placed cases within a few months, said he didn't believe the industry would willingly accept change.

"The banks' profits aren't connected to the performance of the loan," he said. "The people making policy, thinking the servicers are part of the solution to the foreclosure problem, need to understand that."



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# Exhibit 6

April 9, 2012

US Bank
4801 Frederica St.
Owensboro, KY. 42301

I obtained a mortgage loan in 2007 from US Bank, #Redacted , at that time I was not required to have flood insurance. However in the summer of 2010 I received 2 letters from U S Bank dated June 9 and August 18, 2010 telling me that U S Bank intended to force place flood insurance on my home back dated to July 2009. U S Bank did force place flood insurance on my home. I am including a copy of this declaration page for this policy. I think it is unfair and outrageous to back date a flood insurance policy. I also think it violates my deed of trust. Please issue me a refund for this policy.

Sincerely,

Stephen Ellsworth