1

2

3

4

5

6

7

8                          UNITED STATES  DISTRICT COURT

9                           Northern District of California

10                              San Francisco Division

11   STEPHEN ELLSWORTH, MARILYN              No. C 12-02506 LB
     WEAVER, and LAWRENCE and DONENE
12   SKELLEY, individually and as representatives
     of the classes and on behalf of the general    **ORDER DENYING DEFENDANTS'**
13   public,                                         **MOTIONS TO DISMISS**

14                          Plaintiffs,              [ECF Nos. 174, 175]

15          v.

16   U.S. BANK, N.A., and AMERICAN
     SECURITY INSURANCE COMPANY,

17                          Defendants.
     _____/
18

19                               **INTRODUCTION**

20       In this putative class action, Plaintiffs challenge their lender U.S. Bank's business practices

21   associated with force-placing flood insurance on their real property that was underwritten by

22   Defendant American Security Insurance Company ("ASIC").  They also allege that U.S. Bank

23   received kickbacks or other compensation from ASIC.  Second Amended Class Action Complaint

24   ("SAC"), ECF No. 169, ¶ 2.[1]  Plaintiffs states six claims in the SAC:  (1) breach of contract against

25   U.S. Bank; (2) breach of the covenant of good faith and fair dealing against U.S. Bank; (3)-(4)

26

27   _____

28       [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the document.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   unjust enrichment against U.S. Bank and ASIC; and (5)-(6) violations of California Business &

2   Professions Code section 17200 *et seq.* against U.S. Bank and ASIC.  *See id.*, ¶¶ 86-130.

3       ASIC and U.S. Bank move to dismiss the SAC, arguing that certain claims are (1) moot, (2)

4   barred by the filed rate doctrine, (3) barred by the express terms of the governing contracts, and (4)

5   fail to state a claim.  *See* ASIC Motion to Dismiss, ECF No. 175; U.S. Bank Motion to Dismiss,

6   ECF No. 174.  Ellsworth opposed the motions on February 14, 2014.  *See* Opposition, ECF No. 180.

7   ASIC and U.S. Bank filed replies on February 27, 2014.  *See* ASIC Reply, ECF No. 181; U.S. Bank

8   Reply, ECF No. 182.  The court denies the motions to dismiss.

9   **STATEMENT**

10       Plaintiffs and the putative class members have mortgages secured by residential property and

11   were charged for lender-placed (also called "force-placed") flood insurance by U.S. Bank.  SAC ¶ 1.

12   Lenders generally have the right to force-place flood insurance where the property securing the loan

13   falls in a Special Flood Hazard Area ("SFHA") and is not insured by the borrower.  *Id.* ¶ 2.

14   Plaintiffs allege that U.S. Bank abused that right by (1) purchasing backdated policies, (2) charging

15   borrowers for expired or partially expired coverage, and (3) arranging for kickbacks, commissions,

16   qualified expense reimbursements, or other compensation for itself and/or its affiliates in connection

17   with force-placed flood insurance coverage.  *See id.* ¶ 2.  Plaintiffs further allege that ASIC actively

18   participated in this scheme by issuing backdated lender-placed flood insurance for U.S. Bank and by

19   offering kickbacks, commissions, qualified expense reimbursements, or other compensation to U.S.

20   Bank in return for the business.  *Id.* ¶ 3.  Plaintiffs allege that U.S. Bank and ASIC did this in bad

21   faith and knowing that their actions were not authorized by the borrowers' mortgage contracts or the

22   National Flood Insurance Act and were inconsistent with applicable law.  *Id.* ¶ 4.

23   **I. THE PARTIES**

24       **A. Defendants**

25       Defendant U.S. Bank is a national banking association headquartered in Cincinnati, Ohio that

26   does business in California and throughout the United States.  *Id.* ¶ 11.  U.S. Bank Home Mortgage

27   is one of U.S. Bank's divisions.  *Id.*  Defendant ASIC is a Delaware corporation with its principal

28   place of business in Atlanta, Georgia, is a subsidiary of Assurant, Inc., and does business in

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

California and throughout the United States.  *Id.* ¶ 12.

**B.  Plaintiff Stephen Ellsworth**

On or about July 2, 2007, Plaintiff Stephen Ellsworth obtained a $393,892 mortgage loan from U.S. Bank that was secured by the deed of trust on his Napa County, California home.[2]  *See* SAC, ECF No. 169, ¶¶ 8, 18, Ex. 1 at 3-4.  Ellsworth's mortgage is a standard Fannie Mae/Freddie Mac Uniform Instrument.  *Id.* ¶ 18.  U.S. Bank is the lender-in-interest, and it services Ellsworth's loan through its U.S. Bank Home Mortgage division.  *Id.* ¶ 19.  Ellsworth's mortgage includes a provision that allows U.S. Bank, in its discretion, to require that Ellsworth maintain flood insurance on the property.  *Id.* ¶ 20, Ex. 1 at 7.  The provision states:

> **5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires Insurance.  This Insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar charges occur which reasonably might affect such determination or certification.

SAC Ex. 1, ECF No. 169-1 at 7.  The same provision permits U.S. Bank to force-place flood insurance at Ellsworth's expense if he fails to maintain the required amount of coverage.  SAC ¶ 20, Ex. 1 at 7.

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

---

[2]  Except where a distinction is necessary, the court refers collectively to promissory notes, deeds of trust, and similar documents as a plaintiffs' "mortgage."

*Id.* Ellsworth alleges that U.S. Bank's discretion to force-place insurance is constrained by the mortgage's paragraph 9, which provides:

> **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

*Id.* Ex. 1 at 8; *see* SAC ¶ 20. Ellsworth's mortgage also contains a provision titled "Loan Charges," which provides that U.S. Bank "may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting [U.S. Bank's] interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees." *Id.* at 11.

When Ellsworth entered into the mortgage agreement, U.S. Bank did not require him to carry flood insurance.[3] *Id.* at 5 n.2. On or about June 9, 2010, U.S. Bank sent Ellsworth a "Notice of Temporary Flood Insurance Placed by Lender Due to Cancellation, Expiration, or Missing Policy Information," stating that "[o]ur records indicate your property is located in a Special Flood Hazard Area (SFHA) as determined by the Federal Emergency Management Agency (FEMA)" and that the Mortgage and the Flood Disaster Protection Act of 1973 required Ellsworth to purchase flood insurance. *Id.* ¶ 21, Ex. 2, ECF No. 169-2 at 2. The notice explained that U.S. Bank had purchased a 45-day flood insurance binder for Ellsworth's property from ASIC. *Id.* ¶ 22. The binder was effective as of July 3, 2009, and would expire 45 days after the June 9, 2010 notice. *Id.* ¶ 22, Ex. 2 at 2-3. If Ellsworth failed to provide adequate proof of flood insurance within 45 days, "this temporary coverage will convert to a full year policy and the annual premium [$2,250] will be added to your escrow account." *Id.* ¶ 23, Ex. 2 at 3. The notice also informed Ellsworth that "[i]n many instances, the insurance we purchase for you may be more expensive than you are able to obtain on your own" and provided the telephone number of another insurance agency that (according to the

---

[3] At some point after U.S. Bank claimed that Ellsworth was required to obtain flood insurance, he obtained a letter of map amendment from FEMA establishing that his home is not in an SFHA. *Id.* at 5 n.2.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   First Notice) could also provide Ellsworth with adequate flood insurance. *Id.* ¶ 23, Ex. 2 at 2-3.

2   On August 18, 2010, U.S. Bank sent Ellsworth a "Notice of Flood Insurance Placed by Lender

3   Due to Cancellation, Expiration, or Missing Policy Information" informing him that it had not

4   received evidence that he had purchased flood coverage. *Id.* ¶ 24, Ex. 3, ECF No. 169-3 at 2. In the

5   August 18 notice, U.S. Bank stated that it had purchased a "full year flood insurance policy" from

6   ASIC, and the charge for the policy was $2,250. *Id.* ¶ 24, Ex. 4. The force-placed flood insurance

7   policy was backdated so that it was effective from July 3, 2009 to July 3, 2010 (although it was not

8   issued until August 18, 2010). *Id.* ¶¶ 24-25, Ex. 4., ECF No. 169-4 at 2. There was no damage to

9   the property or claims arising out of the property during that period. *Id.* ¶ 25. In other words, the

10  coverage was expired on the date it was purchased and was worthless. *Id.*

11  U.S. Bank and/or its affiliates received kickbacks from ASIC on lender-placed insurance (in the

12  form of "expense reimbursements" and subsidized insurance tracking services), which is consistent

13  with ASIC's standard business practices. *Id.* ¶ 26. U.S. Bank did not subtract these kickbacks from

14  the amount it charged Ellsworth. *Id.* ¶¶ 26-27.

15  In August 2010, Ellsworth purchased a one-year flood insurance policy through State Farm

16  effective September 1, 2010. *See id.* ¶ 28, Ex. 5, ECF No. 169-5. This policy (like the ASIC policy)

17  provided $250,000 in flood insurance coverage, but it was not backdated and cost only $276. *Id.*

18  On April 9, 2012, Ellsworth sent a letter to U.S. Bank stating that the force-placed flood

19  insurance policies violated the deed of trust and requesting a refund of the premiums he paid. *See*

20  *id.* ¶ 29; *id.* Ex. 6, ECF No. 169-6 at 2. Ellsworth did not receive a response from U.S. Bank. *Id.* ¶

21  29. Ellsworth was reimbursed for these charges only after the initiation of this lawsuit, but he has

22  not been reimbursed for his costs and expenses associated with bringing this lawsuit. *Id.* ¶ 27.

23  **C. Plaintiff Marilyn Weaver**

24  Plaintiff Marilyn Weaver is a California resident. *Id.* ¶ 9. On or about August 28, 2011, Weaver

25  obtained a $435,000 mortgage loan from First Nations Home Finance secured by a deed of trust on

26  her San Diego, California home. *Id.* ¶ 30, Ex. 7, ECF No. 169-7 at 2. Weaver's mortgage also is a

27  standard Fannie Mae/Freddie Mac Uniform Instrument. *Id.* ¶ 30. Ellsworth's and Weaver's

28  mortgages contain identical provisions regarding flood insurance and U.S. Bank's discretion to force

place it.  *Compare id.* Ex. 7, ECF No. 169-7 at 4-11 (Weaver's mortgage), *with id.* Ex. 1, ECF No. 169-1 at 4-13 (Ellsworth's mortgage).

Weaver initially was not required to carry flood insurance on her property.  *Id.* at 7 n.3.  On or about November 2, 2011, Weaver received a letter from Freddie Mac stating that her mortgage had been sold to Freddie Mac and that the servicer of the mortgage would now be U.S. Bank.  *Id.* ¶ 32, Ex. 8, ECF No. 169-8 at 2.  On or about June 11, 2012, U.S. Bank sent Weaver a notice informing her that "[w]e have been notified of a Physical Map Revision issued by the Federal Emergency Management Agency which places your structure(s) in Special Flood Hazard Area 'Zone A,'" Weaver had "45 days to purchase flood insurance, and if [she did] not provide adequate proof of flood insurance within 45 days of this letter, as a federally regulated lender, U.S. Bank, NA is required to lender place coverage."  *Id.* ¶ 33, Ex. 9, ECF No. 169-9 at 3.

On July 3, 2012, Weaver sold the property, and she finalized the sale papers on July 16, 2012.  *Id.* ¶ 34.  On July 18, 2012, Weaver notified U.S. Bank by letter and fax that she would not need flood insurance because the property had been sold and escrow would close on August 31, 2012.  *Id.* ¶ 34, Ex.10, ECF No. 169-10 at 2-3.

On or about August 13, 2012, Weaver received a response from U.S. Bank, stating that ASIC had issued lender-placed flood insurance for her property with an effective date of July 27, 2012.  *Id.* ¶ 35, Ex. 11, ECF No. 169-11 at 2.  Then on or about August 21, 2012, Weaver received a "Notice of Flood Insurance Placed by Lender" that attached the declarations page for the flood insurance coverage on her property.  *Id.* ¶ 36, Ex. 12, ECF No. 169-12 at 2-3.  This force-placed flood insurance had an effective date of July 27, 2012, provided coverage of $250,000, and had an annual premium of $2,250.  *Id.* ¶ 36, *E*x. 12 at 2-3.

Weaver signed the final papers for the sale of her house on August 29, 2012.  *Id.* ¶ 37.  She was forced to pay $2,250 in "Escrow Overdraft" for the U.S. Bank-placed flood insurance.  *Id.*; *see id.* Ex. 13, ECF No. 169-13 at 2-3.  Thereafter, Weaver made several attempts to contact U.S. Bank to ask about canceling the force-placed flood insurance.  *Id.* ¶ 38, Ex. 14, ECF No. 169-14 at 2.

On or about September 11, 2012, U.S. Bank sent Weaver a letter stating that the insurance coverage on her property had been partially cancelled effective August 30, 2012.  *Id.* ¶ 38, Ex. 15,

1    ECF No. 169-15 at 2.  On or about September 22, 2012, Weaver received a check in the amount of

2    $2,041 for a partial refund of the $2,250 that she initially paid for the force-placed flood insurance

3    coverage.  *Id*. ¶ 39, Ex. 16, ECF No. 169-16 at 2.  Weaver has yet to be fully reimbursed.  *Id*.

4    **D.  Plaintiffs Lawrence and Donene Skelley**

5    On or about February 21, 2002, Plaintiffs Lawrence and Donene Skelley obtained a $100,000

6    mortgage loan from Firstbank that was secured by a deed of trust on their Causey, New Mexico

7    home.  *Id*. ¶ 40, Ex. 17, ECF No. 169-17 at 2.  Their mortgage also is a standard Fannie Mae/Freddie

8    Mac Uniform Instrument and contains the same provisions as the Weaver and Ellsworth mortgages.

9    *Id*.; *compare id*. Ex. 17, ECF No. 169-17 at 4-12, *and id*. Ex. 7, ECF No. 169-7 at 4-11, *with id*. Ex.

10   1, ECF No. 169-1 at 4-13.

11   When they closed on their mortgage loan, the Skelleys' home was not located in an SFHA, and

12   they were not required to carry flood insurance on their property at that time.  *Id*. ¶ 41.  On or about

13   September 7, 2011, the Skelleys received an "Assignment of Mortgage" document that stated that

14   their mortgage had been assigned to U.S. Bank effective February 3, 2011.  *Id*. ¶ 42, Ex. 18, ECF

15   No. 169-18 at 2-3.  At the time of assignment, the Skelleys were not informed of a flood insurance

16   requirement on their property.  *Id*. ¶ 42.

17   On December 12, 2011, U.S. Bank sent the Skelleys a form letter claiming that their property

18   was located in an SFHA and that they were required to purchase flood insurance on the property.  *Id*.

19   ¶ 43, Ex. 19, ECF No. 169-19 at 2.  The letter further stated that U.S. Bank had placed temporary

20   flood insurance on their property with a backdated effective date of June 1, 2011.  *Id*. ¶ 43.  An

21   "Insurance Binder" document was attached to the Skelley Notice that showed that this force-placed

22   flood insurance coverage was issued through ASIC, with an effective date of June 1, 2011, a

23   coverage amount of $86,461, and an $778 annual premium.  *Id*. ¶ 43, Ex. 19, ECF No. 169-19 at 3.

24   On or about February 20, 2012, the Skelleys received a "Notice of Flood Insurance Placed by

25   Lender" that had the declarations page for the force-placed flood insurance coverage attached.

26   *Id*. ¶ 44.  This force-placed coverage had a backdated effective date of June 1, 2011, provided

27   effective coverage of $86,461, and had an annual premium of $778.  *See id*. ¶ 44, Ex. 20, ECF No.

28   169-20 at 3.

*UNITED STATES DISTRICT COURT*
*For the Northern District of California*

UNITED STATES DISTRICT COURT
For the Northern District of California

On or about February 21, 2012, the Skelleys' insurance agent, Lori Bohm, sent a letter to U.S. Bank stating that the Skelleys' home was located in Flood Zone D and thus "flood insurance is NOT available nor should it be required." *Id*. ¶ 45, Ex. 21, ECF No. 169-21 at 2.  Attached to Ms. Bohm's letter was a flood zone determination that was completed on February 21, 2012 and stated that the Skelleys' home was not located in a SFHA. *Id*. ¶ 45, Ex. 21 at 3.  The National Flood Insurance Program Map Panel effective date reflected on the form was October 6, 2010. *Id*. ¶ 45.

On or about March 5, 2012, U.S. Bank sent the Skelleys a letter that stated "A recent review of your account revealed that the property structure secured by the above referenced loan is no longer located in a Special Flood Hazard Area (SFHA)." *Id*. ¶ 46, Ex. 22, ECF No. 169-22 at 2.  The letter also stated that "[a]s a result [of the recent account review], U.S. Bank Home Mortgage no longer requires that you maintain flood insurance. *Id*. ¶ 46, Ex. 22 at 2.  The Skelleys received another letter from U.S. Bank the same day that stated that its records showed "a lapse of insurance coverage from 06/01/11 to 03/0512." *Id*., Ex. 23, ECF No. 169-23 at 2.

The Skelleys received another letter from U.S. Bank on or about March 12, 2012 that stated the force-placed flood insurance coverage on their property would be cancelled and that they would receive a partial refund of $187. *Id*. ¶ 47, Ex. 24, ECF No. 169-24 at 2.  Nonetheless, because "coverage was provided between the effective date of the coverage [U.S. Bank] obtained and the termination date," $591 would be charged to their escrow account. *Id*. ¶ 47., Ex. 24 at 2.

Ms. Skelley faxed a letter to U.S. Bank on or about July 5, 2012, reiterating that her home never was located in a flood zone. *Id*. ¶ 48, Ex. 25, ECF No. 169-25 at 2.  Along with this letter, Ms. Skelley faxed a July 5, 2012 flood zone determination that showed that the Skelleys' home was not located in a SFHA. *Id*. ¶ 48, Ex. 25, ECF No. 169-25 at 3.  Like the February 21, 2012 determination, the July 5, 2012 flood zone determination showed a National Flood Insurance Program Map Panel effective date of October 6, 2010. *Id*. ¶ 48, Ex. 25.

On or about July 16, 2012, the Skelleys received another letter from U.S. Bank repeating its earlier claim that their home was no longer in a flood zone as of March 5, 2012 and stating that "U.S. Bank still required you to have flood insurance for this period of time from 06/01-2011 - 03/05-2012." *Id*. ¶ 49, Ex. 26, ECF No. 169-26 at 2.  The $591 charge that U.S. Bank imposed for

1  force-placed flood insurance coverage from June 1, 2011 to March 5, 2012 was added to the

2  Skelleys' escrow account and built into their monthly mortgage payment.  *Id. ¶ 50.*  To remain

3  current on their mortgage, the Skelleys have been making increased payments against their will.  *Id.*

## II.  THE CHALLENGED CONDUCT

5      Force-placing insurance is a lucrative business for U.S. Bank and other mortgage lenders and

6  servicers (referred to generically as lenders).  *Id. ¶ 51.*  Commonly, the lender selects the insurance

7  provider in accordance with an agreement whereby the insurance provider pays a percentage of the

8  premium back to the lender as an inducement to do business with the insurance provider.  Under

9  such arrangements, the force-placed insurance provider pays a commission (also referred to as a

10  "qualified expense reimbursement") to the lender or a subsidiary that poses as an agent.  Often, the

11  insurance provider also gives discounted or subsidized insurance tracking services to the lender.  *Id.*

12      U.S. Bank has tried to keep its own compensation arrangement with ASIC secret, but discovery

13  in this action has shown that ASIC paid so-called qualified expense reimbursements (which were not

14  legitimate reimbursements for actual costs and were tantamount to commissions) to a U.S. Bank

15  affiliate in connection with force-placed insurance.  *Id. ¶ 52.*  ASIC also provided discounted

16  insurance tracking services to U.S. Bank.  *Id.*

17      These compensation arrangements (including arrangements involving ASIC and its parent

18  company) are the subject of court opinions, *id. ¶ 53* (citing cases), publicly-filed deposition

19  testimony, *id. ¶ 54* (quoting a Chase representative who refers to these arrangements as "standard

20  industry-wide practice"), an article in *American Banker* magazine, *id. ¶ 55 & Ex. 28,* and public

21  regulatory filings, *id. ¶ 56.*  For example, ASIC reported to the California Department of Insurance

22  that it paid more than $1.8 million dollars in commissions and brokerage expenses in connection

23  with its flood insurance program in 2010.  *Id. ¶ 56.*  According to an article in *American Banker*, the

24  force-placed insurance business (for flood, hazard, and wind policies) "brings servicers hundreds of

25  millions of dollars each year."  *Id. ¶ 57, Ex. 30.*  In return for this compensation, ASIC and its parent

26  company, Assurant, make billions of dollars in premiums.  *Id. ¶ 58.*  In 2010 alone, Assurant

27  collected approximately $2.7 billion in premiums through its specialty insurance division, which is

28  primarily is devoted to force-placed insurance.  *Id. ¶ 58, Ex. 30.*

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

**A.  Criticism of "Kickback Arrangements" in Force-Placed Insurance**

Plaintiffs argue that the "kickback arrangements" between ASIC and its clients (including U.S. Bank) are unjust.  *Id.* ¶ 59.  Numerous courts have condemned self-dealing in connection with force-placed insurance.  *Id.* ¶ 60 (collecting cases).  Plaintiffs claim that the NFIA allows lenders and servicers only to "charge the borrower for the cost of premiums and fees *incurred* by the lender or servicer for the loan in purchasing the insurance."  *Id.* ¶ 61 (quoting 42 U.S.C. § 4012(e)(2)).

On March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance.  In the RFP, Fannie Mae stated that it had conducted an extensive internal review of the lender-placed insurance process and found that it could be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners.  *Id.* ¶ 63, Ex. 33.  Fannie Mae made the following observations:

- Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them.  The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

- The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . .  Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down.

- [M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner.

*Id.* ¶ 63 (quoting Ex. 33).  Accordingly, Fannie Mae stated that it sought to "[r]estructure the business model" in part to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability."  *Id.*

On March 14, 2012, Fannie Mae issued a Servicing Guide Announcement pertaining to lender-paced insurance.  *Id.* ¶ 62, Ex. 31.  In it, Fannie Mae clarified its requirements relating to reasonable reimbursable expenses for lender-placed insurance, and stated that "reimbursement of lender-placed insurance premiums must **exclude** any lender-placed insurance commission earned on that policy by the servicer or any related entity[.]"  *Id.* ¶ 62 (quoting Ex. 31 at 4) (emphasis in

UNITED STATES DISTRICT COURT
For the Northern District of California

1   original quotation).  The U.S. Department of Housing and Urban Development promulgated similar

2   guidance in its Lender Manual.  *Id.* ¶ 62 n.7, Ex. 32.

3       Also on March 14, 2012, the California Department of Insurance announced that it had contacted

4   the ten largest lender-placed insurers in California (including ASIC), and asked them to reduce their

5   rates.  *Id.* ¶ 64; *see* Exs. 34-35.  The California Insurance Commissioner expressed concern about

6   "questionable financial integration between mortgage lenders and insurers providing 'forced-placed'

7   mortgage insurance."  *Id.* ¶ 64; *see* Ex. 34.  The Commissioner also noted a "lack of arm's length

8   transactions between lenders and insurers and, in some cases, a financial relationship between the

9   lender and the insurer" that results in higher premiums and prejudices homeowners.  *Id.*

10      In May 2012, the New York Department of Financial Services ("NYDFS") held a three-day

11  hearing regarding the force-placed insurance practices of mortgage lenders, servicers, and insurance

12  companies.  *Id.* ¶ 65 (citing http://www.dfs.ny.gov/insurance/hearing/fp_052012_schedule.htm).  On

13  the opening day of the hearings, NYDFS Superintendent Benjamin Lawsky issued a statement,

14  announcing that "our initial inquiry into the operation of the force placed insurance market has

15  raised a number of serious concerns and red flags," including:

16      a web of tight relationships between the banks, their subsidiaries and insurers that have the
        potential to undermine normal market incentives and may contribute to other problematic
17      practices.  In some cases this takes the form of large commissions being paid by insurers to
        the banks for what appears to be very little work.

18

19  *Id.* ¶ 65 (quoting Ex. 36 at 2).  According to Superintendent Lawsky, "[t]his perverse incentive, if it

20  exists, would appear to harm both homeowners and investors while enriching the banks and the

21  insurance companies."  *Id.* ¶ 65 (quoting Ex. 36 at 3).  After these hearings, the NYDFS entered into

22  a Consent Order with ASIC.  *Id.* ¶ 65; *see* Ex. 37.  The Consent Order (1) forbids ASIC from paying

23  "commissions to a servicer or a person or entity affiliated with a servicer on force-placed insurance

24  policies obtained by the servicer;" (2) characterizes qualified expense payments as "substitutes for

25  commissions;" and (3) provides that ASIC "shall not provide free or below-cost outsourced services

26  to servicers, lenders, or their affiliates."  *Id.* ¶ 65 (quoting Ex. 37).

27      The National Association of Insurance Commissioners ("NAIC") recently expressed its

28  "regulatory concern," as follows:

C 12-02506 LB (ORDER)                                    11

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obligated to pay the cost of coverage.  Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower.  Normally competitive forces tend to drive down costs for consumers.  However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

5

*Id.* ¶ 66 (quoting Ex. 38).

6

**B. Criticism of Backdating Insurance Policies**

7

Plaintiffs also cite authorities critical of backdating insurance.  *See id.* ¶¶ 67-69.  For example,

8

according to the NAIC, insurance is "prospective in nature" and policies "should not be backdated to

9

collect premiums for a time period that has already passed."  *Id.* ¶ 67 (quoting Ex. 28).  Similarly,

10

the Ohio Department of Insurance has specifically warned that "there's no such thing as retroactive

11

flood insurance."  *Id.* ¶ 67 (quoting Ex. 39).

12

In the context of the National Flood Insurance Act of 1968, the Office of the Office of the

13

Comptroller of the Currency ("OCC") has stated:

14

15

16

> The ability to impose the costs of force placed flood insurance on a borrower commences 45 days after notification to the borrower of a lack of insurance or of inadequate insurance coverage. Therefore, lenders may not charge borrowers for coverage during the 45-day notice period.

17

*Id.* ¶ 68 (quoting Flood Insurance Questions & Answers, 74 Fed. Reg. at 35,934).  The OCC later

18

proposed alternative language that would allow lenders to charge borrowers for flood insurance

19

coverage during the 45-day notice period, if the borrower has given the lender "express authority" to

20

do so.  *Id.* ¶ 68 n.9 (quoting Loans in Areas Having Special Flood Hazards; Interagency Questions &

21

Answers Regarding Flood Insurance, 76 Fed. Reg. 64,175, 64,180-81 (Oct. 17, 2011)).  Finally

22

courts have upheld claims that backdating force-placed insurance policies is unfair and/or unlawful."

23

*Id.* ¶ 69 (collecting cases).

24

**III.    PROPOSED CLASS DEFINITIONS**

25

The SAC defines several classes and sub-classes.  *See* SAC ¶¶ 70-79.

26

**A. The Multi-State Lender-Placed Flood Insurance Classes**

27

Plaintiffs assert their breach of contract claims against U.S. Bank (claim 1) on behalf of the

28

proposed "Multi-State Lender-Placed Class," which is divided into two sub-classes:

1  **Proposed Multi-State Lender-Placed Class**: All persons with a closed-end residential
mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged
2  by U.S. Bank, N.A. for force-placed flood insurance on property in California, Alabama,
Alaska, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana,
3  Massachusetts, Missouri, New Jersey, New York, North Dakota, Oregon, Texas, Utah, West
Virginia, New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi,
4  Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South Carolina,
Tennessee, Virginia, Washington, Wisconsin, or Wyoming within the applicable statute of
5  limitations, where such flood insurance was procured with the assistance of American Security
Insurance Company or its affiliates, excluding persons whose force-placed flood insurance
6  charges were completely refunded or extinguished through a bankruptcy, foreclosure judgment,
loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

7
**(a) Proposed Ellsworth/Weaver Lender-Placed Sub-Class**: All persons within the Multi-
8  State Lender-Placed Class whose property is located in California, Alabama, Alaska, Colorado,
Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New
9  Jersey, New York, North Dakota, Oregon, Texas, Utah, and West Virginia.

10  **(b) Proposed Skelley Lender-Placed Sub-Class**: All persons within the Multi-State Lender-
Placed Class whose property is located in New Mexico, Arizona, Arkansas, Delaware, Georgia,
11  Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode
Island, South Carolina, Tennessee, Virginia, Washington, Wisconsin, and Wyoming.

12

13  *Id.* ¶ 71.

14  **B.  The Multi-State Qualified Expense Reimbursement Classes**

15      To the extent that Plaintiffs' breach of contract claims are based on allegations of improper

16  qualified expense reimbursements, Plaintiffs assert these claims on behalf of a proposed "Multi-

17  State QER Class," which is divided into two sub-classes:

18  **Proposed Multi-State QER Class:** All persons with a closed-end residential mortgage loan
secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank,
19  N.A. for force-placed flood insurance on property in California, Alabama, Alaska, Colorado,
Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New
20  Jersey, New York, North Dakota, Oregon, Texas, Utah, West Virginia, New Mexico, Arizona,
Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada,
21  Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Washington,
Wisconsin, or Wyoming within the applicable statute of limitations and **prior to December 1,**
22  **2011**, where such flood insurance was procured with the assistance of American Security
Insurance Company or its affiliates, excluding persons whose force-placed flood insurance
23  charges were completely refunded or extinguished through a bankruptcy, foreclosure judgment,
loan modification, forbearance, short-sale, or deed-in-lieu of foreclosure.

24
**(a) Proposed Ellsworth/Weaver QER Sub-Class:** All persons within the Multi-State QER
25  Class whose property is located in California, Alabama, Alaska, Colorado, Connecticut, Florida,
Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York,
26  North Dakota, Oregon, Texas, Utah, and West Virginia.

27  **(b) Proposed Skelley QER Sub-Class**: All persons within the Multi-State QER whose property
is located in New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota,
28  Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South

1    Carolina, Tennessee, Virginia, Washington, Wisconsin, and Wyoming.

2    *Id.* ¶ 72.

3    **C.  The Multi-State Backdated Flood Insurance Classes**

4    To the extent that Plaintiffs' breach of contract claims are based on allegations of improper

5    backdating, Plaintiffs assert these claims on behalf of a proposed "Multi-State Backdated Class,"

6    which is divided into two sub-classes:

7    **Proposed Multi-State Backdated Class:** All persons with a closed-end residential mortgage
     loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S.
8    Bank, N.A. for force-placed flood insurance on property in the United States before January 1,
     2013 and within the applicable statute of limitations, where such insurance was backdated by
9    more than 60 days, excluding persons whose force-placed flood insurance charges were
     completely refunded or extinguished through a bankruptcy, foreclosure judgment, loan
10   modification, forbearance, short sale, or deed-in-lieu of foreclosure.

11   **(a) Proposed Ellsworth Backdated Sub-Class:** All persons within the Multi-State Backdated
     Class whose property is located in California, Alabama, Alaska, Colorado, Connecticut, Florida,
12   Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York,
     North Dakota, Oregon, Texas, Utah, and West Virginia.

13
     **(b) Proposed Skelley Backdated Sub-Class:** All persons within the Multi-State Backdated
14   Class whose property is located in New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine,
     Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island,
15   South Carolina, Tennessee, Virginia, Washington, Wisconsin, and Wyoming.

16   *Id.* ¶ 73.

17   **D.  The California Classes**

18   Ellsworth and Weaver assert their claims for breach of covenant of good faith and fair dealing

19   (claim 2), unjust enrichment (claims 3-4), and violations of California's Unfair Competition Law

20   (claims 5-6) on behalf of three California classes.  *See id.* ¶¶ 74-76.

21   First, they seek to represent a proposed "California Lender-Placed Class:"

22   **Proposed California Lender-Placed Class:** All persons with a closed-end residential mortgage
     loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S.
23   Bank, N.A. for force-placed flood insurance on property in the State of California on or after
     May 16, 2008, where such flood insurance was procured with the assistance of American
24   Security Insurance Company or its affiliates, excluding persons whose force-placed flood
     insurance charges were completely refunded or extinguished through a bankruptcy, foreclosure
25   judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

26   *Id.* ¶ 74.

27   Second, to the extent their claims 2-6 are based on improper qualified expense reimbursements,

28   Ellsworth and Weaver seek to represent a proposed "California QER Class:"

**Proposed California QER Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of California on or after May 16, 2008 and **prior to December 1, 2011**, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

*Id.* ¶ 75.

Third, to the extent Ellsworth's claims 2-6 are based on allegations of improper backdating, Ellsworth asserts these claims on behalf of a proposed "California Backdated Class:"

**Proposed California Backdated Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of California on or after May 16, 2008 and before January 1, 2013, where such flood insurance was backdated by more than 60 days, excluding persons whose force-placed flood insurance charges were completely refunded or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

*Id.* ¶ 76.

**E. The New Mexico Classes**

Plaintiffs Lawrence and Donene Skelley assert their claims for breach of covenant of good faith and fair dealing (claim 2) and unjust enrichment (claims 3-4) on behalf of three New Mexico classes.          First, the Skelleys assert claims 2-4 on behalf of a proposed "New Mexico Lender-Placed Class:"

**Proposed New Mexico Lender-Placed Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May 16, 2008, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

*Id.* ¶ 77.

Second, to the extent the Skelleys' claims 2-4 are based on allegations of improper qualified expense reimbursements, they seek to represent a proposed "New Mexico QER Class:"

**Proposed New Mexico QER Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May

1   16, 2008 and **prior to December 1, 2011**, where such flood insurance was procured with the
2   assistance of American Security Insurance Company or its affiliates, excluding persons whose
    force-placed flood insurance charges were completely refunded or extinguished through a
3   bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of
    foreclosure.

4   *Id.* ¶ 78.

5       Third, to the extent the Skelleys' claims 2-4 are based on allegations of improper backdating,

6   they seek to represent a proposed "New Mexico Backdated Class:"

7       **Proposed New Mexico Backdated Class:** All persons with a closed-end residential mortgage
        loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S.
8       Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after
        May 16, 2008 and before January 1, 2013, where such insurance was backdated by more than
9       60 days, excluding persons whose force-placed flood insurance charges were completely
        refunded or extinguished through a bankruptcy, foreclosure judgment, loan modification,
10      forbearance, short sale, or deed-in-lieu of foreclosure.

11  *Id.* ¶ 79.

12  **IV. PROCEDURAL HISTORY**

13      Ellsworth filed his original complaint on May 16, 2012 against U.S. Bank and filed a First

14  Amended Complaint ("FAC") against U.S. Bank and ASIC on July 23, 2012.  Complaint, ECF No.

15  1; FAC, ECF No. 26.  On August 6, 2012, U.S. Bank moved to compel arbitration based on the

16  arbitration provisions in Ellsworth's U.S. Bank checking account.  *See* ECF No. 32.  While that

17  motion was pending, ASIC moved to dismiss the FAC.  *See* ECF No. 52.  On September 19, 2012,

18  the court denied U.S. Bank's motion to compel arbitration.  ECF No. 64.  U.S. Bank then moved to

19  dismiss the FAC.  ECF No. 68.  The court denied ASIC's and U.S. Bank's motions to dismiss on

20  December 11, 2012.  *See* ECF No. 80.  Defendants then answered the FAC, and the parties began

21  discovery.  *See* ECF Nos. 83 (U.S. Bank Answer), 84 (ASIC Answer), 91 (Pre-Trial Order).

22      On September 24, 2013, Ellsworth moved for class certification.  *See* ECF No. 135.  In its

23  opposition, U.S. Bank stated that at Ellsworth's October 4, 2013 deposition, it "discovered" that

24  Ellsworth's property was never in a flood zone, it never should have force-placed flood insurance on

25  his property, and it was refunding Ellsworth's money.  *See* U.S. Bank Class Certification Opp'n,

26  ECF No. 132-5.  In his class certification reply brief, Ellsworth characterized U.S. Bank's late

27  discovery as a "last-minute machination" and proposed new class definitions and adding additional

28  class representatives.  *See* Reply Supp. Motion for Class Certification, ECF No. 149-5.  Four days

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  later, on November 18, 2013, Ellsworth filed a motion to amend the complaint and an administrative

2  motion to shorten the hearing schedule so that the motion to amend could be heard at the December

3  5, 2013 hearing on the class certification motion.  *See* ECF Nos. 151-52.

4      "Following Plaintiff's identification of Ms. Skelley as a proposed putative class representative

5  and plaintiff to this action, U.S. Bank commenced an internal review and investigation of her

6  records."  Wolfe Decl. Supp. U.S. Bank Opp'n to Motion to Amend, ECF No. 165-1, ¶ 7.  U.S. Bank

7  explained that it discovered that Ms. Skelley's property was never in a flood zone either.  *Id.* ¶ 9.

8  "Accordingly, consistent with U.S. Bank's policies, on November 29, 2013, U.S. Bank issued to Ms.

9  Skelley a complete refund" of the remaining premiums she had been charged.  *Id.*

10      On December 19, 2013, the court granted Ellsworth's motion to file the SAC, vacated the class

11  certification hearing, and ordered the parties to submit a proposed schedule regarding (1) discovery

12  into new issues regarding the new Plaintiffs and proposed classes, (2) dispositive motions, and (3)

13  supplemental class certification briefing.  ECF No. 168 at 18-20.  The court limited the scope of the

14  issues the parties could address in any motions to dismiss to "new issues (such as the New Mexico

15  law issues identified in ASIC's opposition to the motion to amend) and [said that it] will not

16  reconsider arguments raised in the last round of dispositive motions.  Defendants may not argue new

17  cases and old issues on summary judgment."  *Id.* at 19.  Plaintiffs then filed the SAC with claims

18  against U.S. Bank for breach of contract (claim 1) and breach of the covenant of good faith and fair

19  dealing (claim 2) and claims against both Defendants for unjust enrichment/restitution (claims 3 and

20  4) and violation of California's Unfair Competition Law (claims 5 and 6).  See ECF No. 169.

| Claim | Defendant(s) | Proposed Classes |
|---|---|---|
| Breach of Contract (Claim 1) | U.S. Bank | 1. Multi-State Lender Placed Class<br>   a. Ellsworth/Weaver Lender-Placed Sub-Class<br>   b. Skelley Lender-Placed Sub-Class<br><br>2. Multi-State QER Class<br>   a. Ellsworth/Weaver QER Sub-Class<br>   b. Skelley QER Sub-Class<br><br>3. Multi-State Backdated Class<br>   a. Ellsworth Backdated Sub-Class<br>   b. Skelley Backdated Sub-Class |

| Implied Covenant (Claim 2) | U.S. Bank | 1. California Lender-Placed Class |
|---|---|---|
| Unjust Enrichment / Restitution / Disgorgement (Claim 3) | U.S. Bank | 2. California QER Class<br>3. California Backdated Class<br>4. New Mexico Lender-Placed Class<br>5. New Mexico QER Class |
| Unjust Enrichment / Restitution / Disgorgement (Claim 4) | ASIC | 6. New Mexico Backdated Class |
| California Unfair Competition Law (Claim 5) | U.S. Bank | 1. California Lender-Placed Class<br>2. California QER Class<br>3. California Backdated Class |
| California Unfair Competition Law (Claim 6) | ASIC | |

On January 17, 2014, U.S. Bank and ASIC filed separate motions to dismiss the SAC. *See* ECF Nos. 174-175. The court held a hearing on March 20, 2014. *See* Minute Order, ECF No. 184.

## ANALYSIS

## I. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Dismissal of a claim is appropriate under Federal Rule of Civil Procedure Rule 12(b)(1) when the court lacks subject-matter jurisdiction over the claim. *Morongo Band of Mission Indians v. California Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988). A Rule 12(b)(1) motion may either attack the sufficiency of the complaint to establish federal jurisdiction (a facial challenge) or allege a lack of jurisdiction that exists despite the formal sufficiency of the complaint (a factual challenge). *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial attack asserts lack of federal jurisdiction based on the complaint alone, and the court must accept all allegations of fact in the complaint as true and construe them in the light most favorable to the plaintiffs. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). By contrast, with a factual challenge, a court need not assume the truth of factual allegations but may hear additional evidence about jurisdiction and resolve factual disputes when necessary. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). If a defendant challenges jurisdiction by presenting evidence, then the party opposing the motion must present sufficient evidence to support the court's subject-matter jurisdiction. *See Savage v. Glendale Union High School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

UNITED STATES DISTRICT COURT
For the Northern District of California

### B.  Failure to State a Claim

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quotation and citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id.* at 550.  In addition, courts may consider documents attached to the complaint. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

### C.  The National Flood Insurance Act

Under the National Flood Insurance Act of 1968 ("NFIA") and the Flood Disaster Protection Act of 1973, as amended, the Office of the Comptroller of Currency ("OCC") is charged with promulgating regulations that require lending institutions and servicers to ensure that properties subject to their mortgage loans have adequate flood insurance. *See* 42 U.S.C. §§ 4012a(b)(1), 4003(a)(5).  The OCC regulations that control a lender's powers and obligations related to flood insurance provide that a national bank "shall not make, increase, extend, or renew any designated

loan unless the building . . . securing the loan is covered by flood insurance for the term of the loan."[4]  12 C.F.R. § 22.3(a) (also setting minimum coverage requirements); *see also* 42 U.S.C. § 4012a(b)(1) (substantially similar); 12 C.F.R. § 22.2(b) (regulations applicable only to national banks).  The NFIA permits lenders to force-place flood insurance in areas with special flood hazards:

> If, at the time of origination or at any time during the term of a loan secured by improved real estate or by a mobile home located in an area that has been identified . . . as an area having special flood hazards and in which insurance is available under the [NFIA], the lender or servicer for the loan determines that the building or mobile home and any personal property securing the loan is not covered by flood insurance or is covered by [inadequate flood insurance], the lender or servicer shall notify the borrower under the loan that the borrower should obtain, at the borrower's expense, an amount of flood insurance for the building or mobile home and such personal property that is not less than the amount under subsection (b)(1) of this section, for the term of the loan.

42 U.S.C. § 4012a(e)(1).  "If the borrower fails to purchase such flood insurance within 45 days after notification . . . the lender or servicer for the loan shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance."  42 U.S.C. § 4012a(e)(2).[5]  "If a bank requires the escrow of taxes, insurance premiums, fees, or any other charges . . . the bank shall also require the escrow of all premiums and fees for any flood insurance required under § 22.3."  12 C.F.R. § 22.5.

---

[4]  "Designated loan means a loan secured by a building or mobile home that is located or to be located in a special flood hazard area in which flood insurance is available under the [National Flood Insurance Act of 1968]."  12 C.F.R. § 22.2(e).

[5]  The OCC has promulgated a similar regulation:

> If a bank, or a servicer acting on behalf of the bank determines at any time during the term of a designated loan that the building . . . is not covered by flood insurance or is covered by flood insurance in an amount less than the amount required under § 22.3, then the bank or its servicer shall notify the borrower that the borrower should obtain flood insurance, at the borrower's expense, in an amount at least equal to the amount required under § 22.3, for the remaining term of the loan.  If the borrower fails to obtain flood insurance within 45 days after notification, then the bank or its servicer shall purchase insurance on the borrower's behalf.  The bank or its servicer may charge the borrower for the cost of premiums and fees incurred in purchasing the insurance.

12 C.F.R. § 22.7.

## II. DISCUSSION

The three issues are as follows:  whether the Skelleys' claims are barred for lack of standing or mootness; whether the filed rate doctrine bas the kickback claims; and whether the amended complaint pleads plausible claims.

### A. Standing and Mootness

The first issue is whether the Skelleys' claims are moot or whether they lack standing.

Standing is jurisdictional, cannot be waived, and is properly addressed under Rule 12(b)(1).  *See United States v. Hays,* 515 U.S. 737, 742 (1995); *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1122 (9th Cir. 2010).  The party asserting the claim has the burden of establishing standing.  *See Colwell v. Dept. of Health and Human Servs.,* 558 F.3d 1112, 1121 (9th Cir. 2009).  When ruling on a motion to dismiss for lack of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Graham v. FEMA,* 149 F.3d 997, 1001 (9th Cir. 1998) (*quoting Warth v. Seldin,* 422 U.S. 490, 501 (1975)).

From a constitutional perspective, Article III's case-or-controversy requirement requires the following for each claim: (1) the party invoking federal jurisdiction must have suffered some actual or threatened injury; (2) the injury must be fairly traceable to the challenged conduct; and (3) a favorable decision would likely redress or prevent the injury.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),* 528 U.S. 167, 180–81, 185 (2000); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992); *Valley Forge Christian College,* 454 U.S. at 472; *Sahni,* 83 F.3d at 1057. "In a class action, standing is satisfied if at least one named plaintiff meets the requirements."  *See Bates v. United Parcel Serv.,* 511 F.3d 974, 985 (9th Cir. 2007).

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  "[T]he question is not whether the precise relief sought at the time the application for an injunction was filed is still available.  The question is whether there can be any effective relief."  *West v. Secretary of Dept. of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000).

UNITED STATES DISTRICT COURT
For the Northern District of California

1   "Mere voluntary cessation of allegedly illegal conduct does not moot a case; it if did, the courts

2   would be compelled to leave [t]he defendant . . . free to return to his old ways." *United States v.*

3   *Concentrated Phosphate Export Ass'n*, 393 U.S. 199 (1968) (quoting *United States v. W.T. Grant*

4   *Co.*, 345 U.S. 629, 632 (1953)); *see also, Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222,

5   (2000).  Voluntary cessation of illegal conduct does not render a challenge to that conduct moot

6   unless "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief

7   or events have completely and irrevocably eradicated the effects of the alleged violation."  *Barnes v.*

8   *Healy*, 980 F.2d 572, 580 (9th Cir. 1992); *see also Lindquist v. Idaho State Bd. of Corrections*, 776

9   F.2d 851, 854 (9th Cir. 1985) (quoting *Davis*, 440 U.S. at 631).  "The burden of demonstrating

10   mootness 'is a heavy one.'"  *Davis*, 440 U.S. at 631 (quoting *W.T. Grant*, 345 U.S. at 632-33).

11      Here, the relevant facts[6] are that after Ellsworth moved for class certification, U.S. Bank deposed

12   Ellsworth, purportedly discovered that his house never was in a flood zone, and refunded his money.

13   At least partly in response, Ellsworth proposed revising the proposed class definitions and adding

14   Weaver and Skelley as additional class representatives.  *See* Statement.  Several days later, he filed a

15   motion to amend the complaint.  *See* Statement.  As required by this district's Civil Local Rules, he

16   attached a copy of the proposed second amended complaint to his motion.  U.S. Bank then reviewed

17   its files, discovered it never should have charged Ms. Skelley for flood insurance either, and issued a

18   refund check to her for the $561.00 for the improper charges and $2.64 in interest.  The court then

19   granted Ellsworth's motion for leave to amend.  Over Plaintiffs' objections, the court continued the

20   hearing on the class certification motion to allow Defendants to take discovery, draft these

21   dispositive motions, and (if needed) file supplemental class certification briefing.  Plaintiffs,

22   including the Skelleys, filed the SAC on December 23, 2013.  *See* ECF No. 169.

23      U.S. Bank argues that the Skelleys' claims are moot and ASIC argues that the refunds mean that

24   the Skelleys lack standing.  The court disagrees.

25      In this circuit, an unaccepted settlement offer that would fully satisfy a plaintiff's claim does not

26

27

28      [6]  Because Defendants' standing and mootness arguments challenge the court's subject
      matter jurisdiction, the court can consider facts outside the complaint.  *See* Fed. R. Civ. P. 12(b)(1).

render that claim moot. *Diaz v. First American Home Buyers Protection Corp.*, 732 F.3d 948, 954-55 (9th Cir. 2013). This is because "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* (quoting *Knox v. Serv. Employees Int'l Union*, *Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation marks and alteration omitted)). In *Diaz*, the Ninth Circuit vacated the district court's order granting a motion to dismiss where the plaintiff rejected the defendant's Rule 68 offer of judgment. *Id.* The plaintiff purchased a home warranty plan from the defendant and filed a class action alleging the defendant refused to make timely repairs, used substandard contractors, and wrongfully denied claims. *Id* at 949. After the court denied class certification, the defendant made a Rule 68 offer of judgment that would have fully satisfied Diaz's remaining individual claims. Lacking binding Ninth Circuit authority, the district court relied on Fourth and Seventh Circuit precedent and dismissed the plaintiff's claims as moot. *Id.* at 951. On appeal, the Ninth Circuit quoted the following passage from Justice Kagan's dissent in *Genesis Healthcare v. Symcyzk*:

> We made clear earlier this Term that "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin,* 568 U.S. ——, ——, 133 S.Ct. 1017, 1023, 185 L.Ed.2d 1 (2012) (internal quotation marks omitted). "[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Ibid.* (internal quotation marks omitted). By those measures, an unaccepted offer of judgment cannot moot a case. When a plaintiff rejects such an offer—however good the terms—her interest in the lawsuit remains just what it was before. And so too does the court's ability to grant her relief. An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's rejection of an offer "leaves the matter as if no offer had ever been made." *Minneapolis & St. Louis R. Co. v. Columbus Rolling Mill,* 119 U.S. 149, 151, 7 S.Ct. 168, 30 L.Ed. 376 (1886). Nothing in Rule 68 alters that basic principle; to the contrary, that rule specifies that "[a]n unaccepted offer is considered withdrawn." Fed. Rule Civ. Proc. 68(b). So assuming the case was live before—because the plaintiff had a stake and the court could grant relief—the litigation carries on, unmooted.
>
> For this reason, Symcyzk's individual claim was alive and well when the District Court dismissed her suit. Recall: Genesis made a settlement offer under Rule 68; Symcyzk decided not to accept it; after 10 days, it expired and the suit went forward. Symcyzk's individual stake in the lawsuit thus remained what it had always been, and ditto the court's capacity to grant her relief. After the offer lapsed, just as before, Symcyzk possessed an unsatisfied claim, which the court could redress by awarding her damages. As long as that remained true, Symcyzk's claim was not moot, and the District Court could not send her away empty-handed. So a friendly suggestion to the Third Circuit: Rethink your mootness-by-unaccepted-offer theory. And a note to all other courts of appeals: Don't try this at home.

*Id.* at 953-54 (quoting *Genesis Healthcare Corp. v. Symcyzk*, 133 S. Ct. 1523 (2013) (Kagan, J., dissenting)). In *Diaz*, the Ninth Circuit said that "Justice Kagan has articulated the correct

UNITED STATES DISTRICT COURT
For the Northern District of California

approach" and held "that an unaccepted Rule 68 offer that would have fully satisfied a plaintiff's claim does not render that claim moot." *Id.* at 954-55.  The court explained that its holding was "consistent with the language, structure and purpose of Rule 68 and with fundamental principles governing mootness.  These principles provide that "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" *Id.* at 955 (quotation omitted).

Here, as in *Diaz*, U.S. Bank attempted to refund the Skelleys' money.  Because the Skelleys did not accept U.S. Bank's settlement offer, the attempted refund did not moot their claims.

The analysis in *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081 (9th Cir. 2011), supports this conclusion.  There, the Ninth Circuit reversed the district court's determination that a Rule 68 offer of a judgment to a named plaintiff mooted the putative class action.  *Id.*  The offer of judgment exceeded the amount of the named plaintiff's individual claim.  *See id.*  It also was made before the district court certified the class (and before the class certification motion was even filed).  *Id.*  This procedural context was potentially relevant because once the district court has certified a class, mooting the class representative's claim does not moot the class action.  *Id.* at 1090.  That is because the class acquires a legal status apart from the interest asserted by the class representative.  *Id.*

In holding that the claim was not moot, the Ninth Circuit observed that even where the district court denies a motion for class certification, mooting the class representative's claim will not necessarily moot the class action because the putative class representative retains an interest in obtaining a final decision on class certification.  *Id.*  Also, where the offer precedes the filing of a class certification motion, a rejected offer of judgment for the full amount of a putative class representative's individual claim does not necessarily moot a class action complaint.  *Id.* at 1090.

The *Pitts* court explained that where "a defendant seeks to 'buy off' the small individual claims of the named plaintiffs," the class claims become analogous to "inherently transitory claims."  *Id.* at 1091  "An inherently transitory claim will certainly repeat as to the class, either because 'the individual could nonetheless suffer repeated harm' or because 'it is certain that other persons similarly situated' will have the same complaint."  *Id.* at 1090 (quoting *Gerstein v. Pugh*, 420 U.S. 103 (1975) (alterations omitted).  "In such cases the named plaintiff's claim is 'capable of repetition,

1  yet evading review,' and 'the relation back doctrine is properly invoked to preserve the merits of the

2  case for judicial resolution." *Id.* (quoting *Gerstein*, 420 U.S. at 103, and *County of Riverside v.*

3  *McLaughlin*, 500 U.S. 44, 52 (1991)).  "A rule allowing a class action to become moot 'simply

4  because the defendant has sought to 'buy off' the individual private claims of the named plaintiffs'

5  before the named plaintiffs have a chance to file a motion for class certification would thus

6  contravene Rule 23's core concern: the aggregation of similar, small but otherwise doomed claims."

7  *Id.* (quoting *Roper*, 445 U.S. at 339).  It also was likely to "discourage potential claimants" and

8  "waste judicial resources by stimulating successive suits brought by others claiming aggrievement."

9  *Id.* (quoting *Weiss*, 385 F.3d at 345).  Under such circumstances, "an unaccepted Rule 68 offer of

10  judgment – for the full amount of the named plaintiff's individual claim and made before the named

11  plaintiff files a motion for class certification – does not moot a class action."  *Id.* at 1091-92; *see*

12  *Scott v. Westlake Servs. LLC*, 740 F.3d 1124, 1126 n.1 (7th Cir. 2014) (recognizing that *Diaz* stands

13  for the proposition that an unaccepted settlement offer does not render a case moot).

14      Defendants argue that the procedural context is different here in part because the amended

15  complaint had not been filed.  That might make a difference in a different case.  But here, Plaintiffs

16  filed a class certification motion.  Defendants (according to Plaintiffs) tried to moot Mr. Ellsworth's

17  claims.  *See* 12/19/13 Order, ECF No. 168 at 14-16).  As a result, Plaintiffs revised the class

18  definitions and proposed an amended complaint with new parties.  *Id.*  Defendants then offered not

19  to oppose Ellsworth's motion to amend his complaint if he withdrew his class certification motion

20  (something that Ellsworth obviously was not inclined to do).  *See id.* at 16.  The procedural context

21  suggests a calculated strategy that includes picking off named Plaintiffs.  U.S. Bank's actions do not

22  moot the claims.

23      **B. The Filed Rate Doctrine**

24      The next issue is whether Plaintiffs' "kickback theory" claims are barred under the filed rate

25  doctrine.  *See* ASIC Motion a 15-24; U.S. Bank Motion at 20-21.

26      "The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the

27  rates charged by the utility are unreasonable.  The doctrine holds that any 'filed rate' – that is, one

28  approved by the governing regulatory agency – is per se reasonable and unassailable in judicial

UNITED STATES DISTRICT COURT
For the Northern District of California

1    proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).

2    The policies underlying the filed rate doctrine are the following:  (1) courts are not "institutionally

3    well suited" to determine whether rates are reasonable, and (2) permitting individual ratepayers to

4    attack the filed rate "would lead to discrimination in rates in that a victorious plaintiff would end up

5    paying less than similarly situated non-suing customers" and "'would undermine the congressional

6    scheme of uniform rate regulation.'" *Id.* at 19 (citing *Keogh v. Chicago & Northwestern Railway*

7    *Co.*, 260 U.S. 156, 162–63 (1922) and quoting *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571,

8    572 (1981)).

9      In denying the previous motions to dismiss, the court rejected Defendants' arguments that the

10    filed rate doctrine barred Ellsworth's claims, stating:

11      Ellsworth does not challenge the rates or the premiums he paid but instead challenges the alleged kickbacks.  ASIC's argument that he really is challenging the premiums is

12      unpersuasive.  Just because the damages are based on increased costs incurred as a result of the alleged kickback scheme does not transform a challenge to conduct and practices into a

13      challenge to the premiums.

14    Order, ECF No. 80 at 19-20.

15      The allegations in the SAC are not significantly different from those in the FAC.  As the court

16    said previously, it is not going to revisit old arguments in new motions to dismiss.  The court already

17    held that at the pleading stage, the complaint plausibly challenges an alleged kickback scheme and

18    does not challenge whether the premiums paid were reasonable.  Plaintiffs do not challenge the rates

19    that were filed or the process of ratesetting, and they are not the ratepayers.  Instead U.S. Bank paid

20    ASIC's premiums and then passed them on to Plaintiffs.  Other courts in this district have reached

21    similar conclusions on arguments nearly identical to ASIC's.  *See, e.g., Cannon v. Wells Fargo*

22    *Bank, N.A.* ("*Cannon III*"), No. C-12-1376 EMC, 2014 WL 324556, at *4-6 (N.D. Cal. Jan. 29,

23    2014); *Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093, 1114-15 (N.D. Cal. 2013).

24      The addition of New Mexico class claims does not change this analysis.  ASIC points to *Valdez*

25    *v. State*, 132 N.M. 667 (2002), where the New Mexico Supreme Court applied the filed rate doctrine

26    to bar a suit by prisoners who alleged that correctional facilities received commissions in exchange

27    for granting exclusive contracts to companies to provide telephone service and that those companies

28    charged an unfairly high rate.  But there, the prisoners were ratepayers who alleged that the

1   approved rates they paid were too high.  Here, Plaintiffs allege that U.S. Bank (the ratepayer)

2   charged them more than them more than the actual insurance rate it paid and that ASIC's role in that

3   arrangement led to its unjust enrichment.  Defendants also rely on *Coll v. First Am. Title Ins. Co.*,

4   642 F.3d 876 (10th Cir. 2011) (applying New Mexico law), but that case was a direct challenge to

5   the rate setting process.

6       Finally, Defendants argue that New Mexico law permits an insurer to file rates that include

7   commissions, insurance tracking, and expense reimbursement to creditors.  *See* ASIC Opp'n at 19-

8   20 (citing N.M. Admin. Code §§ 13-18-3-13).  ASIC attaches copies of the applicable rate filings to

9   its motion.  *See* Voyles Decl. ¶¶ 5-6, Exs. 1-3 (rate filings), ECF No. 175-1; Wilson Decl. ¶¶ 10-13,

10   Exs. A-C, ECF No. 175-2.  But Defendants do not identify any provisions specifically disclosing

11   commissions, insurance tracking fees, or QERs, and the court is not going to wade through the

12   filings.  In any event, at the pleadings stage, Plaintiffs' allegations are plausible.

13       The court denies the motion to dismiss on this basis.

14   **C. Kickback Claims**

15       The next issue is whether Plaintiffs' first five claims fail to the extent they are based on

16   Plaintiffs' kickback-related allegations.  *See supra* Statement.  In relevant part, Plaintiffs allege that

17   U.S. Bank abused its right to force-place flood insurance by accepting kickbacks, commissions,

18   qualified expense reimbursements ("QERs"), and discounted insurance tracking services from ASIC

19   in exchange for using ASIC's policies and that U.S. Bank did not deduct these payments from the

20   premiums it passed onto Plaintiffs. SAC ¶ 2.  These allegations are sufficiently similar to the

21   allegations in the earlier complaint.  As the court said in December 2013 at the hearing and in its

22   order, the revised complaint was not meant to be another opportunity to relitigate matters already

23   raised (or that could have been raised) in the previous motions to dismiss.

24       U.S. Bank's new argument is that these QERs are linked to hazard insurance, not the flood

25   insurance at issue in this case, and the discovery in this case shows that.[7]  U.S. Bank Motion at 14.

26

27       [7]  On a Rule 12(b)(6) motion to dismiss, the court generally does not consider materials
28   beyond the pleadings but may consider unattached evidence on which the complaint necessarily
     relies if (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim;

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Plaintiffs disagree.  These are fact issues not resolvable at a motion to dismiss and can be addressed

2  at summary judgment.[8]

3      U.S. Bank also argues that Plaintiffs' kickback-related claims fail under both California and New

4  Mexico law.  U.S. Bank Motion at 15-16.  U.S. Bank's California law argument relies on a

5  California Department of Insurance opinion regarding the propriety of ASIC's including

6  commissions and tracking expenses as components of the rate it charged a lender.  *See In re Rates,*

7  *Rating Plans, or Rating Sys. of Am. Sec. Ins. Co.*, No. OV-01-01-8309 (Cal. Ins. Comm'r Apr. 18,

8  2002).  But as Plaintiffs point out, in that opinion, the Department of Insurance expressly noted that

9  it lacked "jurisdiction to decide the scope of charges which would be reasonable as between a lender

10  and its borrower."  *Id.* at 6 n.3.  Another court in this district recently rejected the identical argument

11  made by Wells Fargo (represented by ASIC's counsel).  *See Cannon III*, 2014 WL 324556, at *5.

12  The court applies *Cannon III* and reaches the same result.

13      U.S. Bank's New Mexico law argument is that regulations promulgated by the New Mexico

14  Public Regulations Commission, Insurance Division, expressly permit lenders to pass QERs and

15  insurance tracking fees to consumers.  U.S. Bank Motion at 16; *see* N.M. Admin. Code § 13.18.3.1,

16  *et seq.*  The cited provision provide as follows:

17      Nothing in this section shall prohibit the superintendent from approving other loss rations
18      which may be found reasonable.  An insurer may file a rate that produces or may reasonably
       be expected to produce a loss ratio of less than fifty percent (50%) provided the provision in
19      the rate for commissions, acquisition costs, insurance tracking, expense reimbursement to

20  and (3) no party questions the document's authenticity.  *U.S. v. Corinthian Colleges*, 655 F.3d 984,

21  998-99 (9th Cir. 2011) (citations omitted).  Here, the court disagrees with U.S. Bank's argument that

22  the complaint necessarily implicates unattached evidence that the court can consider.

23      [8] U.S. Bank raises another fact argument about whether Plaintiffs' allegations regarding
    "discounted insurance tracking services" state a claim.  U.S. Bank Motion at 10.  Plaintiffs allege
24  that "ASIC provided discounted insurance tracking services to U.S. Bank.  This is how ASIC
    captured U.S. Bank's business and the business of other mortgage lenders, enabling it to become the
25  largest provider of force-placed insurance in the United States."  SAC ¶ 52.  U.S. Bank argues that
    this conduct does not constitute a kickback and is authorized by the NFIA and Plaintiffs' deeds of
26  trust.  U.S. Bank Motion at 15.  As U.S. Bank acknowledges in a footnote, the court previously
    rejected these arguments.  *See id.* at 15 n.9; ECF No. 80 at 23 (agreeing with another court's
27  rejection of the same arguments).  U.S. Bank cites additional evidence now, but U.S. Bank can
    address its fact-based arguments at summary judgment.
28

creditors, and all similar expenses incurred directly or indirectly does not exceed thirty percent (30%).

N.M. Admin. Code § 13.18.3.13(E).  The only other cited provision includes the following:

**REBATES PROHIBITED:**  No insurer shall offer, and no creditor shall accept, a rebate or inducement. This section does not prohibit or restrict an insurer which provides creditor-placed insurance for a creditor from doing business with that creditor if the business is conducted in accordance with the same terms and conditions and at the regular and customary interest rates and charges the creditor applies to its other customers.

. . .

A. An insurer shall not pay directly or indirectly to a creditor commissions, fees, rent, expense reimbursement, or other compensation greater than thirty percent (30%) of earned premium net of terminations.

B. An insurer shall not pay to a creditor a policyholder dividend, retrospective premium adjustment, profit sharing, or similar return of premium.

. . .

H. An insurer shall not require a creditor to purchase insurance tracking or any other services from a specific person but may require that such services meet minimum quality standards.

N.M. Admin. Code § 13.18.3.16.

U.S. Bank reads these provisions as "prohibit[ing] inducements generally but . . . allow[ing] commissions or other compensation less than 30% specifically." U.S. Bank Reply at 10.  Plaintiffs counter that the provisions are consistent with its theory that the commissions U.S. Bank received were not legitimately earned.  Opp'n at 13.  At the pleading stage, the claims are plausible.

ASIC argues that this court should follow the Seventh Circuit's opinion in *Cohen v. American Security Insurance* Company, 735 F.3d 601 (7th Cir. 2013).[9]  *Cohen* affirmed the district court opinion in *Shilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 832-33 (N.D. Ill. 2011).  This court distinguished the facts in *Shilke* from the present case in the last order.  *See* ECF No. 80 at 23. The issue can be addressed at summary judgment.

**D. Breach of Contract Claims**

_____

[9]  In reply, ASIC also relies on *Feaz v. Wells Fargo Bank, N.A.*, No. 13-10230, 2014 L 503149, at *10 (11th Cir. Feb. 10, 2014).  ASIC cites *Feaz* for the first time in its reply brief.  As a result (and because the Eleventh Circuit issued the opinion in *Feaz* just four days before Plaintiffs' opposition brief was due) Plaintiffs had no opportunity to address these arguments.  The court will consider *Feaz* on summary judgment.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    U.S. Bank generally argues that the Skelleys' breach of contract claim fails because New Mexico

2  law applies and "expressly allows creditors to charge borrowers QERs and insurance tracking fees as

3  part of a lender placed insurance premium."  U.S. Bank Motion at 21 (citing N.M. Admin. Code

4  §§ 13.18.3.13, 13.18.3.16).  It makes no substantive analysis of New Mexico law.  The

5  administrative code provisions are not straight forward, and the generalized argument does not

6  provide a basis at the pleading stage to conclude that the claims are not plausible.

7    Ellsworth and Weaver argue breach of contract under California law.  Any argument about

8  Ellsworth is foreclosed by the court's previous orders.  As the court held previously, the claims are

9  plausible.  By extension, Weaver's claims are too (to the extent that they are the same as

10  Ellsworth's).

11    There is a separate issue regarding Weaver, which is whether she can sue U.S. Bank for breach

12  of the mortgage agreement when U.S. Bank is the mortgage servicer, not the lender.

13    To establish her contract claims, Weaver must plead facts demonstrating the existence of a

14  contract with U.S. Bank.  *See, e.g., First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731,

15  745 (2001) (establishing elements of breach of contract claim); *Guz v. Bechtel Nat'l, Inc.* 24 Cal. 4th

16  317, 375 (2000) (holding that breach of the implied covenant of good faith and fair dealing claim is

17  predicated on the existence of a contract).

18    Here, U.S. Bank is the servicer of Weaver's loan, and Freddie Mac is the lender.  *See* SAC Ex. 8.

19  As a loan servicer, U.S. Bank is not a party to the deed of trust.  *See McKenzie v. Wells Fargo Bank,*

20  *N.A.*, 931 F. Supp. 2d 1028, 1043 (N.D. Cal. 2013) (dismissing breach of contract claim against

21  servicer in force-placed flood insurance case on this basis); *Cannon II*, 917 F. Supp. 2d at 1052

22  (same); *see also Lomboy v. SCME Mortg. Bankers*, No. C–09–1160 SC, 2009 WL 1457738, at *5

23  (N.D. Cal. May 26, 2009).  As everyone agreed at oral argument, a servicer can stand in the shoes of

24  the party to the contract to the extent that rights are assigned.  If rights are not assigned, then U.S.

25  Bank is off the hook for breach of contract (although Weaver's claim of unjust enrichment would

26  survive).  *See Lomboy,* 2009 WL 1457738 at *5; *Connors v. Home Loan Corp.*, No. 08–1134 L,

27  2009 WL 1615989, at *6 (S.D. Cal. June 9, 2009) (breach of implied contract claim dismissed where

28  plaintiffs failed to plead any facts that might constitute an agreement or meeting of the minds

1   between plaintiff and loan servicer); *see also In re Ocwen Loan Servicing, LLC Mortg. Serv. Lit.*,

2   491 F.3d 638, 645 (7th Cir. 2007); *Akopyan v. Wells Fargo Home Mortg., Inc.*, 216 Cal. App. 4th

3   120, 136 (2013).

4       This is a fact issue. Plaintiffs point to the Uniform Instrument and argue that more discovery

5   will illuminate the nature of the assignment. Defendants say that looking at the assignments ends

6   the inquiry. No one calls out the specific provisions with sufficient detail to allow a call at the

7   pleadings stage about the argument. As in *Cannon*, this may well be an issue that is resolvable as a

8   matter of law. On this record, the court cannot easily do so and thus holds that the claims are

9   plausible.

10      **F. The Skelleys' Implied Covenant of Good Faith and Fair Dealing Claim**

11      U.S. Bank moves to dismiss this claim as barred by the express terms of the contract. The New

12  Mexico Supreme Court describes the elements of the claim as follows:

> New Mexico courts have held that every contract imposes a duty of good faith and fair
> dealing on the parties with respect to the performance and enforcement of the terms of the
> contract. *See Cont'l Potash, Inc. v. Freeport–McMoran, Inc.,* 115 N.M. 690, 706, 858 P.2d
> 66, 82 (1993) (citing *Watson Truck & Supply Co. v. Males,* 111 N.M. 57, 60, 801 P.2d 639,
> 642 (1990)). "The breach of this covenant requires a showing of bad faith or that one party
> wrongfully and intentionally used the contract to the detriment of the other party." *Id.* The
> implied covenant of good faith and fair dealing "requires that neither party do anything that
> will injure the rights of the other to receive the benefit of their agreement. Denying a party its
> rights to those benefits will breach the duty of good faith implicit in the contract." *Bourgeois
> v. Horizon Healthcare Corp.,* 117 N.M. 434, 438, 872 P.2d 852, 856 (1994) (citation
> omitted).
>
> "The implied covenant is aimed at making effective the agreement's promises. Thus, it is
> breached only when a party seeks to prevent the contract's performance or to withhold its
> benefits from the other party." *Azar v. Prudential Ins. Co. of Am.,* 2003–NMCA–062, ¶ 51,
> 133 N.M. 669, 68 P.3d 909. Importantly, the implied covenant of good faith and fair dealing
> cannot be used to overcome or negate an express term contained within a contract. *See, e.g.,
> Cont'l Potash, Inc.,* 115 N.M. at 707, 858 P.2d at 83 ("[T]he trial court erred as a matter of
> law in finding and enforcing implied covenants against the defendants that were inconsistent
> with the provisions of the written agreements."); *Melnick v. State Farm Mut. Auto. Ins. Co.,*
> 106 N.M. 726, 731, 749 P.2d 1105, 1110 (1988) ("We align also with those courts that have
> refused to apply an implied covenant of good faith and fair dealing to override express
> provisions addressed by the terms of an integrated, written contract.").

25  *Sanders v. FedEx Ground Package Sys., Inc.*, 188 P.3d 1200, 1203 (N.M. 2008).

26      U.S. Bank argues that the Skelleys' mortgage agreement discloses that "the lender placement

27  process is for the benefit of *U.S. Bank*" and that it "grants U.S. Bank discretion with respect to the

28  fees, such as expense reimbursements and insurance tracking, that may be charged." U.S. Bank

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Motion at 22 (quoting SAC Ex. 17 § 5, 14).  Plaintiffs respond that U.S. Bank's conduct violated

2   other express provisions of the mortgage agreement, which permit U.S. Bank only to "do and pay for

3   whatever is reasonable and appropriate to protect [its] Interest in the Property and rights under [the]

4   Security Instrument."  *See* Opp'n at 24; SAC Ex. 17 § 9.   The court addressed this issue previously

5   with Ellsworth's claims, and its conclusions apply by extension here.  *See* ECF No. 80 at 24-25.

6   **F.  Plaintiffs' Unjust Enrichment Claims**

7          Defendants argue that Plaintiffs cannot allege unjust enrichment claims and claims for breach of

8   an express contract.  ASIC Motion at 25; U.S. Bank Motion at 26.  The court previously rejected this

9   argument:

10          "California courts appear to be split on whether a stand alone cause of action for unjust
           enrichment is anything more than "a general principle, underlying various legal doctrines and
11          remedies." *Mattel, Inc. v. MGA Entm't, Inc. & Consol. Actions,* 782 F. Supp. 2d 911, 1014
           (C.D. Cal. 2010) (noting that "stand alone claims for unjust enrichment are simply redundant
12          of relief already available under other existing law").  Courts in this district have held that
           California law permits unjust enrichment claims, in which "restitution may be awarded either
13          (1) in lieu of breach of contract damages, where an asserted contract is found to be
           unenforceable or ineffective, or (2) where the defendant obtained a benefit from the plaintiff
14          by fraud, duress, conversion, or similar conduct, but the plaintiff has chosen not to sue in
           tort." *Oracle Corp. v. SAP AG,* No. C 07-1658 PJH, 2008 WL 5234260, at *8 (N.D. Cal.
15          Dec. 15, 2008) (citing *McBride v. Boughton,* 123 Cal. App. 4th 379, 388 (2004)); *see also*
           *Wolf,* 2011 WL 4831208, at *8 ("Restitution [under an unjust enrichment theory] may be
16          awarded in lieu of breach of contract damages when the parties had an express contract, but it
           was procured by fraud or is unenforceable or ineffective for some reason.") (citing *McBride*
17          123 Cal. App. 4th at 388).

18          "To state a claim for restitution, a plaintiff 'must plead receipt of a benefit and the unjust
           retention of the benefit at the expense of another.'" *Walters v. Fid. Mortg. of Cal.*, No. 2:09-
19          cv-3317 FCD/KJM, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) (quoting
           *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)).

20
           Plaintiffs' unjust enrichment claim is based on Defendants' alleged kickback scheme and the
21          unjust retention of those commissions for backdated premiums.  *See* FAC ¶¶ 75-79, 83.
           ASIC also allegedly received improper benefits, including "(1) non-competitive premiums
22          that ASIC would not have secured absent a kickback to U.S. Bank to do business with ASIC,
           and (2) premiums for backdated insurance policies." *Id.* ¶ 83.

23
           There are two express contracts.  Still, given the allegations about undisclosed kickbacks and
24          inappropriate backdating, the court follows *McNeary* and holds that Ellsworth states a
           restitution claim.

25

26   ECF No. 80 at 26-27; ECF No. 168 at 19.  The court will not revisit its previous orders merely

27   because Plaintiffs added a party to forestall Defendant's possible attempts to moot Ellsworth's

28   claims.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The court reaches the same conclusions for the claims arising under New Mexico law. To state a

2    claim for unjust enrichment under New Mexico law, a plaintiff must allege that the defendant

3    knowingly benefitted at their expense and that allowing the defendant to retain this benefit would be

4    unjust. *See Starko, Inc. v. Presbyterian Health Plan, Inc.*, 276 P.3d 252, 278 (N.M. Ct. App. 2011)

5    In *Starko*, the New Mexico Court of Appeals reversed the lower court's dismissal of breach of

6    contract and unjust enrichment claims, explaining "[t]hat Plaintiffs had a contractual relationship

7    with the MCOs does not foreclose a claim for unjust enrichment." *Id.* at 278. The plaintiffs were

8    pharmacists who alleged that managed care organizations ("MCOs") were underpaying them for

9    treating Medicaid patients. *See id.* at 278. Multiple contracts were involved including contracts

10    between the plaintiffs and the New Mexico Human Services Department ("HSD"), the HSD and the

11    MCOs, and Plaintiffs and the MCOs. *Id.* The pharmacists alleged that the MCOs breached

12    contracts with the HSD by retaining payments that should have gone to them under those contracts

13    and sued the MCOs for unjust enrichment. After examining precedent concerning the relationship

14    between law and equity in New Mexico, the court held that the plaintiffs' "pleadings are enough to

15    state a claim in equity for unjust enrichment, and the fact that Plaintiffs had contracts with the MCOs

16    does not work to automatically foreclose it. Our system explicitly provides for alternative pleading

17    of civil claims. We therefore leave open their claim for unjust enrichment." *Id.*[10]

18    U.S. Bank also argues that Ellsworth and the Skelleys cannot pursue claims for unjust

19    enrichment because U.S. Bank "fully disgorged all payments made by the Skelleys in the November

20    29, 2013 refund." U.S. Bank Motion at 23. Plaintiffs dispute this, arguing that they did not cash the

21

22

---

23    [10]  Defendants cite older federal cases that reached a different result. *See* ASIC Motion at 25;

24    U.S. Bank Motion at 23; *Elliott Indus. L.P. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005); *Otiveros Insulation Co. v. Sanchez*, 3 P.3d 695, 698-99 (N.M. Ct. App. 2000). *Starko* is a more recent decision of the New Mexico Court of Appeals, and it speaks definitively about how that

25    court resolves the issue. *See Anderson Living Trust v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1033 (D.N.M. 2013) (following *Elliott Industries* as binding precedent but acknowledging that

26    its inclination was "to believe that [in *Starko*] the Court of Appeals of New Mexico correctly states

27    the law of New Mexico, and that the Supreme Court of New Mexico would agree if the question is presented to it").

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    check from U.S. Bank and the amount of interest was insufficient.  Opp'n at 25 n.19, 31.  Because

2    the Skelleys rejected U.S. Bank's refund offer, and given the conflicting arguments regarding

3    whether the amount of interest was sufficient, at the pleading stage, the court resolves the inferences

4    in Plaintiffs' favor and denies U.S. Bank's motion.

5      ASIC moves to dismiss Ellsworth and Weaver's unjust enrichment claim as duplicative of their

6    UCL claim.  *See* ASIC Motion at 26; Reply at 20.  As another court in this district explained,

7    "although plaintiffs' claim under their eighth cause of action may ultimately be superfluous to their

8    restitution claim under section 17200, it is inappropriate at the motion to dismiss stage to make that

9    determination, as plaintiffs may prevail in one cause of action and not in the other."  *Nordberg v.*

10   *Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1101 (N.D. Cal. 2006).

11      **G. Ellsworth's and Weaver's Unfair Competition Claims**

12      The claims allege that U.S. Bank engaged in unfair practices by (1) "[m]anipulating the force-

13   placed insurance process," (2) "[a]rranging for kickbacks, commissions, qualified expense

14   reimbursements or other compensation (*e.g.*, subsidized or discounted insurance tracking services)

15   for itself and/or its affiliates in connection with lender-placed flood insurance;" and (3)

16   "[p]urchasing backdated flood insurance coverage at borrowers' expense."  SAC ¶ 117.  The court

17   already rejected Defendants' QER and kickback arguments and held that the kickback allegations

18   are plausible.  *See supra*; 12/11/2012 Order, ECF No. 80 at 27-30.

19      ASIC also argues that the court should dismiss the UCL claims against it under the doctrine of

20   equitable abstention because "the suit . . . attacks the pricing, sales, and placement practices of a

21   heavily regulated industry."  *See* ASIC Motion at 21.

22      "A court may abstain from employing the relief permitted by the UCL if (1) "granting the

23   requested relief would require a trial court to assume . . .  or to interfere with the functions of an

24   administrative agency;" (2) "the lawsuit involves determining complex economic policy, which is

25   best handled by the Legislature or an administrative agency;" or (3) "granting injunctive relief

26   would be unnecessarily burdensome for the trial court to monitor and enforce given the availability

27   of more effective means of redress."  *Reudy v. Clear Channel Outdoor, Inc.*, 428 F. App'x 774, 776

28   (9th Cir. 2011) (quoting *Blue Cross of California, Inc. v. Superior Court,* 180 Cal. App. 4th 1237

(2009)).  "Where a court abstains under the UCL, dismissal with prejudice is appropriate."  *Id.*

ASIC could have raised this argument previously, and it did not.  Again, the amended complaint was not an opportunity to try again and instead was a remedy to address potential predatory mooting by Defendants.  In any event, this is not a case that involves complex economic policy considerations or requires the court to determine "whether LPI charges are too high."  *See* ASIC Motion at 23.[11]          ASIC cites only one force-placed insurance case where the court abstained on this basis.  *See* ASIC Motion at 24 (citing *Conley v. Norwest Mortg. Inc.*, No. N73741, slip op. At 2 (Cal. Sup. Ct. Jan. 10, 2000)).  As discussed previously, the Commissioner of Insurance later determined that it lacked jurisdiction to decide whether the charges at issue (from a lender to a borrower) were appropriate.  *See In the Matter of the Rates, Rating Plans, or Rating Systems of American Security Ins. Co.*, No. OV-01-0108309, at n.3 (Cal. Dep't of Ins. Apr. 18, 2002).

### CONCLUSION

The court denies the motions to dismiss.  This disposes of ECF Nos. 174 & 175.

**IT IS SO ORDERED.**

Dated: March 21, 2014

LAUREL BEELER
United States Magistrate Judge

---

[11]  ASIC cites California Court of Appeals decisions favoring dismissal based on equitable abstention or judicial restraint where resolution of the dispute would require the court to determine "complex economic policy which is better handled by the legislature or an administrative agency." *Alvarado v. Selma Convalescent Hosp.*, 153 Cal. App. 4th 1292, 1298 (2007) (claim seeking injunction to compel compliance with statute regulating nursing hours per patient in a nursing facility); *see Reudy*, 428 F. App'x at 776 (affirming district court decision to equitably abstain in suit over regulation of rules governing outdoor advertising); *Shamsian v. Dep't of Conservation*, 136 Cal. App. 4th 621, 642 (2006) (claim to enforce provisions of complex statutory beverage container recycling scheme); *Desert Healthcare Dist. v. PacifiCare FHP, Inc.*, 94 Cal. App. 4th 781, 795-96 (2001) (claim that licensed health service plan abused captition system by transferring excessive risk to intermediary without adequate oversight); *Crusader Ins. Co. v. Scottsdale Ins. Co.*, 54 Cal. App. 4th 121, 137-38 (1997) (insurance company sought "court-created regulation of surplus line brokers" because Department of Insurance had not addressed the issue); *Wolfe v. State Farm Fire & Cas. Ins. Co.*, 46 Cal. App. 4th 554, 564-65 (1996) (challenge to insurers who failed to offer homeowners policies because of requirement to provide earthquake coverage in light of recent legislative enactments); *California Grocers Ass'n v. Bank of America*, 22 Cal. App. 4th 205, 217 (1994) (challenge to service fee charged by bank was economic policy properly determined by the Legislature).