1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
For the Northern District of California

# UNITED STATES  DISTRICT COURT

## Northern District of California

### San Francisco Division

STEPHEN ELLSWORTH, MARILYN
WEAVER, and LAWRENCE and DONENE
SKELLEY, individually and as representatives
of the classes and on behalf of the general
public,

               Plaintiffs,

    v.

U.S. BANK, N.A., and AMERICAN
SECURITY INSURANCE COMPANY,

               Defendants.

_____/

No. C 12-02506 LB

**ORDER GRANTING PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION, DENYING U.S.
BANK'S MOTION TO DISMISS FOR
LACK OF SUBJECT-MATTER
JURISDICTION, AND DENYING U.S.
BANK'S MOTION FOR JUDGMENT
ON THE PLEADINGS REGARDING
BACKDATING**

[ECF Nos. 190-4, 195, and 197]

## INTRODUCTION

    In this putative class action, Plaintiffs challenge U.S. Bank's practice of force-placing backdated

flood insurance on their real property that was underwritten by American Security Insurance

Company ("ASIC").  They also allege that U.S. Bank received kickbacks from ASIC in the form of

expense reimbursements and discounted administrative insurance tracking services.  Second

Amended Class Action Complaint ("SAC"), ECF No. 169, ¶ 2.[1]  They allege six claims: (1) breach

of their form mortgage contracts by U.S. Bank; (2) breach of the implied covenant of good faith and

---

    [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
generated page numbers at the top of the document.

C 12-02506 LB (ORDER)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  fair dealing by U.S. Bank under the laws of California and New Mexico; (3)-(4) unjust enrichment

2  of U.S. Bank and ASIC under the laws of California and New Mexico; and (5)-(6) violations of

3  California Business and Professions Code section 17200 *et seq.* against U.S. Bank and ASIC.

4      Plaintiffs move to certify three multi-state classes on the contract claims based on three theories

5  of liability (two on a kickback theory and one on a backdating theory).  Each multi-state class has

6  two subclasses to account for variations in state contract law: one subclass for states with contract

7  laws like California's, and one subclass for states with contract laws like New Mexico's.  Plaintiffs

8  also propose three California classes and three New Mexico classes for the other state-law claims.

9  *See* Motion, ECF No. 190-4.  For the reasons stated below, the court grants the motion and certifies

10  the classes set forth at the end of the order.

11      After Plaintiffs filed their class certification motion, U.S. Bank moved to dismiss for lack of

12  subject matter jurisdiction on the ground that Plaintiffs had no standing for states other than

13  California and New Mexico, and it also moved for judgment on the pleadings on the ground that a

14  recent amendment to the National Flood Insurance Act clarifies that borrowers can be charged for

15  backdated coverage.  *See* ECF Nos. 195, 197.  The court denies both motions.

16                                      **STATEMENT**

17  **I.  THE LAWSUIT**

18      Plaintiffs challenge U.S. Bank's practice of charging them for flood insurance it purchased for

19  their residential properties, which secure mortgage loans U.S. Bank services (and sometimes owns)..

20  This practice is called "force-placed flood insurance" ("FPI") or "lender-placed flood insurance"

21  ("LPFI").  SAC ¶ 1.  Lenders generally have the right to force-place flood insurance where the

22  property securing the loan falls in a Special Flood Hazard Area ("SFHA") and is not insured by the

23  borrower.  *Id.* ¶ 2.  Plaintiffs allege that U.S. Bank and ASIC engaged in a scheme to manipulate the

24  FPI process in two ways: (A) U.S. Bank received kickbacks from ASIC in the form of so-called

25  "qualified expense reimbursements" ("QERs") and subsidized insurance tracking services; and (B)

26  U.S. Bank and ASIC engaged in retroactively force-placing flood insurance coverage on Plaintiffs

27  and other borrowers in the event of a lapse in coverage without regard to (1) when the lapse was

28  discovered, (2) when notice of the lapse was provided to the borrower, or (3) whether there was any

damage to the property during the backdated coverage period.  Motion, ECF No. 190-4 at 15.

Plaintiffs state six claims in the SAC: (1) breach of contract against U.S. Bank; (2) breach of the covenant of good faith and fair dealing against U.S. Bank; (3)-(4) unjust enrichment against U.S. Bank and ASIC; and (5)-(6) violations of California Business & Professions Code section 17200 *et seq.* against U.S. Bank and ASIC.  *See* SAC, ¶¶ 86-130.

## II.  U.S. BANK'S & ASIC'S FORCE-PLACED FLOOD INSURANCE PROGRAM

Since 1998, U.S. Bank has had an exclusive business arrangement with ASIC, which (1) monitors U.S. Bank's residential mortgage loan portfolio to ensure that borrowers maintain adequate flood and hazard insurance on the secured properties and (2) serves as U.S. Bank's sole provider of the insurance when borrowers do not maintain adequate insurance.  *See* Quist Dep. 117:10-20, 1st Richter Decl. Ex. 1, ECF No. 139-5.  The business relationship is set forth in contracts between U.S. Bank and ASIC.  From 1998 to 2011, U.S. Bank and ASIC had three separate contracts.





9   In 2011, the parties combined the three agreements into one Master Supplier Service Agreement

10  with various schedules that set forth the components of ASIC's services.  *See* Master Agreement, 1st

11  Richter Decl. Ex. 13, ECF No. 139-6; *see, e.g., id.* at Schedule No. 2 (governing Compliance PLUS

12  Insurance Administration Program), Schedule No. 3 (Hazard, Compliance and Wind Plus

13  Outsourcing Program).  The terms of the Master Agreement largely include the terms of the prior

14  contracts. *See* Wolfe Dep. 76:8-14, 1st Richter Decl. Ex. 4, ECF No. 139-10.

15      U.S. Bank and ASIC developed uniform policy and procedure manuals to administer the forced-

16  placed insurance program.  *See* 1st Richter Decl., ECF No. 119-1 Exs. 7 ("Lender Placed Insurance

17  (LPI) Hazard Operations U.S. Bank Procedures Manual"), 14 (same); Quist Dep. 40:1-3, 1st Richter

18  Decl. Ex. 1, ECF No. 139-4; Scherer Dep. 55:1-3, 1st Richter Decl. Ex. 2, ECF No. 139-7.  Under

19  these policies, when ASIC learned that a borrower lacked adequate flood insurance, it began a "letter

20  cycle" process.  *See* 1st Richter Decl. Ex. 14, ECF No. 137-7 at 14.  *First*, ASIC sent the borrower a

21  "notice letter" on U.S. Bank letterhead, describing the flood insurance requirement and telling the

22  buyer to provide proof of insurance in 45 days or U.S. Bank would force-place coverage.  *See*

23  Scherer Dep., 1st Richter Decl. Ex. 2, ECF No. 139-7, 59:24-60:20, 63:20-64:1.  *Second*, if the

24  borrower failed to provide proof of adequate insurance within 45 days, ASIC sent a "placement

25  letter" informing the borrower that U.S. Bank had force-placed flood insurance through ASIC.  *See,*

26  *e.g, id.* at 64:2-18.  ASIC followed this procedure for all U.S. Bank borrowers.  *Id.* at 61:11-16.

27      The notification process was uniform, but the LPFI policies about when to force-place coverage,

28  and at what effective date, varied depending on factors such as the date of the inadequacy of the

UNITED STATES DISTRICT COURT
For the Northern District of California

flood insurance or its lapse. *See* Wolfe Decl., ECF No. 206, ¶ 6. For example, if a borrower with a property in an SFHA never had flood insurance, the LPFI policy was effective on the initial date of inadequacy. *Id.* ¶ 7. If a borrower had an existing flood insurance policy that lapsed or was cancelled, the LPFI policy was effective on the date of lapse or cancellation. *Id.* If the borrower had flood insurance with an inadequate coverage amount, a supplementary LPFI policy was issued effective the day after the 45-day notice period expired. *Id.* If the property initially was not in an SFHA, but later was based on a FEMA map amendment, the LPFI policy was effective the day after the 45-day notice period expired. *Id.* Flood insurance is required only for improved real property, so construction loans are treated differently. *Id.* ¶ 9. When the structure's footings are in place, a second flood zone determination is made to be sure that the structure is in a SFHA, and if it is, the LPFI letter cycle begins, and any LPFI policy is effective the day after the 45-day notice period expires. *Id.*

Another iteration of the policy is that when U.S. Bank first acquires an existing mortgage loan or its servicing rights, it has CoreLogic, a third-party vendor, check the flood zone status. *Id.* ¶ 13. The earliest effective date for the LPFI policy is the date U.S. Bank acquired the loan or servicing rights. *Id.* Also, U.S. Bancorp Service Providers, LLC sends the letters, not U.S. Bank through ASIC. *Id.*

Regardless of the issuance date of the LPI policy, it is effective as of the date a borrower permits his or her voluntary insurance to lapse. *See* Wolfe Decl. Ex. 2, ECF No. 202- 2 at 20.

According to U.S. Bank, it generally does not lender-place insurance with an effective date more than 45 to 60 days before the date that the property is selected for lender placement. Wolfe Decl., ECF No. 206, ¶ 8. A policy that is retroactive more than 60 days is the exception to the rule. *Id.* When a policy is retroactively effective more than 60 days, it is commonly because U.S. Bank "is unable to receive notice" of cancellation of the buyer's flood insurance, which generally happens because the insurance company requires the borrower's consent to list U.S. Bank as a lienholder for the insured property, and the buyer does not provide that consent *Id.* Alternatively, more than 60 days may lapse because if flood insurance lapses, it sometimes takes U.S. Bank and ASIC more than 15 days after the 45-day notice period to complete the processing. *Id.* Plaintiffs dispute that their

UNITED STATES DISTRICT COURT
For the Northern District of California

1  experiences are exceptional and assert that in many cases, such as the Skelleys and Ellsworth,

2  Defendants issue insurance coverage "well after the purported lapse." *See* Motion, ECF No. 190-4

3  at 20 (citations omitted).

4      The policies typically are more expensive than non-force-placed coverage. *See, e.g.,* Ellsworth

5  Decl. Ex. 2, ECF No. 119-10 at 3 (U.S. Bank's form letter conceding this point).  Plaintiffs cite

6  ASIC's data regarding the premiums and losses on force-placed flood insurance in 2010 and 2011.

7  Richter Decl. Ex. 15, ECF No. 137-9 at 30.  The amounts show that less than 20% of the premiums

8  were returned to borrowers, and ASIC retained the rest or kicked it back to U.S. Bank.  Motion, ECF

9  No. 190-4 at 21.

10  **III.  PLAINTIFFS AND THEIR FORCE-PLACED INSURANCE**

11      Plaintiffs Stephen Ellsworth and Marilyn Weaver live in California, and Plaintiffs Lawrence and

12  Donene Skelley live in New Mexico.  All plaintiffs had residential mortgage loans that were owned

13  or serviced by U.S. Bank, and all were secured by standard Single Family Fannie Mae/Freddie Mac

14  Uniform Instruments with the following standard uniform covenants that allow U.S. Bank to force-

15  place flood insurance if the borrower failed to maintain required coverage. *See* Ellsworth Decl.

16  ¶¶ 3-4, Ex. 1, ECF No. 119-8 - 119-9; Donene Skelley Decl. ¶¶ 8-9, Ex. A, ECF No. 148-5 - 148-6;

17  1st Weaver Decl., ¶¶ 8-9, Ex. A, ECF No. 148-16 - 148-17.

18  **5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter
   erected on the Property insured against loss by fire, hazards included within the term
19  "extended coverage," and any other hazards including, but not limited to, earthquakes and
   floods, for which Lender requires Insurance.  This Insurance shall be maintained in the
20  amounts (including deductible levels) and for the periods that Lender requires.  What Lender
   requires pursuant to the preceding sentences can change during the term of the Loan.  The
21  insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's
   right to disapprove Borrower's choice, which right shall not be exercised unreasonably.
22  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time
   charge for flood zone determination, certification and tracking services; or (b) a one-time
23  charge for flood zone determination and certification services and subsequent charges each
   time remappings or similar charges occur which reasonably might affect such determination
24  or certification.

25  If Borrower fails to maintain any of the coverages described above, Lender may obtain
   insurance coverage, at Lender's option and Borrower's expense.  Lender is under no
26  obligation to purchase any particular type or amount of coverage.  Therefore, such coverage
   shall cover Lender, but might or might not protect Borrower, Borrower's equity in the
27  Property, or the contents of the Property, against any risk, hazard or liability and might
   provide greater or lesser coverage than was previously in effect.  Borrower acknowledges
28  that the cost of the insurance coverage so obtained might significantly exceed the cost of

insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

*Id.*  At the time that they took out their loans, Plaintiffs did not maintain flood insurance, and they were not required to obtain flood insurance as a condition of their loans.  Ellsworth Decl. ¶ 4; Donene Skelley Decl. ¶ 9; Weaver Decl. ¶ 9.

All Plaintiffs received U.S. Bank's form "Notice of Temporary Flood Insurance Placed by Lender Due to Cancellation, Expiration, or Missing Policy Information" (described above), which explained that (A) their properties were in an SFHA (as determined by FEMA), (B) they were required to purchase flood insurance, (C) a failure to provide proof of adequate insurance within 45 days would result in the conversion of the temporary policy to a full-year policy, (D) the charge for the FPI [which was specified] then would be added to their escrow account, and (E) this insurance could be more expensive than the insurance they could purchase on their own (and included with this explanation a telephone number for an insurance agent who could provide adequate coverage). *See* Ellsworth Decl. ¶ 4, Ex. 2; Donene Skelley Decl. ¶ 12, Ex. C; 1st Weaver Decl. ¶ 12, Ex. C.  All had insurance force-placed on their residential properties, all were charged 90 cents per $100 of coverage, and all costs were charged to their escrow accounts so that they had no choice but to pay them.  Ellsworth Decl. ¶ 8, Ex. 2; Donene Skelley Decl. ¶ 20, Ex. C; 1st Weaver Decl. ¶ 16, Ex. F.

The following sections have additional facts about the individual plaintiffs.

**A. Stephen Ellsworth**

Ellsworth obtained his $393,892 mortgage on July 2, 2007, and it originated with and was serviced by U.S. Bank at all times.  *See* SAC, ECF No. 169, ¶¶ 8, 18, Ex. 1 at 3-4; Ellsworth Decl. ¶¶ 3-13, Ex. 1.  His loan originally was a construction loan and then was converted to a home loan. *See* Wolfe Decl., ECF No. 206, ¶ 18; Wolfe Dep. 36:12-37:14, ECF No. 139-10.  U.S. Bank is the lender-in-interest, and it services Ellsworth's loan through its U.S. Bank Home Mortgage division.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Wolfe Decl. ¶ 19.  When Ellsworth entered into the mortgage agreement, U.S. Bank did not require him to carry flood insurance.  SAC, ECF No. 169 at 5 n.2.  At some point after U.S. Bank claimed that Ellsworth was required to obtain flood insurance, he obtained a letter of map amendment from FEMA establishing that his home is not in an SFHA.  *Id.*

On June 9, 2010, U.S. Bank sent Ellsworth the notice (described in the previous section) that Ellsworth was required to have flood insurance.  *Id.* ¶ 23, Ex. 2 at 3.  On August 18, 2010, U.S. Bank sent its second notice and force-placed an ASIC insurance policy for $2,250 issued on August 18, 2010 and "backdated" it so that it was effective from July 3, 2009 to July 3, 2010.  *Id.* ¶¶ 24-25, Ex. 4 at 2.  In August 2010, Ellsworth purchased a one-year flood insurance policy through State Farm effective September 1, 2010.  *See id.* ¶ 28, Ex. 5, ECF No. 169-5.  This policy (like the ASIC policy) provided $250,000 in flood insurance coverage, but it was not backdated and cost only $276. *Id.*

On April 9, 2012, Ellsworth sent a letter to U.S. Bank requesting a refund of the charges he paid but received no response.  *See id.* ¶ 29, Ex. 6 at 2.  After Ellsworth filed his motion for class certification, U.S. Bank reimbursed the FPI charge, paid an interest rate of less than 1% (instead of the rate applicable to the mortgage loan), and did not reimburse any costs, expenses, attorney's fees, or damages sought in this litigation.  *See id.* ¶ 27.

**B.  Plaintiff Marilyn Weaver**

On August 28, 2011, Weaver obtained her $435,000 mortgage from First Nations Home Finance. After closing, by letter dated November 2, 2011, Freddie Mac notified her that her loan had been sold to Freddie Mac, and the new servicer of her loan was U.S. Bank.  *Id.* ¶ 30, Ex. 7 at 2.

On or about June 11, 2012, U.S. Bank sent Weaver its standard notice that she was required to have flood insurance.  *Id.* ¶ 33, Ex. 9.  On July 3, 2012, Weaver sold the property, and she finalized the sale papers on July 16, 2012.  *Id.* ¶ 34.  On July 18, 2012, Weaver notified U.S. Bank by letter and fax that she would not need flood insurance because the property had been sold and escrow would close on August 31, 2012.  *Id*. ¶ 34, Ex.10 at 2-3.

On August 13, 2012, U.S. Bank sent its second notice that it had force-placed an ASIC insurance policy effective July 27, 2012.  *Id.* ¶ 35, Ex. 11, ECF No. 169-11 at 2.  On August 21, 2012, Weaver

1   received the binder with the declarations page showing the ASIC-issued force-placed flood

2   insurance with an effective date of July 27, 2012, coverage of $250,000, and an annual premium of

3   $2,250.  *Id.* ¶ 36, Ex. 12 at 2-3.

4        Weaver signed the final papers for the sale of her house on August 29, 2012.  *Id.* ¶ 37.  Weaver

5   made several attempts to contact U.S. Bank to ask about canceling the force-placed flood insurance.

6   *Id.* ¶ 38, Ex. 14 at 2.  On September 11, 2012, U.S. Bank sent Weaver a letter stating that the

7   insurance coverage on her property had been partially cancelled effective August 30, 2012.  *Id.* ¶ 38,

8   Ex. 15 at 2.  On or about September 22, 2012, Weaver received a check in the amount of $2,041 for

9   a partial refund of the $2,250 that she initially paid for the force-placed flood insurance coverage.

10  *Id.* ¶ 39, Ex. 16 at 2.

11  **C.  Plaintiffs Lawrence and Donene Skelley**

12       On or about February 21, 2002, Plaintiffs Lawrence and Donene Skelley obtained their $100,000

13  mortgage from Firstbank.  *Id.* ¶ 40, Ex. 17, ECF No. 169-17 at 2.  When they closed on their

14  mortgage loan, the Skelleys' home was not located in an SFHA, and they were not required to carry

15  flood insurance on their property.  *Id.* ¶ 41.  On September 7, 2011, they received a notice that their

16  mortgage had been assigned to U.S. Bank effective February 3, 2011.  *Id.* ¶ 42, Ex. 18 at 2-3.

17       On December 12, 2011, U.S. Bank sent the standard form notice (described above) that the

18  Skelleys were required to buy flood insurance and that it had placed a temporary ASIC-issued flood

19  insurance policy with an effective date of June 1, 2011.  *Id.* ¶ 43, Ex. 19 at 2.  The attached

20  insurance binder showed the ASIC-issued policy with an effective date of June 1, 2011, a coverage

21  amount of $86,461, and a $778 annual premium.  *Id.* ¶ 43, Ex. 19 at 3; *see id.* ¶ 44, Ex. 20 at 3

22  (February 20, 2012 notice and declarations showing the same coverage and effective date).

23       On February 21, 2012, the Skelleys' insurance agent sent U.S. Bank a flood-zone determination

24  that showed that the Skelleys' home was not located in an SFHA and that flood insurance thus was

25  not available or required.  *Id.* ¶ 45, Ex. 21 at 3 (effective date on map was October 6, 2010).  On

26  March 5, 2012, U.S. Bank said that the property was no longer in a flood zone, and it no longer

27  required flood insurance.  *Id.* ¶ 46, Ex. 22, ECF No. 169-22 at 2.  It sent another letter that day that

28  its records showed "a lapse of insurance coverage from 06/01/11 to 03/05/12."  *Id.*, Ex. 23, ECF No.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    169-23 at 2.  On March 12, 2012, U.S. Bank said that it would cancel the flood insurance, issue a

2    partial refund of $187, and retain $591 for the coverage it provided through the termination date.  *Id*.

3    ¶ 47, Ex. 24, ECF No. 169-24 at 2.  It maintained that position after Ms. Skelley faxed another flood

4    zone determination on July 5, 2012.  *Id*. ¶¶ 48-49, Exs. 25-26.

5    **IV.  PROPOSED CLASS DEFINITIONS**

6        Plaintiffs state six claims in the SAC: (1) breach of contract against U.S. Bank; (2) breach of the

7    covenant of good faith and fair dealing against U.S. Bank; (3)-(4) unjust enrichment against U.S.

8    Bank and ASIC; and (5)-(6) violations of California Business & Professions Code section 17200 *et*

9    *seq*. against U.S. Bank and ASIC.  *See id.*, ¶¶ 86-130.  They propose multi-state and state classes.

10       Plaintiffs propose three multi-state classes for the breach of contract claim, one for each of the

11   following three theories: a lender-placed class, a QER class, and a backdating class.  The first two

12   challenge the alleged kickbacks, and the third challenges the alleged backdating.  Motion, ECF No.

13   190-4 at 2-4.  Each class has two subclasses: one for states with contract laws similar to California's

14   contract law (Ellsworth/Weaver subclasses), and one for states with contract laws similar to New

15   Mexico's contract law (Skelley subclasses).  *Id.*  In their reply brief, Plaintiffs agreed to narrow the

16   proposed class definition for all contract claims to include only loans owned by U.S. Bank and to

17   exclude loans "merely serviced by the bank."  Reply, ECF No. 222-4 at 7.

18       Plaintiffs also propose separate classes for the non-contract state-law claims under California and

19   New Mexico law based on the same three theories:  a lender-placed class, a QER class, and a

20   backdating class.  Motion, ECF No. 190-4 at 5-7.

21       The classes do not include "(1) Defendants' agents, board members, directors, officers, or

22   employees; or (2) any judicial officer assigned to this case or any immediate family member of such

23   judicial officer."  Motion, ECF No. 190-4 at 2 n.1.  Also, all classes have a limitation that excludes

24   "persons whose force-placed flood insurance charges were completely refunded or extinguished

25   through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-

26   lieu of foreclosure."  In their reply brief, Plaintiffs refine the limitation about refunds to include the

27   words "in the ordinary course of business."  *See* Reply, ECF No. 222-4 at 7.

28       The following chart summarizes the proposed classes by claim, and the proposed class

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

definitions (including any refinements by Plaintiffs in the reply brief) are set forth after the chart.

| Claim | Defendant | Proposed Classes |
|---|---|---|
| Breach of Contract (Claim 1) | U.S. Bank | 1. Multi-State Lender Placed Class<br>   a. Ellsworth Lender-Placed Sub-Class<br>   b. Skelley Lender-Placed Sub-Class<br><br>2. Multi-State QER Class<br>   a. Ellsworth QER Sub-Class<br>   b. Skelley QER Sub-Class<br><br>3. Multi-State Backdated Class<br>   a. Ellsworth Backdated Sub-Class<br>   b. Skelley Backdated Sub-Class |
| Implied Covenant (Claim 2)<br><br>Unjust Enrichment / Restitution / Disgorgement (Claim 3)<br><br>Unjust Enrichment / Restitution / Disgorgement (Claim 4) | U.S. Bank<br><br>U.S. Bank<br><br><br>ASIC | 1. California Lender-Placed Class<br>2. California QER Class<br>3. California Backdated Class<br>4. New Mexico Lender-Placed Class<br>5. New Mexico QER Class<br>6. New Mexico Backdated Class |
| California Unfair Competition Law (Claim 5)<br><br>California Unfair Competition Law (Claim 6) | U.S. Bank<br><br>ASIC | 1. California Lender-Placed Class<br>2. California QER Class<br>3. California Backdated Class |

**A.  Proposed Multi-state Classes for Breach of Contract Claim (Claim 1)**

Plaintiffs assert breach of contract claims for the following classes (the first two on a kick-back theory and the third on a backdating theory) with two subclasses based on the California-like and New Mexico-like contract laws.  See Motion, ECF No. 190-4 at 2-4.  The word "mortgage" includes a mortgage, deed of trust, or other type of security instrument.  *Id.* at 2 n.2.

**1.  *Proposed Multi-State Lender-Placed Flood Insurance Class***

**Proposed Multi-State Lender-Placed Class**: All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in California, Alabama, Alaska, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York, North Dakota, Oregon, Texas, Utah, West Virginia, New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Washington, Wisconsin, or Wyoming within the applicable statute of limitations, where such flood insurance

UNITED STATES DISTRICT COURT
For the Northern District of California

was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

> **(a) Proposed Ellsworth Lender-Placed Sub-Class**: All persons within the Multi-State Lender-Placed Class whose property is located in California, Alabama, Alaska, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York, North Dakota, Oregon, Texas, Utah, and West Virginia.

> **(b) Proposed Skelley Lender-Placed Sub-Class**: All persons within the Multi-State Lender-Placed Class whose property is located in New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Washington, Wisconsin, and Wyoming.

### 2. The Multi-State Qualified Expense Reimbursement ("QER") Classes

**Proposed Multi-State QER Class:** All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in California, Alabama, Alaska, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York, North Dakota, Oregon, Texas, Utah, West Virginia, New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Washington, Wisconsin, or Wyoming with an effective date within the applicable statute of limitations and prior to December 1, 2011, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short-sale, or deed-in-lieu of foreclosure.

> **(a) Proposed Ellsworth QER Sub-Class:** All persons within the Multi-State QER Class whose property is located in California, Alabama, Alaska, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York, North Dakota, Oregon, Texas, Utah, and West Virginia.

> **(b) Proposed Skelley QER Sub-Class**: All persons within the Multi-State QER whose property is located in New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Washington, Wisconsin, and Wyoming.

### 3. The Multi-State Backdated Flood Insurance Classes

**Proposed Multi-State Backdated Class:** All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the United States before January 1, 2013 and within the applicable statute of limitations, where such insurance was backdated by more than 60 days, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

**(a) Proposed Ellsworth Backdated Sub-Class:** All persons within the Multi-State Backdated Class whose property is located in California, Alabama, Alaska, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Missouri, New Jersey, New York, North Dakota, Oregon, Texas, Utah, and West Virginia.

**(b) Proposed Skelley Backdated Sub-Class:** All persons within the Multi-State Backdated Class whose property is located in New Mexico, Arizona, Arkansas, Delaware, Georgia, Maine, Minnesota, Mississippi, Montana, Nebraska, Nevada, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Virginia, Washington, Wisconsin, and Wyoming.

**B.  Proposed California State Classes (Claims 2 through 6)**

### 1. California Breach of the Covenant of Good Faith and Fair Dealing Claim

Ellsworth asserts a claim for breach of the covenant of good faith and fair dealing (claim 2) on behalf of three California classes.  *See id.*; Reply, ECF No. 222-4 at 7 (limited by definition to contract claims and thus to borrowers whose loans are owned by U.S. Bank; excluding Weaver).

**Proposed California Lender-Placed Good Faith and Fair Dealing Class:** All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of California on or after May 16, 2008, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

**Proposed California QER Good Faith and Fair Dealing Class:**  All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of California with an effective date on or after May 16, 2008 and prior to December 1, 2011, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

**Proposed California Backdated Good Faith and Fair Dealing Class:**  All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of California on or after May 16, 2008 and before January 1, 2013, where such insurance was backdated by more than 60 days, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

### 2. California Unjust Enrichment and Unfair Competition Claims

Ellsworth and Weaver assert claims for unjust enrichment (claims 3 and 4) and violations of California's Unfair Competition Law (claims 5 and 6) on behalf of three California classes.  *See*

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Motion, ECF No. 190-4 at 5.[2]

2    **Proposed California Lender-Placed Unjust Enrichment and UCL Class:** All persons with a
     closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform
3    Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property
     in the State of California on or after May 16, 2008, where such flood insurance was procured
4    with the assistance of American Security Insurance Company or its affiliates, excluding persons
     whose force-placed flood insurance charges were completely refunded [in the ordinary course
5    of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification,
     forbearance, short sale, or deed-in-lieu of foreclosure.

6
     **Proposed California QER Unjust Enrichment and UCL Class:** All persons with a closed-
7    end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who
     were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of
8    California with an effective date on or after May 16, 2008 and prior to December 1, 2011,
     where such flood insurance was procured with the assistance of American Security Insurance
9    Company or its affiliates, excluding persons whose force-placed flood insurance charges were
     completely refunded [in the ordinary course of business] or extinguished through a bankruptcy,
10   foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

11   **Proposed California Backdated Unjust Enrichment and UCL Class:** All persons with a
     closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform
12   Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property
     in the State of California on or after May 16, 2008 and before January 1, 2013, where such
13   insurance was backdated by more than 60 days, excluding persons whose force-placed flood
     insurance charges were completely refunded [in the ordinary course of business] or
14   extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short
     sale, or deed-in-lieu of foreclosure.

15

16   **C. Proposed New Mexico Classes**

17       ***1. New Mexico Breach of the Covenant of Good Faith and Fair Dealing Claim***

18       Lawrence and Donene Skelley assert a claim for breach of covenant of good faith and fair

19   dealing (claim 2) on behalf of three New Mexico classes.  *Id.* at 6-7.

20   **Proposed New Mexico Lender-Placed Good Faith and Fair Dealing Class:** All persons with
     a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely
21   serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were
     charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New
22   Mexico on or after May 16, 2008, where such flood insurance was procured with the assistance
     of American Security Insurance Company or its affiliates, excluding persons whose force-
23   placed flood insurance charges were completely refunded [in the ordinary course of business] or
     extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short
24   sale, or deed-in-lieu of foreclosure.

25   **Proposed New Mexico QER Good Faith and Fair Dealing Class:** All persons with a closed-
     end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the
26   bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by

27   _____

28       [2]  Weaver is not a class representative for the QER class.

U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May 16, 2008 and prior to December 1, 2011, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

**Proposed New Mexico Backdated Good Faith and Fair Dealing Class:** All persons with a closed-end residential mortgage loan owned by U.S. Bank (and excluding loans merely serviced by the bank) and secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May 16, 2008 and before January 1, 2013, where such insurance was backdated by more than 60 days, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

### 2. New Mexico Unjust Enrichment Claim

The Skelleys assert a claim for unjust enrichment on behalf of the following three New Mexico classes. *Id.* at 6-7.

**Proposed New Mexico Lender-Placed Unjust Enrichment Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May 16, 2008, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

**Proposed New Mexico QER Unjust Enrichment Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May 16, 2008 and **prior to December 1, 2011**, where such flood insurance was procured with the assistance of American Security Insurance Company or its affiliates, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

**Proposed New Mexico Backdated Unjust Enrichment Class:** All persons with a closed-end residential mortgage loan secured by a Fannie Mae/Freddie Mac Uniform Instrument, who were charged by U.S. Bank, N.A. for force-placed flood insurance on property in the State of New Mexico on or after May 16, 2008 and before January 1, 2013, where such insurance was backdated by more than 60 days, excluding persons whose force-placed flood insurance charges were completely refunded [in the ordinary course of business] or extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of foreclosure.

## V. ADDITIONAL RELEVANT PROCEDURAL HISTORY

On September 24, 2013, Ellsworth moved for class certification. *See* ECF No. 135. In its opposition, U.S. Bank said that it discovered at Ellsworth's October 4, 2013 deposition that

1    Ellsworth's property was never in a flood zone, and it said that it would issue a refund.  *See* ECF No.

2    132-5.  Ellsworth then proposed new class definitions and additional class representatives and

3    moved to amend the complaint.  *See* ECF Nos. 149-5, 151, 152.  Then U.S. Bank conducted an

4    internal review of the new proposed representative plaintiffs and "discovered that, like Mr.

5    Ellsworth, Ms. Skelley's property was never in a flood zone."  Wolfe Decl. Supp. U.S. Bank Opp'n

6    to Motion to Amend, ECF No. 165-1, ¶¶ 7-9.  It issued a refund.  *Id.* ¶ 9.  The court allowed the new

7    complaint, ordered additional briefing to address the new class definitions, issued a new case

8    management schedule, and denied Defendants' motion to dismiss.  On May 15, 2014, the court held

9    a hearing on the motion for class certification and U.S. Bank's two motions.

10                                              **ANALYSIS**

11   **I. CLASS CERTIFICATION**

12        Plaintiffs move to certify a damages classes under Rule 23(b)(3).

13        A threshold requirement is that Plaintiffs must establish a definable class.  *See* Fed. R. Civ. P.

14   23(c)(1)(B) ("[a]n order that certifies a class action must define the class and the class claims, issues,

15   or defenses"); *Mazur v. Ebay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).  A party seeking class

16   certification then must show the following prerequisites of Rule 23(a): numerosity, commonality,

17   typicality, and adequacy of representation.  A court may certify a class under Rule 23(b)(3) if the

18   court finds that questions of law or fact common to class members predominate over any questions

19   affecting only individual members, and a class action is superior to other available methods for

20   fairly and efficiently adjudicating the controversy.  *See* Fed. R. Civ. P. 23(b)(3).

21        "Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the

22   prerequisites of Rule 23(a) have been satisfied."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

23   2550 (2011) (internal quotation marks and citation omitted).  The "rigorous analysis" often will

24   "entail some overlap with the merits of the plaintiff's underlying claim."  131 S. Ct. at 2551.  More

25   specifically:

26        [A] party seeking to maintain a class action must affirmatively demonstrate his compliance with
          Rule 23.  The Rule does not set forth a mere pleading standard.  Rather, a party must not only be
27        prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law
          or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule
28        23(a).  The party must also satisfy through evidentiary proof at least one of the provisions of

1   Rule 23(b). . . . [I]t may be necessary for the court to probe behind the pleadings before coming
    to rest on the certification question, and . . . certification is proper only if the trial court is
2   satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Such
    an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim.  That
3   is so because the class determination generally involves considerations that are enmeshed in the
    factual and legal issues comprising the plaintiff's cause of action.  The same analytical principles
4   govern Rule 23(b).

5   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation marks and citations omitted).

6   Still, "Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage.

7   Merits questions may be considered to the extent – but only to the extent – that they are relevant for

8   determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v.*

9   *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  If a court concludes that the

10  moving party has met its burden of proof, then the court has broad discretion to certify the class.

11  *Zinser v. Accuflix Res. Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001).

12  **A. Plaintiffs Establish a Definable, Ascertainable Class**

13      A class should be sufficiently definite and "clearly ascertainable" by reference to objective

14  criteria "so that it is administratively feasible [for a court] to determine whether a particular person

15  is a class member" and thus "bound by the judgment."  *Shepard v. Lowe's HIW, Inc.*, No. C 12-3893

16  JSW, 2013 WL 4488802 (N.D. Cal. Aug. 19, 2013) (collecting cases);  *Deitz v. Comcast Corp.*, No.

17  C 06-06352 WHA, 2007 WL 2015440, at *8 (N.D. Cal. July 11, 2007) (proposed class of cable

18  subscribers who owned cable-ready televisions or related equipment not ascertainable where the

19  defendant did not maintain records to identify those customers, rendering it "impossible to

20  determine without significant inquiry which subscribers owned such devices"); *see also* Newberg on

21  Class Actions § 3:3 (5th Ed. 2013) ("Administrative feasibility means that identifying class members

22  is a manageable process that does not require much, if any, individual factual inquiry."); Annotated

23  Manual for Complex Litigation (Fourth) § 21.222 (2013) ("Because individual class members must

24  receive the best notice practicable and have an opportunity to opt out, and because individual

25  damage claims are likely, Rule 23(b)(3) class actions require a class definition that will permit

26  identification of individual class members").  Still, "the class need not be so ascertainable that every

27  potential member can be identified at the commencement of the action."  *Ortiz v. CVS Caremark*

28  *Corp.*, No. C-12-05859 EDL, 2013 WL 6236743 (N.D. Cal. Dec. 2, 2013) (quotation omitted).

1    As refined, the class definitions exclude persons whose force-placed flood insurance charges

2    were [1]"completely refunded ['in the ordinary course of business'] or [2] extinguished through a

3    bankruptcy, foreclosure judgment, loan modification, forbearance, short sale, or deed-in-lieu of

4    foreclosure."  *See supra* Statement; Reply, ECF No. 222-4 (inserting bracketed quote as an

5    additional limitation).  These limitations are crafted to exclude anyone who received a full refund or

6    otherwise had their obligations extinguished.  Defendants do not argue that it is possible to

7    extinguish the obligation to pay FPI charges in ways other than the six examples.

8    Defendants agree that this limitation is required for class certification but assert that its business

9    records do not allow it to identify these borrowers who are excluded from the class.  *See* U.S. Bank

10   Opp'n, ECF No 200-5 at 18; ASIC Opp'n, ECF No. 199 at 16.  More specifically, according to the

11   Defendants, "[t]he only way to tell how much has been paid is to analyze each borrower's escrow

12   account or manually review each borrower's loan file" and the "only way to determine whether a

13   borrower's Flood LPI charge has been completely refunded through a flat-out cancellation is to

14   conduct a file-by-file review of all borrowers with Flood LPI charges."  U.S. Bank Opp'n, ECF No.

15   200-5 at 11; *see* Stewart Decl., ECF No. 207, ¶¶ 4-5.  ASIC adds that "U.S. Bank's records might

16   indicate that a complete refund occurred or a charge was extinguished, but they are insufficiently

17   detailed to explain why that occurred" without a file-by-file review.  ASIC Opp'n, ECF No. 199 at

18   16 (citing Stewart Decl., ECF No. 207, ¶¶ 5-6).

19   According to Plaintiffs, U.S. Bank produced data for borrowers including the loan type, the issue

20   and effective dates for force-placed insurance, the coverage amount, the gross amount charged, the

21   amount of any refund, and the net amount (meaning, the gross amount less any refund).  *See* 3d

22   Richter Decl., ECF No. 221-3, ¶ 5; *id.* Exs. 1-2.  This information shows that excluded members of

23   the class are identifiable.  It does not matter why a charge is refunded or extinguished; it is sufficient

24   that U.S. Bank can identify borrowers whose charges were completely refunded in the ordinary

25   course of business or otherwise cancelled or extinguished.

26   Moreover, to the extent that U.S. Bank makes the argument that a file-by-file review is required

27   to calculate damages for borrowers who make partial payments, *see* U.S. Bank Opp'n, ECF No. 200-

28   5 at 18 n.11, again, the net amount is reflected in the data.  Again, it does not matter why refunds

1   were made.  If extinguishments are different (for example, because there is a partial write-off during

2   a loan modification), the net amount apparently is on the spreadsheet, the reason does not matter,

3   and the amount of any write-off by U.S. Bank is ascertainable from the general data and reflected (as

4   are the damages) in the net amount.

5        Thus, like the definition in *Lane v. Wells Fargo Bank, N.A.*, limiting the class to exclude

6   recovered or extinguished charges is appropriate.  *See* No. C 12-04026 WHA, 2013 WL 3187410, at

7   *10 (N. D. Cal. June 21, 2013).  That information is ascertainable from the records, even if it "will

8   entail some effort on the part of counsel for both parties" to identify the class members.  *See id.*

9   (reaching this conclusion).  Also, and for the reasons stated in *Lane*, the class does not exclude

10  borrowers with charges on the books that were not otherwise refunded or extinguished, even if the

11  borrowers have not paid them.  *Id.* at *9.  The limitation will read: "excluding persons whose force-

12  placed flood insurance charges were (1) completely refunded in the ordinary course of business or

13  (2) extinguished through a bankruptcy, foreclosure judgment, loan modification, forbearance, short

14  sale, or deed-in-lieu of foreclosure."

15       To the extent that Defendants argue that Ellsworth or the Skelleys are excluded from the class

16  because U.S. Bank refunded or tried to refund their FPI charges in this litigation, they are not. The

17  "complete refund in the ordinary course of business" limitation is crafted so that it does not exclude

18  Ellsworth or the Skelleys.  As the court held previously, the refunds in this litigation arguably were

19  part of a litigation strategy, were not in the ordinary course of business, and did not moot the claims.

20  *See* 3/21/14 Order, ECF No. 186 at 25.

21       ASIC also argues that the class definition is unmanageable because some borrowers may have

22  received assistance from loan assistance programs such as the U.S. Treasury's Hardest Hit Fund or

23  Keep Your Home California.  *See* ASIC Opp'n, ECF No. 199 at 11.  The programs provide

24  mortgage assistance to borrowers who are delinquent or facing default.  *Id.*  Examples include

25  providing up to $3,000 per month for 12 months to borrowers who are involuntarily unemployed or

26  providing help to borrowers with reinstating a loan (including up to $25,000).  *See id.*  U.S. Bank

27  participates in the programs and has had transactions funded through them.  *Id.*  ASIC argues that it

28  would be unmanageable to conduct the file-by-file review needed to ascertain whether the program

UNITED STATES DISTRICT COURT
For the Northern District of California

1  assistance was credited to borrowers' LPI charges.  *Id.*  This order does not exclude program

2  payments credited to LPI charges, which in turn eliminates ASIC's manageability concern because

3  no file-by-file review will be necessary.  This approach also is consistent with the point of the

4  programs, which is to help borrowers with delinquent mortgages.  If Defendants credited mortgage

5  assistance to LPI charges, then refunds of the charges – again, identifiable from general records –

6  allow the program funds to be used for their intended purpose: delinquent mortgage payments.

7  Defendants do not offer any arguments that support a contrary conclusion.

8       Defendants also note that U.S. Bank owns some loans and services others.  If U.S. Bank just

9  services the loans (as with Ms. Weaver's loan), a file-by-file review is needed to determine whether

10  U.S. Bank acquired a "partial interest" in a loan sufficient to allow a breach of contract claim against

11  it.  U.S. Bank Opp'n, ECF No. 200-5 at 18.  U.S. Bank has identified "the loans where it acted

12  exclusively in a servicing capacity."  Plaintiffs' Reply, ECF No. 222-4 at 7.  To address the issue, in

13  the reply brief, Plaintiffs narrowed the class definition for the contract claims to include only loans

14  owned by U.S. Bank and to exclude loans "merely serviced by the bank."  *Id.*  This limitation

15  eliminates the need for a file-by-file review and addresses U.S. Bank's manageability concern.

16  **B. Rule 23(a) Requirements**

17       Plaintiffs must show the following prerequisites of Rule 23(a): numerosity, commonality,

18  typicality, and adequacy of representation.

19       *1. Numerosity*

20       Rule 23(a)(1) requires that, for a class to be certified, "the class is so numerous that joinder of all

21  members is impracticable."  Defendants do not challenge certification based on the numerosity

22  element.  Plaintiffs submitted evidence establishing that the total number of loans with force-placed

23  flood insurance policies is approximately 16,000 (14,000 with effective dates during the period that

24  ASIC paid QERs to U.S. BIS and 4,500 that are backdated more than 60 days).  *See* 1st Richter

25  Decl., ECF No. 119-1, ¶¶ 23-24.  That submission satisfies the numerosity requirement.

26       *2. Commonality*

27       Under Rule 23(a)(2), a class cannot be certified unless Plaintiffs establish that "there are

28  questions of law or fact common to the class."  Rule 23(a)(2) does not require Plaintiffs to show that

each class member's claim is based on identical factual and legal issues: "The existence of shared legal issues with divergent factual predicates is sufficient" to meet the requirements of Rule 23(a)(2). *Parra v. Bashas, Inc.*, 536 F.3d 975, 978 (9th Cir. 2008) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Under Rule 23(a)(2), "even a single common question will do." *Dukes*, 131 S. Ct. at 2556 (quotation omitted). "Commonality requires the plaintiff to demonstrate that class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 2551. The common question "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common 'questions'– even in droves – but rather the capacity of a classwide proceeding to generate common answers apt to drive resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citation omitted).

Plaintiffs identify the following common factual and legal questions, among others:

1. Whether the QERs that ASIC provided to U.S. BIS were legitimate or simply constituted a kickback;

2. Whether ASIC offered insurance tracking services to U.S. Bank at a discount in return for its FPI business, and if so, whether this constituted a type of kickback;

3. Whether U.S. Bank had the contractual authority under Paragraph 5 of the Uniform Instrument to (1) arrange for cash or in-kind compensation for itself or its affiliates on FPI; and (2) whether it had the authority to significantly backdate coverage;

4. Whether the QERs and subsidized services that U.S. Bank received from ASIC were "reasonable and appropriate," as required by Paragraph 9 of the Uniform Instrument;

5. Whether significantly backdating coverage is reasonable and appropriate; and

6. Whether statutory amendments apply retroactively to authorize backdated FPI.

Motion, ECF No. 190-4 at 31-32; Reply, ECF No. 222-4 at 6. Additional common issues on the state claims include whether the FPI practices of kickbacks and backdating violated U.S. Bank's duty of good faith and fair dealing, whether Defendants were enriched unjustly, and whether the practices were unfair under California's unfair competition law. *See* Motion, ECF No. 190-4 at 32.

The allegations here are that Plaintiffs had identical form contracts, the policies were applied

UNITED STATES DISTRICT COURT
For the Northern District of California

1    uniformly, and form notices were sent about the FPI and the charges.  Plaintiffs allege a common

2    scheme to force place insurance on borrowers in a way designed to increase kickbacks to U.S. Bank

3    from a captive insurance provider (ASIC) in the form of QERs or discounted tracking services, and

4    to maximize costs collected from borrowers by force-placing LPFI policies that were backdated

5    more than 60 days.  *See* Motion, ECF No. 190-4 at 23-26.  In similar cases, courts in this district

6    have found commonality under Rule 23(a)(2).  *See, e.g., Hofstetter v. Chase Home Finance, LLC*,

7    No. C 10-01313 WHA, 2011 WL 1225900, at *8 (N.D. Cal. Mar. 31, 2011) (TILA claim), *13

8    (UCL claim); *Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2013 WL 3187410, at *8

9    (N.D. Cal. June 21, 2013) (commonality satisfied as to a California class).

10       Defendants do not argue otherwise and instead argue that individual issues predominate over

11   common issues.  *See* U.S. Bank Opp'n, ECF No. 200-5 at 10-23; ASIC Opp'n, ECF No. 199 at 15-

12   24.  The order addresses predominance below.

13       ### *3. Typicality*

14       Rule 23(a)(3) requires, as a prerequisite to class certification, that "the claims or defenses of the

15   class representatives [must be] typical of the claims or defenses of the class. . . . [R]epresentative

16   claims are typical if they are reasonably co-extensive with those of absent class members; they need

17   not be substantially identical."  *Hanlon* 150 F.3d at 1020 (internal quotation marks and citation

18   omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not

19   to the specific facts from which it arose or the relief sought."  *Ellis v. Costco Wholesale Corp.*, 657

20   F.3d 970, 984 (9th Cir. 2011).  "The test of typicality is whether other members have the same or

21   similar injury, whether the action is based on conduct which is not unique to the named plaintiffs,

22   and whether other class members have been injured by the same course of conduct."  *Hanon v.*

23   *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks

24   omitted).  "The purpose of the typicality requirement is to assure that the interest of the named

25   representative aligns with the interests of the class. . . . [C]lass certification is inappropriate when a

26   putative class representative is subject to unique defenses which threaten to become the focus of the

27   litigation."  *Id.*

28       The claims are typical.  The allegations here are that Plaintiffs had identical form contracts, and

1   the policies were applied uniformly (including through uniform notices).  The harms are identical,

2   and classes and subclasses address different theories of liability.

3       U.S. Bank challenges typicality in four ways.

4       *First*, it argues that the QER theory requires payment of QERs when the borrower was charged

5   for the FPI.  U.S. Bank Opp'n, ECF No. 200-5 at 30.  Defendants discontinued QERs effective

6   December 1, 2011.  *Id.* (noting that Plaintiffs concede this point).[3]  Plaintiffs' revised class

7   definitions define the QER classes by reference to persons who were charged for FPI "with an

8   effective date within the applicable statute of limitations and prior to December 1, 2011."  *See supra*

9   Statement.  The Skelleys and Weaver were not charged for FPI until after December 1, 2011, but

10  they meet the class definition because the effective date for their FPI is before December 1, 2011.

11  But U.S. Bank argues that the claim of an unlawful kickback in the form of a QER necessarily

12  requires tying the FPI charge to the QER, meaning, U.S. Bank needs to be paid the QER when the

13  borrower is charged for the FPI.  Thus, U.S. Bank argues, the Skelleys – while technically meeting

14  the class definition – are not typical (or adequate) class representatives because they were not

15  charged for FPI until after Defendants terminated QERs.  U.S. Bank Opp'n, ECF No. 200-5 at 30.

16      Plaintiffs' QER theory is that the QERs were really kickbacks to U.S. Bank that were passed on

17  to borrowers in inflated charges for the LPFI.  *See* Reply, ECF No. 222-4 at 19.  Charges for LPFI

18  accrue as of the effective date of the coverage, not the issue date.  *Id.*  If QERs are built into the pre-

19  December 1, 2011 LPFI charges, then under Plaintiffs' theory, the charges were inflated improperly,

20  and the damages would be the same for the Skelleys and the QER class members.  *Id.*  Plaintiffs also

21  point out that U.S. Bank provides no evidence that QERs were not paid for the Skelleys' loan.  *Id.*

22  In addition, U.S. Bank makes no showing that the QERs would have affected the Skelleys

23

24

25

26      [3]  The documents filed by Plaintiffs are undated but the termination agreement has an

27  effective date of December 1, 2013 (although the addendum is redacted).  *See* Termination of the
    Expense Reimbursement Addendum to Schedule 1 of the Master Supplier Service Agreement, 1st

28  Richter Decl. Ex. 16, ECF No. 137-10.

UNITED STATES DISTRICT COURT
For the Northern District of California

differently than other proposed class members. *See* U.S. Bank's Opp'n, ECF No. 200-5 at 30.[4]

*Second*, U.S. Bank argues that Ellsworth's claims are not typical because he took out a construction loan, not a home loan. U.S. Bank Opp'n, ECF No. 200-5 at 31. Construction loans do not require flood insurance; only improved real estate does, and even then, only if the structure is in a flood zone. Wolfe Decl., ECF No. 206, ¶ 9. But Ellsworth's construction loan was later converted into a standard home mortgage loan, which was subject to the same flood insurance requirements and notices. *See* Wolfe Dep. 36:17-37:10, 1st Richter Decl. Ex. 4, ECF No. 139-10. Ellsworth's harm (in the end) is the same.[5]

*Third*, U.S. Bank argues that Ellsworth and the Skelleys are atypical class representatives because they were treated differently than the putative class members. U.S. Bank Opp'n, ECF No.

---

[4]   In support of its conclusion that the Skelleys are "wholly inadequate and not typical" because they were not charged until after QERs were terminated, U.S. Bank cites *Gooden v. SunTrust Mortg., Inc.*, No. 2:11-cv-02595-JAM-DAD, 2013 WL 6499250, at *9 (E.D. Cal. Dec. 11, 2013). *See* U.S. Bank Opp'n, ECF No. 200-5 at 30-31. That case involved only a determination that plaintiffs with force-placed flood insurance are atypical representatives of a force-placed hazard insurance class. *See Gooden*, 2013 WL 6499250, at *9. This case involves named plaintiffs with the same injury as putative class members who fit within the class definition, and Plaintiffs assert a coherent theory on the effect of QERs on FPI charges. While the court considers merits issues, it does so only to the extent that they are relevant to the Rule 23 prerequisites. *See Amgen*, 133 S. Ct. at 1194-95.

[5]   In support of its conclusion that Ellsworth is not typical, U.S. Bank cites (without further explanation) *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998), for the proposition that there is no "typicality where '[t]he differences between the [Franchise and Trade Agreements] raise the distinct possibility that there was a breach of contract with some class members but not with other class members'"). U.S. Bank Opp'n, ECF No. 200-5 at 31. In *Broussard*, the Fourth Circuit reversed class certification (and a $590 million judgment) and remanded in part because the plaintiffs were not typical of the putative class members. *Broussard* was a franchisor-franchisee suit in which ten muffler shop owners sued the franchisor and its advertising agency, among others, for breach of their FTAs. *Id.* at 335. The plaintiffs were atypical class representatives because the franchisees "signed FTAs containing materially different contract language." *Id.* at 340. Thus, "the contract claims of plaintiffs are not typical of claims of franchisees who entered into FTAs containing different language." *Id.* Unlike the different contracts in *Broussard*, this case ultimately involves the same form contracts, and the fact that Ellsworth's loan began as a construction loan does not matter because in the end, his mortgage converted to a standard home mortgage loan with the same terms resulting in the same FPI imposed pursuant to standard policies.

200-5 at 31. The point is that U.S. Bank made mistakes with both. Both homes were improperly classified as being in SFHAs. *Id.*; *see supra* Statement. Also, with Ellsworth, U.S. Bank did not follow its policy regarding timing of the placement of the FPI. If it had, the policy "would have resulted in coverage effective the day after the 45 day notice period expires, rather than retroactively lender-placed by more than one year." U.S. Bank Opp'n, ECF No. 200-5 at 31 (citing Wolfe Decl., ECF No. 206, ¶ 9). Once it discovered its errors, U.S. Bank refunded the LPFI charges to Ellsworth and the Skelleys. *Id.*; *see* ASIC Opp'n, ECF No. 199 at 18 (arguing this results in mootness and a lack of standing to pursue injunctive relief). These differences do not alter typicality. The nature of the claim remains the same: wrongful FPI. The injury is the same. The interests of the named plaintiffs are the same as the interests of the named class. Whether U.S. Bank made mistakes here is just another reason why the FPI was wrong and does not change Plaintiffs' challenges to the alleged uniform policies and practices of wrongful FPI, kickbacks, and backdating. Also, "[w]here a plaintiff challenges a well-established company policy, a defendant cannot cite poor management to defend against class certification." *Kurihara v. Best Buy Co.*, No. C 06-01884 MHP, 2007 WL 2501698, at *10 (N.D. Cal. Aug. 30, 2007). The attempted refund does not change the typicality analysis either. To the extent that it is a defense, it is not the kind of defense that defeats typicality by the need for substantial cross-examination on negative facts or that poses "a danger that absent class members will suffer if their representative is preoccupied with defenses [or issues] unique to it," at least with regard to a claim for damages. *See Hanon*, 976 F.3d at 508. The court already held that the refunds during this litigation arguably was a litigation strategy that did not moot the claims (including those under the UCL). *See* 3/21/2014 Order, ECF No. 186 at 21-25.

*Fourth*, U.S. Bank argues that Ellsworth and the Skelleys are atypical because they agree that it was not reasonable to ignore the 45-day notice letters warning of imminent FPI. U.S. Bank Opp'n, ECF No. 200-5 at 32. This is a "failure to mitigate" defense that U.S. Bank argues renders them atypical and creates conflicts with other class members. *Id.* This does not affect typicality. What is at issue here is whether U.S. Bank appropriately force-placed backdated insurance and the relatively higher LPFI charges caused by U.S. Bank and ASIC's undisclosed kickback arrangements. It is not a defense that poses the kind of danger that defeats typicality. *See Hanon*, 976 F.3d at 508.

1    ASIC's argument is that Plaintiffs lack Article III standing on their injunctive relief claims

2  because they cannot demonstrate a real or immediate threat of being forced to pay for inflated or

3  backdated LPFI charges.  *See* ASIC Opp'n, ECF No. 199 at 18.  Ellsworth's and the Skelleys'

4  properties are no longer located in flood zones, and Weaver is no longer a U.S. Bank borrower.  *See*

5  SAC, ECF No. 169, ¶¶ 21 n.2, 34, 45-49.  Plaintiffs do not respond to this argument in their reply

6  brief.  *See generally* Reply, ECF No. 222-4.

7    ASIC's reasoning makes sense to the extent Plaintiffs seek injunctive relief under the UCL.  But

8  the court disagrees with ASIC's argument that this dooms Plaintiffs' UCL claim for restitution.

9  *See* ASIC Opp'n at 18.  ASIC cites *Deitz* for the proposition that where a plaintiff "lacks standing

10  even to obtain an injunction," he "is not entitled to restitutionary relief."  2006 WL 3782902, at *5.

11  As the California Supreme Court made clear in a post-*Deitz* opinion, however, "the right to seek

12  injunctive relief under section 17203 is not dependent on the right to seek restitution; the two are

13  wholly independent remedies."  *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 790 (2010) (citation

14  omitted) (section 17203 "contains . . . no language of condition linking injunctive and restitutionary

15  relief"); *see also Maraventano v. Nordstrom, Inc.*, No. 10-CV-02671 JM WMC, 2013 WL 5936183,

16  at *3-5 (S.D. Cal. Nov. 1, 2013) (discussing the developments in this case law).

17    ### 4. *Adequacy of Representation*

18    Rule 23(a)(4) requires that, before a court may certify a class, it must find that "the

19  representative parties will fairly and adequately protect the interests of the class."  The requirement

20  applies to the class representative and class counsel and requires resolution of two questions: "(1) do

21  the named plaintiffs and their counsel have any conflicts of interest with other class members, and

22  (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

23  class?"  *Hanlon,* 150 F.3d at 1020.  Rule 23(g)(4) also specifies that class counsel "must fairly and

24  adequately represent the interests of the class."  Under Rule 23(g)(1)(A), the court must consider the

25  following criteria in appointing class counsel:

26        (i) the work counsel has done in identifying or investigating potential claims in the
          action;

27        (ii) counsel's experience in handling class actions, other complex litigation, and the types
28        of claims asserted in the action;

UNITED STATES DISTRICT COURT
For the Northern District of California

C 12-02506 LB (ORDER)                                27

1          (iii) counsel's knowledge of the applicable law; and

2          (iv) the resources that counsel will commit to representing the class.

3    Rule 23(g)(1)(B) permits the court to "consider any other matter pertinent to counsel's ability to

4    fairly and adequately represent the interests of the class."

5          Defendants do not dispute the adequacy of Plaintiffs' counsel.  Plaintiffs retained counsel with

6    significant experience in prosecuting force-placed insurance cases, and other courts in this district

7    have appointed them class counsel in force-placed insurance cases.  *See* 1st Richter Decl., ECF No.

8    136, ¶¶ 28-33; *see also* Transcript of Oral Argument at 8-9, *Hofstetter v. Chase Home Finance, LLC*,

9    No. C 10-1313 WHA (N.D. Cal. Sept. 19, 2012) ( referring to the attorneys in that LPFI class action,

10   including Plaintiffs' counsel, as "models of excellent professionals" in final settlement approval

11   hearing).  Counsel have worked vigorously to identify and investigate the claims in this case, and, as

12   this litigation has revealed, understand the applicable law and have represented their clients

13   vigorously and effectively.  *See In re Netflix Privacy Litigation*, No. 5:11-CV-00379 EJD, 2012 WL

14   2598819, at *3 (N.D. Cal. July 5, 2012).

15        As to the adequacy of the named Plaintiffs, the requirement is meant to evaluate whether "the

16   named plaintiff's claim and the class claims are so interrelated that the interests of the class

17   members will be fairly and adequately protected in their absence."  *Gen. Tel. of Sw. v. Falcon*, 457

18   U.S. 147, 158 n.8 (1982).  Plaintiffs assert, and Defendants do not dispute, that they have worked

19   actively with counsel to prepare and "vigorously" prosecute the case, have no conflicts, and will

20   represent the class members' interests as if they were their own.  *See* Ellsworth Decl., ECF No. 119-

21   8, ¶ 18; 2d Weaver Decl., ECF No. 189-3, ¶¶ 7-8; 2d Donene Skelley Decl., ECF No. 189-1, ¶¶ 7-8;

22   2d Lawrence Skelley Decl., ECF No. 189-2, ¶¶ 7-8.  All suffered the same injuries as the multi-state

23   class members they seek to represent.  *See Hofstetter*, 2011 WL 1225900, at *9 (finding plaintiffs

24   adequate because they suffered the same injury and had no conflicts of interest with the class

25   members).  Given their common claims and shared interests, Plaintiffs adequately represent the

26   classes' interests under Rule 23(a)(4).

27        Defendants' only argument against this result is that Plaintiffs are not adequate representatives

28   under Rule 23(b)(3).  The order addresses Rule 23(b) below.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

## C.  Rule 23(b)(3) Requirements

Under Rule 23(b)(3), a class action is maintainable if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3) thus requires two inquiries: (1) do the common questions of law or fact "predominate" over questions over questions affecting only individual class members, and (2) is class treatment "superior" to alternative methods for adjudicating the controversy?

### 1. Predominance of Common Questions

The Rule 23(b)(3) predominance inquiry involves weighing and evaluating the common and individual issues in the case. *See Dukes*, 131 S. Ct. at 2556.  It involves consideration of the same principles that guide the Rule 23(a) commonality analysis, but it "is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432.  The Rule 23(a)(2) inquiry concerns only whether the plaintiff shows the existence of a common issue of law or fact. *See Dukes*, 131 S. Ct. at 2556.  The predominance inquiry looks at those common questions, "focuses on the relationship between the common and individual issues," *Hanlon*, 150 F.3d at 1022, and requires the court to weigh the common issues against the individual issues. *See Dukes*, 131 S. Ct. at 2556.  Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication. *Hanlon*, 150 F.3d at 1022.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  "In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative defenses); then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried." *Gaudin v. Saxon Mortgage Servs., Inc.*, No. 11-CV-01663-JST, 2013 WL 4029043 (N.D. Cal. Aug. 5, 2013) (citing Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:412).  The predominance analysis is a pragmatic one: it is not a numerical analysis and instead is a qualitative assessment of overriding issues in the case, despite the existence of individual questions. *See* Newberg on Class Actions, § 4.51 (5th Ed.

2013); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (finding a single, central issue of liability in a class action involving defects in washing machines; the two central defects were mold and the control unit; those differences could be addressed by subclassing; differences in damages can be addressed in individual hearings, in settlement negotiations, or by creation of subclasses), *cert. denied*, 134 S. Ct. 1277 (2014).

As discussed in the section on commonality, Plaintiffs – all with the same Fannie Mae/Freddie Mac Uniform Instrument – allege a common scheme to force-place insurance on borrowers and pass on inflated charges that include kickbacks to U.S. Bank in the form of QERs and discounted tracking services and a policy and practice of backdating policies, resulting in increased charges for FPI. *See supra* I.B.2, Commonality (listing common issues regarding the alleged kickbacks, the contractual authority for the FPI compensation arrangements and backdating, the retroactivity of legislation, and the state claims). The challenged practices are the same, the insurer ASIC is the same, and the legal issues generally are the same: were the practices lawful under the standard mortgage contract or under state laws regarding the implied covenant of good faith and fair dealing, unjust enrichment, or unfair competition.

These common issues have resulted in courts – including courts in this district – concluding that common issues predominate and certifying class-wide relief to borrowers with claims based on a kickback theory and/or inflated charges for FPI. *See, e.g., Lane*, 2013 WL 3187410, at *8 (certifying California class asserting breach of Fannie Mae/Freddie Mac and FHA form contracts by taking kickbacks in connection with FPI); *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 675-76 (S.D. Fla. 2012) (certifying Florida class on claims of unjust enrichment and breach of the covenant of good faith and fair dealing related to inflated charges and unlawful commissions/kickbacks on FPI); *Hofstetter*, 2011 WL 1225900, at *8, * 11 (certifying national TILA class and California UCL class based on theory of inflated charges and commissions/kickbacks to bank in connection with FPI); *Hall v. Midland Group*, No. CIV.A. 99-3108, 2000 WL 1725238, at *1, *3 (E.D. Pa. Nov. 20, 2000) (certified nationwide settlement class on RICO, FDCPA, and state law contract, breach of the duty of good faith, fraud, and unfair practices claims regarding FPI through agencies owned by affiliates that received commissions for

1  the placements); *Robinson v. Countrywide Credit Indus.*, No. CIV.A. 97-2747, 1997 WL 634502, at

2  *4-5 (E.D. Pa. Oct. 8, 1997) (certifying nationwide class on RICO claims of mail and wire fraud

3  relating to FPI with common issues about whether the form contracts authorized placement of the

4  type of insurance and whether Countrywide knowingly purchased inflated or expensive policies to

5  generate commissions); *accord Wahl v. Am. Sec. Ins. Co.*, No. C 08-00555 RS, 2010 WL 1881126,

6  at *7-8 (N.D. Cal. May 20, 2010) (certifying California class to pursue UCL claim on the ground

7  that  that the insurance company and mortgage servicer both stood to benefit from the FPI); *see also*

8  *Brand v. Nat'l Bank of Commerce*, No. 99-60167, 213 F.3d 636, 2000 WL 554193, at *1 (5th Cir.

9  2000) (upholding certification of RICO/fraud class regarding FPI on ground that bank charged

10  borrowers more than the cost of insurance under a system of kickbacks from the insurer; noted that

11  issues would be determined on the basis of the terms of the loan agreement, the terms of the

12  insurance policies, the existence of a robotic system, and the bank's policies regarding collateral

13  protection insurance; "[d]ue to the uniformity of these issues and the relatively small damages to

14  each class member, these claims are particularly suited to class determination.").

15      Moreover, courts routinely certify class actions regarding breaches of form contracts. *See In Re*

16  *Med. Capital Secs. Litig.*, No. SAML 10-2145 DOC (RNBx), 2011 WL 5067208, at *3 (C.D. Cal.

17  Jul. 26, 2011) (collecting cases); *see also* Motion, ECF No. 190-4 at 32-33 n.17 (collecting other

18  cases holding that commonality and predominance exist in form contracts).

19      This authority supports the conclusion that common questions predominate when, as here, they

20  involve form contracts and standardized policies and practices applied on a routine basis to all

21  customers by a bank. *See, e.g., Gutierrez v. Wells Fargo Bank*, No. C 07-5923 WHA, 2008 WL

22  427999550, at *17 (N.D. Cal. Sept. 11, 2008).

23      U.S. Bank and ASIC nonetheless argue that individual issues predominate over common issues

24  in six ways: (a) variations in state contract law defeat certification; (b) the damages theory does not

25  tether damages to the QERs or insurance tracking; (c) the backdating allegations require an

26  individualized inquiry; (d) the kickback allegations require an individualized inquiry; (e) individual

27  issues predominate regarding claims of breach of contract, breach of the implied covenant of good

28  faith and fair dealing, unjust enrichment, and unfair competition; and (f) affirmative defenses require

1    an individualized inquiry.  *See* U.S. Bank Opp'n, ECF No. 200-5 at 10-23; ASIC Opp'n, ECF No.

2    199 at 15-24.  The next sections address these arguments in order and conclude that they do not

3    defeat predominance given Plaintiffs' identical mortgage contracts, the ability to subclass to address

4    different contract laws, a sufficient damages theory, and a predominance of common issues

5    regarding claims and defenses.

6                    *a.  Variations In State Contract Law and the Multi-State Contract Claims*

7        Plaintiffs propose three multi-state classes on their breach of contract claim (claim 1), one for

8    each of the following three theories: a lender-placed class, a QER class, and a backdating class.  The

9    first two challenge the alleged kickbacks, and the third challenges the allegedly backdating.  Motion,

10   ECF No. 190-4 at 2-5.  Each class has two subclasses for two categories of states with contract laws

11   similar to either California's contract law or New Mexico's contract law.  *Id.*; *see supra* Statement

12   (class definitions list the states).  Plaintiffs categorize the states using a 50-state survey of the

13   elements of a contract claim that U.S. Bank filed.  *See id.*; Droske Decl. Ex. 10, ECF No. 130-30.

14   The summary charts the elements of a breach of contract claim for each state and the District of

15   Columbia as a means of identifying the following ways contract laws can vary:  (1) whether the

16   materiality of a breach is a question of law or fact; (2) whether damages are an element of breach;

17   (3) whether plaintiff's performance is an element of breach, and (4) whether parol evidence is

18   allowed to vary contract terms.  *See id*.

19       The next sections address the following issues in this order: (i) whether the differences in issues

20   1 and 2 (materiality and damages as an element) matter; (ii) whether it is appropriate to group states

21   into the two subclasses to account for differences in state contract law regarding a plaintiff's

22   performance; (iii) whether differences about the parol evidence rule and issues of extrinsic evidence

23   nonetheless militate against subclassing; and (iv) whether differences in state interpretations about

24   what is a reasonable, appropriate, or permitted loan charge defeat subclassing.

25                          *i.  Materiality and Damages As Element of Breach*

26       As to whether materiality of a breach is a question of law or fact, U.S. Bank identified two states

27   in its chart (New York and Alabama) as states where it is a question of law.  *Id.*  Plaintiffs point out,

28   and Defendants do not dispute, that materiality actually is an issue of fact in those states (meaning

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   that they can be included in the Ellsworth/Weaver California-like class).  Motion, ECF No. 190-4 at

2   36 (citing state cases to support this conclusion).  Plaintiffs also point out, and Defendants do not

3   dispute, that whether Plaintiffs committed a material breach is not an issue – even in states where

4   Plaintiffs' performance is an element of the claim – because the issue is whether U.S. Bank breached

5   the remedies provisions of the contracts.  *Id.* (citing cases).

6       As to states where damages are an element of breach, Plaintiffs exclude those states (Idaho,

7   Maryland, Michigan, New Hampshire, North Carolina, and Vermont) from the proposed class

8   definitions.

9       Thus, these points do not detract from the predominance of common claims.

10      ***ii.  Appropriateness of Subclassing To Account For Variations in State Law***

11      As to whether a plaintiff's performance is an element of a claim for breach of contract, the class

12  members' form mortgage contracts require application of the contract law of the state where the

13  property is located.  Plaintiffs' performance is required under the contract law of the California-like

14  states, and it is not for the New Mexico-like states.  *See* Droske Decl. Ex. 10, ECF No. 130-30.  That

15  distinction is the basis for Plaintiffs' proposed subclasses: the Ellsworth/Weaver (California-like)

16  subclass and the Skelley (New Mexico-like) subclass.  *See* Motion, ECF No. 190-4 at 34-35.

17  Because the contract laws of the various states are capable of being organized into groups with

18  similar legal regimes, the court finds that common issues predominate in each subclass.  *See*

19  Newberg on Class Actions, § 4.61 (5th Ed. 2013).

20      Case law in the Ninth Circuit supports this approach.  For example, in *Hanlon*, the Ninth Circuit

21  upheld a nationwide settlement in a products liability class action related to faulty rear liftgate

22  latches on certain Chrysler minivans.  150 F.3d at 1011.  The court observed that "[v]ariations in

23  state law do not necessarily preclude a 23(b)(3) action, but class counsel should be prepared to

24  demonstrate the commonality of substantive law applicable to all class members."  *Id.* at 1022

25  (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-23 (1985)).  While there were "slightly

26  differing remedies based on state statute or common law . . . they [were] local variants of a generally

27  homogenous collection of causes which include products liability, breaches of express and implied

28  warranties, and 'lemon laws.'"  *Id.* at 1022-23.  Individual claims based on personal injury and

UNITED STATES DISTRICT COURT
For the Northern District of California

1    wrongful death were excluded from the class, and thus the idiosyncratic differences among state

2    consumer protection laws were not sufficiently substantive to predominate over the common claims.

3    *Id.*

4        Differences in state law can militate against class certification because they "compound the

5    disparities among class members from the different states." *Zinser*, 253 F.3d at 1189. "Where

6    significant differences in applicable law will arise, plaintiffs should also propose 'a suitable and

7    realistic plan for trial of the class claims.'" *In re Conseco Life Ins. Co. Lifetrend Ins. Sales and*

8    *Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010) (quoting *Zinser*, 253 F.3d at 1189). One way of

9    accounting for "isolated and relatively minor variations" is "'by grouping similar state laws together

10   and applying them as a unit.'" *Id.* at 529 (quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig.*,

11   148 F.3d 283, 315 (3d Cir. 1998)). That is what Plaintiffs propose here. And in 2012, the Ninth

12   Circuit implicitly approved the use of subclassing to account for variations in state law in *Mazza v.*

13   *American Honda Motor Co., Inc*, 666 F.3d 581, 594 (9th Cir. 2012). The *Mazza* court reversed a

14   determination that California consumer protection laws could apply to all consumers who purchased

15   or leased certain Acuras. *Id.* It remanded for a determination about whether it would be correct to

16   certify only a smaller class of California consumers or instead to certify a class more broadly "but

17   with subclasses for class members in different states, with different jury instructions for materially

18   different bodies of state law." *Id.* (expressing no view on which approach to class certification

19   would be correct on remand).

20        *Lane* does not alter this analysis. There, the plaintiffs failed to address the issue of state-law

21   variances. *See* 2013 WL 3187410, at *4. By contrast, on this record, Plaintiffs propose a realistic

22   plan to group the breach of contract classes into two subclasses to address differences in state law.

23   *See Zinser*, 253 F.3d at 1189. These are identical form mortgage contracts involving identical harm

24   with relatively small damages, precisely the sort of contract claims that lends themselves to class

25   treatment.

26             ***iii. Parol Evidence***

27        Plaintiffs' proposed class definitions exclude states that do not permit courts to consider parol

28   evidence to resolve contractual ambiguities: Hawaii, Kentucky, Ohio, South Dakota, and the

UNITED STATES DISTRICT COURT
For the Northern District of California

District of Columbia. *See* State Law Summary, ECF No. 130-30; Motion, ECF No. 190-4 at 35 n.20. The rest of the states permit extrinsic evidence. The parties disagree about whether the differences in states' parol evidence rules matter. Plaintiffs argue that extrinsic evidence is not an issue with form contracts of adhesion. Reply, ECF No. 222-4 at 16. Defendants argue that the differences are meaningful. *See* U.S. Bank Opp'n, ECF No. 200-5 at 19. For example, California admits extrinsic evidence without regard to whether there is contractual ambiguity. *Id.* (citing *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 542-47 (C.D. Cal. 2013)). Alabama admits extrinsic evidence only when a contract is ambiguous, and Alaska applies a multi-factor test. *Id.* (citing *Birmingham Steel Erectors v. Haynes*, 816 So. 2d 494, 497 (Ala. Civ. App. 2001); *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583-84 (Alaska 1989)).

On this record, and based on counsel's argument, the court finds that these distinctions do not defeat predominance. These are form Fannie Mae/Freddie Mac Uniform Instrument mortgage contracts, Plaintiffs challenge Defendants' uniform FPI policies, and the alleged injury is the backdating and kickbacks. It is hard to see what extrinsic evidence would be relevant to interpreting the form contract terms or U.S. Bank's liability based on these theories, and U.S. Bank does not identify any extrinsic evidence or ambiguous contract terms. *Accord Ewert v. eBay, Inc.*, No. C-07-02198 RMW, 2010 WL 4269259, at *7 (N.D. Cal. Oct. 25, 2010). Also, with identical form contracts, courts in this district generally hold that extrinsic evidence is unlikely to be important, and ambiguous terms would be construed against the drafter. *See id.*; *see also In re Conseco Life Ins. Co.*, 270 F.R.D. 521 at 529 (noting Conseco's overstatement of the extent of any variations in state contract law, including the definition of breach, the existence of causation and damages requirements, and the admissibility of extrinsic evidence).

Moreover, when a form contract is at issue, courts in this district have held that a breach can be determined on a class-wide basis when the harm is the same and the contract terms are the same. *See id.*; *Vedachalam v. Tata Consultancy Services, Ltd.*, No. C 06-0963 CW, 2012 WL 1110004, at *3, 13-14 (N.D. Cal. Apr. 2, 2012). In *Verdachalam*, the court certified a national class alleging breach of a form employment contract. The specific amounts varied, but the contracts were uniform in their terms. *Id.* at *11. The court explained that "where a form contract of adhesion is at issue,

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the court will, whenever reasonable, interpret the agreement 'as treating alike all those similarly

2   situated, without regard to their knowledge or understanding of the standard terms of the writing' in

3   order to 'effectuate the reasonable expectations of the average member of the public who accepts

4   it.'" *Id.* at *13 (quoting *Ewert,* 2010 WL 4269259, at *7); *see also* Restatement (Second) of

5   Contracts § 211(1)-(2).

6        Finally, Plaintiffs point out that those states such as California and Arizona that "freely admit"

7   and "widely accept" extrinsic evidence do not allow parol evidence to vary the terms of a mortgage

8   contract.  *See* Reply, ECF No. 222-4 at 16-17 (citing *Snyder v. HSBC Bank, USA, N.A.*, 873 F. Supp.

9   2d 1139, 1150 (D. Ariz. 2012); *Quintera v. Aurora Loan Servs.*, 740 F. Supp. 2d 1163, 1171 (E. D.

10  Cal. 2011)).

11       In sum, issues regarding extrinsic evidence do not necessarily defeat predominance in a case

12  involving form contracts and, for the reasons stated above, do not defeat predominance in this case.

13  It is not obvious that extrinsic evidence will be introduced at all, and at best (and on this record,

14  entirely hypothetically), it would be non-individualized extrinsic evidence.

15       U.S. Bank nonetheless cites recent cases denying certification in force-placed insurance cases in

16  support of its argument that predominance does not exist here.  *See* U.S. Bank Opp'n, ECF No. 200-

17  5 at 19-20, n.11.  Those cases are distinguishable.

18       The first case is *Gustafson*, 294 F.R.D. at 542-47.  There, the district court denied class

19  certification in a FPI case, finding that the plaintiffs' breach of contract claim failed Rule 23's

20  commonality and predominance requirements.  *Id.* at 542.  As in this case, the plaintiffs alleged

21  breach of a contract provision that limited the bank to "that which is 'reasonable' and/or 'necessary'

22  to protect Lender's interest in the property."  *Id.*  The court found that the plaintiffs failed to

23  demonstrate commonality or predominance for two reasons.  *Id.* at 542-44.  *First*, there were many

24  different form mortgage contracts issued by the over 3,000 lenders from whom Bank of America

25  purchased loans.  Those contracts had "numerous material variations" of the reasonable-and-

26  necessary term.  *Id.*  "The sheer number of the form contracts at issue itself counsel[ed] against

27  certification."  *Id.* at 543-44.  *Second*, the plaintiffs sought to certify a nationwide class but failed to

28  "propose a plan to manage differences among states' laws regarding the use of extrinsic evidence."

UNITED STATES DISTRICT COURT
For the Northern District of California

1   *Id.* at 544.

2       The *Gustafson* court was concerned that key differences in state contract laws included the

3   admissibility of extrinsic evidence.  *Id.*  Plaintiffs responded only that the words reasonable and

4   necessary were clear and unambiguous and that Defendants treated all borrowers identically, which

5   meant that they "must believe all of the terms in the contracts are materially the same."  *Id.* at 544

6   n.16.  The court rejected the uniform treatment argument on the ground that the only evidence of the

7   alleged uniform treatment was the forceplacing of insurance when voluntary insurance lapsed.  *Id.*

8   By contrast, as summarized above in the Statement, the Plaintiffs in this case offer evidence that the

9   FPI took place pursuant to form contracts and practices applied uniformly.

10      Moreover, the *Gustafson* court ultimately rejected the uniform argument on the ground that there

11  were too many contracts with too many differences, holding that "even if defendants had engaged in

12  a common course of conduct with all borrowers, this does not change the material differences among

13  the contract provisions on which Plaintiffs rely."  *Id.*  Unlike the many contracts in *Gustafson*,

14  Plaintiffs here limit the class to those borrowers with the identical Fannie Mae/Freddie Mac Uniform

15  Instrument.  Finally, *Gustafson* involved only a nationwide proposed class and did not propose

16  subclassing to address differences in state law regarding breach of contract claims.  *See id.* (also did

17  not propose a backdating subclass); *see also Gordon v. Chase Home Finance, LLC*, No. 8:11-cv-

18  2001-T-33EAJ, 2013 WL 436445, at *2, *5 (M.D. Fla. Feb. 5, 2013) (sought only nationwide class

19  for claims of breach of contract, breach of the implied covenant of good faith and fair dealing,

20  breach of fiduciary duty, violation of the anti-tying provisions of the Bank Holding Company Act,

21  and TILA primarily on issues regarding coverage amount, which allegedly was force placed by

22  Chase up to the replacement value of the property even when the loan balance due was much less;

23  class members did not have the same common contract; Plaintiffs did not propose subclassing;

24  Plaintiffs' counsel were disqualified by Judge Alsup in *Lane*); *Kunzelmann v. Wells Fargo Bank,*

25  *N.A.*, No. 9:11-cv-81373-DMM, 2013 WL 139913, at *2, *5-6,  (S.D. Fla. Jan. 10, 2013) (sought

26  certification of nationwide class for stand-alone unjust enrichment and a Florida subclass for breach

27  of the implied covenant of good faith and fair dealing; raised concerns about Plaintiff's counsel's

28  maneuvering to shoehorn in his claim to establish commonality and typicality (thereby defeating

UNITED STATES DISTRICT COURT
For the Northern District of California

1   adequacy); class did not have common form contract; Plaintiff did not propose subclasses).

2   The next case that U.S. Bank cites to show that common issues do not predominate is *Gooden v.*

3   *Suntrust Mortg, Inc.*, No. 2:11-cv-02595-JAM-DAD, 2013 WL 6499250 (E.D. Cal. Dec. 11, 2013).

4   There, the court denied a motion to certify nationwide and state classes for claims alleging breach of

5   contract and TILA violations.  The plaintiffs' theory was that the defendant force placed hazard

6   insurance policies in excess of the replacement value of the home and thereby breached the

7   plaintiffs' mortgage contracts.  *Id.* at *5-6.  The court rejected "as little more than an educated

8   guess" the plaintiffs' proposed theory for determining the replacement value of the class members'

9   homes, which was the only way to ascertain class membership without individualized inquiries.  *Id.*

10  at *6.  That reasoning does not apply here.  Also, the *Gooden* class was not limited to borrowers

11  with the same mortgage contract, and the plaintiffs proposed a nationwide class.

12  Finally, a remaining issue is that in a footnote, Plaintiffs propose adding back in the states that

13  exclude parol evidence entirely (Hawaii and Ohio to the California-like subclasses and Kentucky,

14  South Dakota, and the District of Columbia to the New Mexico-like subclasses) on the ground that

15  parol evidence likely will not be an issue and in any event will not individualized.  Motion, ECF No.

16  190-4 at 35 n.20.  In the end, and based only on this record, the court concludes that the type of

17  extrinsic evidence that might be introduced in any event would not be individualized for the reasons

18  discussed above and advanced by Plaintiffs.  And it may be that extrinsic evidence will not figure at

19  all.  That being said, assuming the possibility of non-individualized extrinsic evidence, having a few

20  extra states that allow no extrinsic evidence could complicate the proceedings by requiring another

21  approach to analyzing the form contracts.  For this reason, Plaintiffs' first proposal (excluding the

22  states entirely from their proposed class definitions) is the one that the court sticks with.  The case is

23  big enough.

24                          *iv.  Other Variations in State Laws*

25  U.S. Bank argues that state contract laws differ about what is a reasonable, appropriate, or

26  permitted loan charge as it relates to QERs, tracking expenses, or retroactive placement.  U.S. Bank

27  Opp'n, ECF No. 200-5 at 20.  It provides no examples except to suggest in a footnote that different

28  states find backdating reasonable.  *Id.* at 21 n.14.  The cases it cites in that footnote involve courts

UNITED STATES DISTRICT COURT
For the Northern District of California

1   that rejected backdating claims on the merits, examining contract laws from different states without

2   identifying conflicts of laws issues, apparently because they did not matter.  *See Cannon v. Wells*

3   *Fargo Bank, N.A.*, No. C-12-1376 EMC, 2013 WL 3388222, at *6-7 (N.D. Cal. July 5, 2013)

4   (dismissing all claims based on backdating allegations in part because backdating was permissible

5   under the mortgage contracts at issue and relying on case law from various states); *LaCroix v. U.S.*

6   *Bank, N.A.*, No. 11-3236(DSD/JJK), 2012 WL 2357602, at *5 (D. Minn. June 20, 2012) (analyzing

7   covenant of good faith and fair dealing claim brought under Connecticut law by applying case law

8   from South Carolina, Ohio and California); *Webb v. Chase Manhattan Mortg. Corp.*, No. 2:05-cv-

9   0548, 2008 WL 2230696, at *3, 6, 19 (S.D. Ohio May 28, 2008) (analyzing breach of mortgage

10   contract claims on properties located in Tennessee and Colorado by applying case law from various

11   states).  In other words, these opinions suggest that the differences in state law are immaterial.

12       U.S. Bank also points out that states "specifically address kickbacks, commissions, and other

13   compensation in their regulatory scheme," and that laws on the filed rate doctrine vary.  *Id.*  As to

14   regulatory schemes, U.S. Bank provide no argument about how those affect a borrower's right to sue

15   under a mortgage loan contact.  As to the filed rate doctrine argument, U.S. Bank makes no

16   argument, and the court already held – at the 12(b)(6) stage  – that it did not apply.

17       In sum, on this record, the court finds that variations in state contract law do not defeat the

18   predominance of common questions.

19             **b.  Whether the Damages Theory Tethers Damages to the QERs or Insurance Tracking**

20       U.S. Bank argues that Plaintiffs' failure to tether damages to the QERs or insurance tracking –

21   the actions that allegedly create liability – forecloses predominance.  U.S. Bank Opp'n, ECF No.

22   200-5 at 22-24.

23       To prevail on class certification, Plaintiffs must "show that their damages stemmed from the

24   defendant's actions that created legal liability."  *Comcast* 133 S. Ct. at 1435.  In *Comcast*, the

25   Supreme Court reversed an order granting class certification in an antitrust case where the damages

26   model "did not isolate damages resulting from any one theory of antitrust impact."  *Id.* at 1431.

27   Instead, the model would have included damages stemming from theories of liability that were no

28   longer at issue.  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Plaintiffs' damages expert is Birny Birmbaum, and his methodology for assessing damages on a

2    class-wide basis has been accepted by courts in similar FPI cases.  *See Lane*, 2013 WL 3187410, at

3    *9; *Williams*, 280 F.R.D. at 670-71.  *First*, a borrower may assert a claim for restitution (or a

4    "credit" of any charge not paid) for unlawful charges or expenses associated with FPI, such an

5    inflated charge.  *See Lane*, 2013 WL 3187410, at *9.  *Second*, Birnbaum calculates damages as a

6    percent of "unreasonable expenses" – defined as those not actually associated with the provision of

7    FPI – multiplied by the total amount of FPI.  *See id.*

8    Here, as in *Lane*, allegedly unreasonable expenses include (a) expenses for the QERs paid by

9    ASIC to U.S. BIS (described by Birnbaum as a kickback in part because U.S. BIS provided no other

10   services to ASIC that U.S. Bank would not have already provided to mortgage owners like Fannie

11   Mae and Freddie Mac and to ensure the continuous insurance coverage required by the NFIA) and

12   (b) expenses for insurance tracking, which are incurred on a portfolio-wide basis and should be

13   borne by all borrowers.  *See* Birnbaum Report, ECF No. 162 ¶¶ 9-10; *accord Lane*, 2013 WL

14   3187410, at *9 (stating that Birnbaum opined that unlawful expenses were charges not associated

15   with the provision of FPI, including kickbacks and fixed costs for servicing).

16   Also, the theory for calculating damages is equivalent to that in *Lane.*  There are three damages

17   calculations: retroactive billing (or backdating), QERs, and insurance tracking.  First, for retroactive

18   billing, the damages are any amounts charged 61 days or more after the lapse in coverage.

19   Birnbaum Report, ECF No. 162, ¶ 19.  This is based on Birnbaum's opinion that retroactive charges

20   imposed more than 60 days after lapse are unreasonable.  *Id.*  Second, the QER damages are based

21   on the amount of QER payments allocable to class members' flood insurance charges, rather than to

22   total hazard insurance charges.  *Id.* ¶ 20.  Third, the damages based on insurance tracking expenses

23   that were included in the FPI charges to class members can be determined by using ASIC's business

24   records to identify the total amount of insurance tracking expenses included in FPI charges to class

25   members and expressing that as a percentage of their total FPI charges.  *Id.* ¶ 21.

26   U.S. Bank challenges this methodology in three ways: (1) QERs are tied exclusively to hazard

27   insurance; (2) insurance tracking cannot be expressed as a percent of force placed flood insurance

28   because one cannot assume that reasonable tracking expenses are tied to the amount of coverage (a

UNITED STATES DISTRICT COURT
For the Northern District of California

1  variable that is unrelated to the cost of the tracking services); and (3) Birnbaum's conclusion that he

2  can calculate the damage for insurance tracking charge from ASIC's normal business records is

3  conclusory.  *See* U.S. Bank Opp'n, ECF No. 200-5 at 22-24.

4        First, as to tying QERs to hazard insurance, Plaintiffs' theory is that everything was negotiated

5  as a package deal.  *See supra* Statement, II.  Birnbaum opines that the codification of the QERs in an

6  LPI hazard agreement does not alter the fact that the QERs paid by ASIC to U.S. Bank also inflated

7  charges for force-placed flood insurance because it was an integrated package.  Birnbaum Report,

8  ECF No. 162, ¶ 9.  If Plaintiffs prove this, the methodologies appear tethered to the harm.

9        Second, as to whether it is unreasonable to tie tracking expenses to the amount of coverage,

10  Plaintiff's theory is that the cost of discounted tracking was passed forward in the form of inflated

11  FPI charges, meaning, the discount was built into the charge.  U.S. Bank's citation to *Gustafson,* 294

12  F.R.D. at 545-46, does not alter this result.  There, the FPI charges and tracking fees both varied

13  through the class period.  *Id.*  By contrast, in this case, U.S. Bank charged Plaintiffs $0.50 per $100

14  of coverage and paid the amount per loan set forth in the Statement.

15        Third, Birnbaum's methodology – accepted by other courts – is sufficiently detailed at class

16  certification.  *See Lane*, 2013 WL  3187410, at *9; *Williams* 280 F.R.D. at 670-71.  If it turns out to

17  be inadequate, the damages theory will fail, and the class can be decertified.  *See Lane*, 2013 WL

18  3187410, at *9.  U.S. Bank cites cases where courts reject damages methodologies, but those cases

19  involve either assumptions with no ascertainable way to prove factual premises or no damages

20  evidence at all.  For example, in *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2012

21  WL 1570035, at *2 (N.D. Cal. May 2, 2012), the expert could calculate damages only if another

22  expert could first identify "categories of inferior parts," and Plaintiffs did not identify a way to do

23  that.  In *Astiana v. Ben & Jerry's Homeade, Inc.*, No. C 10-4387 PJH, 2014 WL 60097, at *10 (N.D.

24  Cal. Jan. 7, 2014), the court denied class certification in an "all natural" labeling case because the

25  plaintiff provided no damages evidence or any model that showed consumers would pay a premium

26  for an "all natural" product.

27        In sum, these are not tethering issues.  Instead, as Plaintiffs point out in their reply brief, they are

28  disagreements about damages calculations that do not defeat certification.  *See Leyva v. Medline*

1    *Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013); Reply Brief, ECF No. 222-4 at 17.

2    ### *c. Whether the Backdating Allegations Require an Individualized Inquiry*

3        Plaintiffs allege backdating classes for borrowers who were charged for FPI backdated by more

4    than 60 days. *See supra* Statement, III, C. Plaintiffs chose that period as "reasonable" because

5    federal law requires a 45-day notice period and the extra 15 days are to account for "any paperwork

6    delays or 'holiday periods.'" Reply, ECF No. 222-4 at 13 (quoting U.S. Bank Opp'n, ECF No. 200-

7    5 at 4). U.S. Bank argues that 60 day is arbitrary. US. Bank Opp'n, ECF No. 200-5 at 4. On this

8    record, the court finds that Plaintiffs' position appears reasonable.

9        U.S. Bank's citation to *Hartman v. United Bank Card, Inc.*, 291 F.R.D. 591, 597 (W.D. Wash.

10   2013), does not change this conclusion. The *Hartman* court denied a motion for leave to file a

11   second class certification motion in a case involving telephone solicitations to class members. To

12   prove liability, the plaintiff needed to show that the defendant made telephone solicitations to the

13   putative class members, and he proposed a class definition that assumed arbitrarily that any call

14   longer than 30 seconds must be a solicitation. Here, by contrast, Plaintiffs identify a time period that

15   includes a reasonable time to account for administrative error after the 45-day notice period.

16       U.S. Bank argues that reasonableness could turn on whether extenuating circumstances occurred

17   during the retroactive time period, such as a reason for a processing delay such as a flood. U.S.

18   Bank Opp'n, ECF No. 200-5 at 15. But Plaintiffs' case is built on Defendants' issuing FPI

19   according to standard policies and procedures, not individualized inquiries. Also, the class

20   definition here has been narrowed so that any mistakes that Defendants caught later and fixed (by,

21   say, a full refund) would be excluded from the class.

22

23   ### *d. Whether Individual Issues Predominate for Claims*

24       This section addresses U.S. Bank's arguments that individual issues predominate regarding

25   claims of breach of contract, breach of the implied covenant of good faith and fair dealing, unjust

26   enrichment, and unfair competition.

27       As to the breach of contract claim, as discussed above, the common elements and any variations

28   in state law can be addressed by the proposed subclassing. The form mortgage contracts are

<b>United States District Court</b><br>For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    identical, and Plaintiffs allege uniform policies and practices surrounding FPI.  Common issues

2    predominate regarding breach.  As to breach of the implied covenant of good faith and fair dealing,

3    the analysis is the same because (whether through California or New Mexico law), the duty of good

4    faith and reasonableness is rooted in form contracts and the application of uniform policies to the

5    rights and obligations under those contracts.  The duty does not require examining each plaintiff's

6    individual expectations because those – as discussed in the subclassing section – are reflected in the

7    contract.  At best, the issue is U.S. Bank's conduct and reasonableness, and any issues there do not

8    defeat the common issues.

9        As to unjust enrichment, the law is similar in California and New Mexico: both require retention

10   of a benefit by Defendants that is unjust.  *See Walters v. Fid. Mortg. of Cal.*, No. 2:09-cv-3317

11   FCD/KJM, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) ("to state a claim for restitution, a

12   plaintiff 'must plead receipt of a benefit and the unjust retention of the benefit at the expense of

13   another.'") (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)); *Starko, Inc. v.*

14   *Presbyterian Health Plan, Inc.*, 276 P.3d 252, 278 (N.M. Ct. App. 2011) (plaintiffs must allege that

15   the defendant knowingly benefitted at their expense and that allowing the defendant to retain this

16   benefit would be unjust).

17       The undersigned previously addressed the appropriateness of simultaneously pleading contract

18   claims and unjust enrichment/restitution claims.  *See* 12/11/12 Order, ECF No. 80 at 26-27.

19   Defendants argued then that the two theories of recovery were inconsistent for claims grounded in a

20   contract.  *See id.*  Although some opinions hold that a stand-alone unjust enrichment claim is just

21   another characterization of relief that cannot form a claim separate from a breach of contract claim,

22   the court followed the weight of authority in allowing both claims to go forward at the motion to

23   dismiss stage given that restitution provides a different avenue for relief when contracts are

24   unenforceable.  *See id.*  That situation exists now for claims arising out of FPI when U.S. Bank is the

25   servicer (and not the owner) of the mortgages.  *See supra* (narrowing the contract class definition).

26   If U.S. Bank merely services a loan, then the borrower is limited to the unjust enrichment and UCL

27   claims.  *See* Plaintiff's Reply Brief, ECF No 222-4 at 7.  Moreover, a fallback unjust

28   enrichment/restitution claim also remains for borrowers where U.S. Bank owns the mortgages.

1    The common issues with backdating and kickbacks in the context of an unjust enrichment claim

2    remain the same because the ability to force place insurance stems from the common mortgage

3    contract and is implemented under Defendants' common policies and practices. The question is

4    whether there nonetheless are individual issues about unjust enrichment that defeat the common

5    issues recited earlier in this order. Plaintiffs point out that courts in this district allow unjust

6    enrichment claims to go forward at the class certification state. *Id.* at 14 (citing *Lane*, 2013 WL

7    3187410, at *5 (FPI); *Keilhotz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 642-43 (N.D. Cal.

8    2010) (products liability); *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. C 04-1511 CW, 2007 WL

9    1689899, at *9-10 (N.D. Cal. June 11, 2007) (antitrust)).

10    Defendants give examples of how individual issues predominate. *See* U.S. Bank Opp'n, ECF

11    No. 200-5 at 28; ASIC Opp'n, ECF No. 199 at 21-24. The best are examples of how unjust

12    enrichment depends on the borrower. For example, perhaps it is more inequitable to force-place

13    insurance against people (Ellsworth and the Skelleys) who are not in an SFHA, and less inequitable

14    for someone like Weaver who let her insurance lapse. *See* U.S. Bank Opp'n, ECF No. 200-5 at 28.

15    That being said, the case is about the appropriateness of backdating and passing along QERs and

16    tracking costs to buyers in the form of increased charges. In the context of FPI, that inquiry does not

17    require the kind of individualized inquiry that defeats predominance.

18    Less persuasive are Defendants' arguments that whether a practice is unjust is different for

19    borrowers who know about insurance tracking or QERs than for borrowers who do not, and that

20    what is just differs for buyers who acquiesce to FPI because it is easier than shopping around. *See*

21    ASIC's Opp'n, ECF No. 199 at 21-22. Again, the case remains about the reasonableness of the

22    kickbacks or backdating, not choices that buyers make to take an easy insurance option.

23    In sum, given the classic class-wide questions that can be answered the same way for all

24    borrowers, on this record, and in accord with other decisions in this district, the court finds that

25    individual issues do not defeat predominance on the unjust enrichment claim.

26    As to the UCL claim, the issue is similar: whether it is unfair for Defendants to backdate FPI and

27    arrange for kickbacks. *See* California Business & Professions Code § 17200; SAC, ECF No. 169,

28    ¶¶ 115-130; Reply, ECF No. 222-4 at 14. The common issues are the same and are grounded in the

UNITED STATES DISTRICT COURT
For the Northern District of California

Frannie Mae/Freddie Mac mortgage form and the uniform policies regarding FPI.  Plaintiffs point

out that other courts in this district have certified classes in FPI cases to pursue UCL claims.  *See*

*Lane*, 2013 WL 3187410, at * 11; *Hofstetter*, 2011 WL 1225900, at *12-14; *Wahl*, 2010 WL

1881126, at *8-10.  The same analysis applies here.  Whether a practice is unfair in the context of

legislative policy, or whether harms outweigh utilities, are questions capable of classwide resolution.

*See* 12/11/12 Order, ECF No. 80 at 27-30 (discussing analysis under section 17200).

Defendants reiterate that the varied circumstances of class members affects the determination of

what is unfair.  U.S. Bank Opp'n, ECF No. 200-5 at 28-29; ASIC Opp'n, ECF No. 199 at 24-25.

Again, the case is about the appropriateness of backdating and the alleged kickbacks, common issues

are substantial, and issues of policy and balancing are susceptible of class-wide determination.  Any

individual issues do not defeat predominance.  To the extent that ASIC argues that disclosures to

borrowers vary, any differences do not defeat predominance because the disclosures do not reveal

kickbacks or backdating.  Nothing in the record suggests that issues of unfairness are not susceptible

to class-wide proof.  All of the main and relevant disclosures (at least on this record, as summarized

in the Statement) suggest only uniformity of policy and common issues of notice.

### e. Whether Affirmative Defenses Require an Individualized Inquiry

Defendants contend  that the following defenses require an individualized inquiry that defeats

predominance: the failure to mitigate damages, the possibility that some plaintiffs let their FPI

policies renew or engaged in mortgage fraud or breached their mortgage contracts in other ways

such as failure to pay (giving rise to possible defenses of voluntary payment, waiver, laches, unclean

hands, or consent), or settlement and release.  *See* U.S. Bank Opp'n, ECF No. 200-5 at 29-30; ASIC

Opp'n, ECF No. 199 at 26-28.  The affirmative defenses do not preclude certification.

As for the failure to mitigate damages defense, it is discussed above in the section addressing

typicality and hinges on the argument that it was unreasonable to ignore the 45-day notices of FPI.

*See supra* Analysis, I.B.3.  This is not a defense that requires substantial cross-examination on

individual facts.  Either a borrower paid or did not pay the cost that U.S. Bank passed on.  As to

Defendants' contention that it is important to know what the borrower knew individually, the main

information about what the borrower knew is contained in U.S. Bank's notices warning of the

1    imminent placement of FPI.

2        In concluding that the same defenses did not defeat predominance in a similar FPI case against

3    Wells Fargo Bank, the *Lane* court observed that the bank applied the same polices and procedures

4    for FPI for all loans, and sent the same notices of warning, which meant that the success or failure of

5    the defenses were susceptible to common methods of proof.  2013 WL 2187410, at *8.

> 6    The basic facts are common to the class: class members had similar contracts and received the same form notice of lapsed insurance; they failed to act in response to receiving multiple
> 7    notices; defendant eventually force-placed insurance procured from QBE or ASIC on class members' properties; defendant then charged class members an allegedly inflated premium
> 8    for the insurance and received a percent of the premium as a commission or kickback through [Wells Fargo]. Whether and to what extent class members were adequately warned of the
> 9    commissions, could have avoided the force-placement of insurance (and payment of the commission), or accepted the benefits of the force-placed insurance is a matter for trial, or
> 10   summary judgment, based on common methods of proof.

11   *Id.*  The court also dismissed the bank's possible defense of voluntary payment on the ground that

12   the point of the lawsuit was to challenge the increased cost passed on to them either by kickbacks

13   included in the costs or by charging class members for costs not actually incurred (and was not about

14   the bank's purchase of insurance on the borrowers' behalf).  *Id.*

15       The same result makes sense here for the same reasons: the defenses are susceptible to common

16   methods of proof.  *See also Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir.

17   2003) ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3)

18   simply because affirmative defenses may be available against individual members . . . . instead,

19   where common issues otherwise predominated, courts have usually certified rule 23(b)(3) classes

20   even though individual issues were present in one or more affirmative defenses."); *McLaughlin v.*

21   *American Tobacco Co.*, 522 F.3d 215, 233 (2d Cir. 2003) ("the presence of individual defenses does

22   not by its terms preclude class certification").

23       *2. Superiority*

24       Rule 23(b)(3) requires a court to assess whether class treatment is "superior to other available

25   methods for the fair and efficient adjudication of the controversy."  Factors to consider in assessing

26   superiority include the following:  (A) the class members' interests in individually controlling the

27   prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

28   controversy already begun by or against class members; (C) the desirability or undesirability of

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1    concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in

2    managing a class action. Fed. R. Civ. P. 23(b)(3).  Aggregation in a class action can be efficient

3    when many individuals have small damages because absent a class suit, it is unlikely that any of the

4    claimants will be accorded relief.  *See Amchem*, 521 U.S. at 617.  The point of the superiority

5    analysis is a focus on efficiency and economy so that appropriate cases may be adjudicated most

6    profitably on a representative basis.  *Zinser*, 253 F.3d at 1190.

7        The main factors here militating in favor of the superiority of a class action are the small

8    individual claims, the common theories of liability, and the form contracts and standard policies.

9    *See* Fed. R. Civ. P. 23(b)(3)(A), (C)-(D).; SAC ¶¶ 24, 36 (Ellsworth and the Skelleys paid $2,250),

10   47 (Weaver paid $591).  Concentrating litigation thus makes sense for efficiency and economy.

11   Manageability should not be an issue (and Defendants do not argue otherwise).  *See* Fed. R. Civ. P.

12   23(b)(3)(D).  There apparently is no other litigation concerning the controversy already commenced

13   by or against members of the class.  *See* Fed. R. Civ. P. 23(b)(3)(B).

14       Based on these factors, a class action is superior for the California class for all claims: contract,

15   breach of the implied contract of good faith and fair dealing, unjust enrichment, and UCL.  *See* Fed.

16   R. Civ. P. 23(b)(3)(C)*; see also Lane*, 2013 WL 3187410, at *12 (certifying similar class on FPI

17   claims).  The court also disagrees with Defendants' characterization that the plethora of issues

18   related to the borrowers makes the class action inferior.  *See* ASIC Opp'n, ECF No. 199 at 29.  The

19   reason is that common issues predominate, and the issues do not raise manageability concerns.  *See*

20   *supra.*

21       The issue regarding superiority is the desirability of a class action in this forum regarding classes

22   other than the California class:  the California-like multi-state subclasses, the New Mexico-like

23   multi-state subclasses, and the New Mexico classes.  *See* ASIC Opp'n, ECF No. 199 at 30; U.S.

24   Bank Opp'n, ECF No. 200-5 at 21.  U.S. Bank and ASIC both contend that members of the proposed

25   New Mexico classes and the New Mexico-like multi-state subclasses have no nexus to this district

26   (although neither extends that argument to the states other than California in the Ellsworth/Weaver

27   multi-state class).  U.S. Bank Opp'n, ECF No. 200-5 at 21; ASIC Opp'n, ECF No. 199 at 29.  ASIC

28   also asserts that to its knowledge, no New Mexico court has certified a stand-alone claim for unjust

UNITED STATES DISTRICT COURT
For the Northern District of California

1    enrichment (which is the only claim for New Mexico borrowers whose loans U.S. Bank services but

2    does not own).  ASIC Opp'n, ECF No. 199 at 21.

3        In *Lane*, a court in this district denied a motion to certify an Arkansas class raising Arkansas

4    state claims.  2013 WL 3187410,. at *12 (quoting *Zinser*, 253 F.3d at 1192).  The reason was that

5    Plaintiffs offered no "adequate justification for the concentration of litigation in this particular

6    forum," given that no class members were in Arkansas, and the forum would be disadvantageous to

7    class members who lived in Arkansas.  *Id.*  In the same order, the court also denied certification of a

8    nationwide class raising claims for violation of the National Bank Holding Act and contract claims.

9    *See id.* at * 4-5.  As to the contract claims, because the plaintiffs never addressed adequately the

10   differences in state law, the court certified only a California class.  *Id.*

11       Given the context in *Lane*, it made good sense to decline to certify an Arkansas class in a

12   California federal court.  There was no national class and no multi-state contract class.  This case is

13   different.  On this record, the court concludes that Plaintiffs propose a workable multi-state contract

14   class where common issues predominate and that appears manageable.  *See supra.*

15       In this form contract case, the differences in contract law between the California-like and New

16   Mexico-like classes are modest, and the similarities and common issues predominate and are

17   substantial.  Put another way, if multi-state classes can be certified with subclasses to accommodate

18   differences in state law (and the case law establishes that they can), then that approach can trump (on

19   the right record) the "no nexus to the forum" argument.  Otherwise, the "no nexus to the forum"

20   argument would preclude any multi-state class actions asserting claims under the laws of multiple

21   states.  Particularly given the form contracts, trying the New Mexico class claims here makes sense

22   for the same reasons for including the California classes.  Given the multi-state subclassing, and on

23   this record, including the New Mexico state class does not defeat superiority.

24       ASIC also argues that class adjudication is not necessary because federal and state regulators are

25   available and already have intervened in Defendants' alleged practices and afforded relief.  *See*

26   ASIC Opp'n, ECF No. 199 at 29-30 (quoting Plaintiffs' submissions regarding negotiated

27   settlements and regulatory interventions by the California Insurance Commissioner).  This is a short

28   argument at the end of the brief, does not demonstrate an alternative forum, and does not defeat

1    superiority.

2    **II. MOTION TO DISMISS**

3        U.S. Bank also moves to dismiss for lack of subject matter jurisdiction on the ground that

4    Plaintiffs lack standing to assert claims under the laws of states other than California and New

5    Mexico.  *See* ECF No. 195.  The only claim at issue is the multi-state breach of contract claim.  The

6    court previously held that the named plaintiffs had standing to sue.  *See* 3/21/2014 Order, ECF No.

7    186 at 12-14.  Ellsworth and Weaver are from California.  The Skelleys are from New Mexico.  The

8    gist of U.S. Bank's argument is that there needs to be a named plaintiff for each state in each multi-

9    state class.  *See* ECF No. 197.  The court concludes that only the named plaintiffs need to have

10   standing to assert a breach of contract claim based on an identical form contract on behalf of class

11   members in states with similar contract laws.  *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d

12   1013, 1021 (9th Cir. 2011); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)

13   (only named plaintiffs must have standing).  As discussed above, certification of multi-state

14   subclasses is appropriate, particularly when the case involves (A) a breach of contract claim

15   stemming from a form contract that implicates FPI administered through uniform policies and

16   procedures, and (B) subclassing to account for variations in state law.  *See Conseco*, 270 F.R.D. at

17   529; *see also* Pls.' Opp'n, ECF No. 213 at 11-12 (collecting cases where courts have certified

18   national or multi-state classes on breach of contract claims).

19       The cases Defendants cite do not compel a different result.  They generally involve statutory

20   claims or unjust enrichment claims on behalf of class members in other states.  *See, e.g., Lauren v.*

21   *PNC Bank*, 296 F.R.D. 389, 390-91 (W.D. Wash. 2014) (unjust enrichment); *O'Shea v. Epson Am.,*

22   *Inc.*, No. CV 09-8063 PSG (CWx), 2011 WL 4352458 (C.D. Cal. Sept. 19, 2011) (various state

23   consumer protection and unfair competition laws); *Pecover v. Electonics Arts Inc.*, 633 F. Supp. 2d

24   976, 984 (N.D. Cal. 2009) (different state unfair competition statutes); *In Re Diptropan XL Antitrust*

25   *Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (different state antitrust statutes).  Those are

26   state-specific statutes and claims that vary by jurisdiction.  By contrast, and as the court already

27   determined, the law regarding the contract claims does not differ materially in the multi-state

28   subclasses.  The order already distinguished *Gustafson* because, among other reasons, the borrowers

UNITED STATES DISTRICT COURT
For the Northern District of California

1   did not share the same form contract. *See* 294 F.R.D. at 544. The order also distinguished *Lane* on

2   the ground that the *Lane* plaintiffs' submissions did not address differences in state law. *See* 2013

3   WL 3187410 at *4; *supra* Analysis, I.C.1.a.ii.

4   **III.  MOTION FOR JUDGMENT ON THE PLEADINGS REGARDING BACKDATING**

5       U.S. Bank moves for judgment on the pleadings on the ground that a recent amendment (the

6   Biggert-Waters amendment) to the National Flood Insurance Act ("NFIA") clarifies that borrowers

7   can be charged for backdated coverage. *See* ECF No. 197. The NFIA allows a lender or servicer to

8   force-place flood insurance on a property in an SFHA if the property is not insured adequately by

9   the borrower. *See supra* Statement, I; 42 U.S.C. § 4012. The lender must give notice, and if the

10  borrower does not purchase adequate insurance within 45 days, the lender or servicer can force place

11  the insurance. *Id.* § 4012a(e)(2). The amendment, which became effective on January 14, 2013,

12  added one sentence to the NFIA relating to a lender's ability to force place insurance and charge for

13  it back to the date of the lapse. The additional sentence is italicized and bolded below.

14      (e) Placement of flood insurance by lender

15          ...

16      (2) Purchase of coverage on behalf of borrower

17

18      If the borrower fails to purchase such flood insurance within 45 days after notification
        under paragraph (1), the lender or servicer for the loan shall purchase the insurance on
        behalf of the borrower and may charge the borrower for the cost of premiums and fees
19      incurred by the lender or servicer for the loan in purchasing the insurance, ***including
        premiums or fees incurred for coverage beginning on the date on which flood
20      insurance coverage lapsed or did not provide a sufficient coverage amount.***

21  42 U.S.C.A. § 4012a(e) (2012) & (2013).

22      By its plain language, the amended statute thus allows FPI back to the date of the lapse or

23  inadequacy. U.S. Bank argues that the amendment is only clarifying legislation that makes explicit

24  what always has been allowed: force placing insurance back to the date of lapse or inadequacy,

25  whatever that date is, and even if that date is before the start of the 45-day notice period. If that is

26  true, then the amendment would apply to all cases pending at the date of its enactment and would

27  foreclose the backdating claims in this case. *See ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689

28  (9th Cir. 2000). By contrast, if the amendment is construed as attaching new legal consequences to

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    actions completed before its enactment, then a presumption against retroactivity applies.  *See*

2    *Landgraf v. USI Film Products,* 511 U.S. 244, 280 (1994).  In that case, the amendment will not be

3    applied retroactively absent a showing of "unequivocal" Congress intent.  *See id.*

4        More specifically, a clarifying amendment is to an ambiguous statute, meaning, it clarifies what

5    the statute was meant to address all along.  *See ABKCO*, 217 F.3d at 691. Congress is not changing

6    the law, merely clarifying it.  *See id.*  Factors relevant to the inquiry about whether an amendment

7    merely clarifies a statute include the following:

8    •   "An amendment in the face of an ambiguous statute . . . indicates that Congress is clarifying,

9        rather than changing, the law."[6]

10   •   Subsequent legislation declaring the intent of an earlier statute.[7]

11   •   Statements of the bill's co-sponsor[8]

12   •   If the amendment was adopted soon after a controversy arose concerning the proper statutory

13       interpretation.[9]

14       Looking at the statute's plain language, the agency guidance, and legislative history, the

15   ambiguity at best (before the amendment) is whether insurance could be force-placed back to the

16   beginning of the 45-day notice period.  It made sense under the previous version of the statute that it

17   could be: a lapse is identified, an opportunity is given to cure within 45 days, and a remedy (in the

18   form of force-placed insurance) kicks in if the borrower does not cure the situation by buying

19   adequate flood insurance.  But while the statute was explicit that a lender may force-place insurance

20

21       [6]  *ABKCO*, 217 F.3d at 689.

22       [7]  "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight
23   in statutory construction." *Loving v. United States*, 517 U.S. 748, 770 (1996) (quotations, citations,
     and indications of alteration omitted).

24
25       [8]  While "the statements of one legislator made during debate may not be controlling," the
     remarks of the sponsors of the bill "are an authoritative guide to the statute's construction."  *United*
26   *States v. Maciel–Alcala*, 612 F.3d 1092, 1100 (9th Cir. 2010) (quoting *N. Haven Bd. of Educ. v. Bell*,
     456 U.S. 512, 526-27 (1982)).

27
     [9]  1A Sutherland Statutory Construction § 22:31 (7th ed.); *McCoy v. Chase Manhattan Bank,*
28   *USA, N.A.*, 654 F.3d 971, 974 (9th Cir. 2011).

1   45 days after the notice of inadequacy, it did not say expressly that it can be retroactively effective.

2   It said only that the lender "shall" purchase the insurance after the 45-day period.

3       The scope of the discussion about the ambiguity matters because if it was only about charging

4   for coverage that was backdated to the beginning of the 45-day notice period, then it would not

5   affect the backdating claims here.  That is because Plaintiffs challenge only insurance that is

6   retroactively effective by more than 60 days (or before the beginning of the 45-day notice period).

7   To the extent the Biggert-Waters Amendment authorized backdating to before the notice period, it

8   would be a change in law and not a clarifying amendment as to that practice.

9       Agency guidance and legislative history confirm that the pre-amendment conversation about

10  backdating was limited to whether force-placed insurance can be retroactively effective to provide

11  coverage during the 45-day notice period, not whether it could be retroactively effective to before

12  the borrower received notice.  For example, in July 2009, the OCC issued draft guidance about

13  retroactive LPFI.  It said:

14          There is no authority under the Act and Regulation to charge a borrower for a force-
            placed flood insurance policy until the 45-day notice period has expired.  The ability
15          to impose the costs of force placed flood insurance on a borrower commences 45
            days after notification to the borrower of a lack of insurance or of inadequate
16          insurance coverage.  Therefore, <u>lenders may not charge borrowers for coverage</u>
            <u>during the 45-day notice period</u>.
17

18  OCC, *Notice and Request for Comment: Flood Insurance Questions & Answers*, 74 Fed. Reg.

19  35914, 35934 (July 21, 2009).  In October 2011, the OCC characterized the 2009 question as

20  "whether a borrower may ever be charged for the cost of flood insurance that provides coverage for

21  the <u>45-day force-placement notice period.</u>"  OCC, *Notice and Request for Comment, Interagency*

22  *Questions & Answers Regarding Flood Insurance*, 76 Fed. Reg. 64175, 64180-81 (Oct. 17, 2011)

23  (emphasis added).  After considering the public comments, the OCC stated:

24          In consideration of the comments received, the Agencies are revising proposed question and
            answer 62. As a general rule, the revised proposed question and answer would allow a lender
25          or its servicer to charge a borrower for insurance coverage *for any part of the 45-day notice*
            *period in which no adequate borrower-purchased flood insurance coverage is in effect <u>if the</u>*
26          *<u>borrower has given the lender or its servicer the express authority to charge the borrower</u>*
            *<u>for such coverage as a contractual condition of the loan being made.</u>*  Any policy that is
27          obtained by a lender or its servicer, the premium of which is charged to the borrower
            pursuant to a contractual right, should be equivalent in coverage and exclusions to an NFIP
28          policy and cover the interests of both the borrower and the lender.

1    *Id.* at 64180 (emphasis added).

2        In 2011, in discussing an earlier proposed amendment similar to the Biggert-Waters amendment

3    (that did not pass), the House of Representatives' report said the following:

4        Additionally, this section clarifies and codifies longstanding practices that allow lenders and
         servicers to collect premiums and fees incurred for coverage beginning on the date an
5        existing flood insurance policy lapsed or did not provide sufficient coverage.  In this
         circumstance, the lender can collect fees and premiums for "force-placed" insurance during
6        the 45-day notification period.

7    Flood Insurance Reform Act of 2011, H.R. 112-102, 112th Cong. § 3 at *39 (2011) (emphasis

8    added).  (U.S. Bank omitted the underlined sentence in its excerpt of the report.  *See* Motion, ECF

9    No. 197 at 5.)

10       Thus, the discussion was only about force-placing during the 45-day period, even in the context

11   of the 2011 House Report for a previous version of a similar amendment.  The Biggert-Waters

12   amendment permitted FPI back to the date of lapse or inadequacy.  If – as U.S. Bank argues – the

13   amendment was intended to clarify that it was always okay to backdate FPI to the date of the lapse

14   or inadequacy (even if that date was before the 45-day notice period), then why was the discussion

15   only about backdating during the 45-day period?  U.S. Bank cites no authority or legislative history

16   suggesting that it was acceptable to charge for LPFI backdated to a date before the lender sent out

17   the 45-say notice.

18       In sum, to the extent that there was ambiguity, it was only about whether it was permissible to

19   force-place insurance within the 45-day notice period.  Plaintiffs avoid any issue by limiting the

20   backdating claims to insurance force-placed retroactively 61 days or more after notice.  U.S. Bank

21   nonetheless points to the OCC's proposed rules to implement the amendment and its use of the word

22   "clarify" to describe the amendment, and argues that this shows that the amendment is only a

23   clarification.  *See* Office of the Comptroller of the Currency, *Joint Notice of Proposed Rulemaking*,

24   78 Fed. Reg. 65108 (Oct. 30, 2013).  The relevant excerpt is as follows:

25       Among other changes, the Act ***significantly amends*** the NFIP requirements, over which the
         Agencies have jurisdiction.  Specifically, the Act: . . . [(i) increases the civil monetary penalty;
26       (ii) generally requires escrow of premiums and fees; (iii) directs lenders to accept and notify
         borrowers about private insurance; and] (iv) amends the force-placement requirement to ***clarify***
27       that regulated lending institutions may charge a borrower for the cost of premiums and fees
         incurred for coverage beginning on the date on which the flood insurance coverage lapsed or did
28       not provide sufficient coverage and to prescribe the procedures for terminating flood insurance.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    *Id.* at 65110 (emphasis added).  The use of the word "clarify" does not change the analysis.  The

2    preamble to the summary of the changes (omitted by U.S. Bank in its excerpted quote) describes the

3    amendment as significant, the next sections describe the changes, and the pre-amendment agency

4    guidance and legislative history (including history for a similar amendment) discuss only the

5    appropriateness of force-placing in the 45-day notice period.

6         Decisions in this district are consistent with this interpretation.

7         In *Lane v. Wells Fargo Bank*, No. C 12-04026 WHA, 2013 WL 1758878, at *2 (N.D. Cal. Apr.

8    24, 2013), the court rejected the bank's argument that the NFIA's continuous coverage requirement

9    mandated backdating, holding that while the statute suggested continuous insurance was necessary,

10   its plain language did not require backdating FPI and charging borrowers for it.  *Id.*  The court noted

11   that administrative guidance (including the OCC October 2011 guidance) supported this statutory

12   interpretation.  *Id.*  And the court rejected the argument that the 2013 Biggert-Waters amendment

13   was a clarifying amendment and accorded little persuasive value to the House report in 2011

14   because it was for a different bill that never passed.  *Id.* at *3.  In sum, the court concluded that

15   federal law did not require backdating, noted that the bank might be able to show that backdating

16   complied with its contractual ability to take "reasonable and appropriate" or "necessary" actions to

17   protect its interests in the collateral for the mortgages, and held that the "reasonable and necessary"

18   analysis was not appropriate for resolution on a motion to dismiss.  *Id.* at *3; *accord Leghorn v.*

19   *Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093, 1112, 1119 (N.D. Cal. June 19, 2013).

20        The decision in *Cannon*, 2013 WL 3388222, at *6-7, does not change the outcome.  There, the

21   court dismissed the backdating claims with prejudice and limited the case to a kickback theory.

22   *Id.* at *8.  First, the court held that the mortgage contracts at issue did not preclude backdating,

23   finding that plaintiffs did not explain why it would be unreasonable to backdate insurance.  *Id.* at *6.

24   Second, the court agreed with the analysis in *Lane* that the NFIA did not require backdating.  *Id.* at

25   *7.  But because the plaintiffs' mortgage contracts permitted backdating, the issue was only whether

26   the NFIA barred the practice.  The court held that – as amended in 2013 – it does not.  *Id.*

27        The *Cannon* court also held that the 2013 amendment was a clarifying amendment that applied

28   to all pending cases and thus barred the backdating claim (given that the mortgage contract

UNITED STATES DISTRICT COURT
For the Northern District of California

permitted backdating).  *Id.*  Unlike the *Lane* court, the *Cannon* court credited the 2011 House

Report's discussion that the amendment was a clarification.  The reason is that the legislative history

for an unenacted bill can have relevance for the bill that is enacted ultimately, particularly when – as

here – the language is carried forward from the unenacted bill to the enacted one.  *Id.* (citations

omitted).

As discussed above, the 2011 House Report's discussion of the amendment supports only the

conclusion that the lender can "collect fees and premiums for 'force-placed' insurance during the

45-day notification period."  *See* H.R. 112-102 at *39; *supra* (quoting a fuller excerpt from the

report).  The backdating allegations in *Cannon* involved only the bank's charges for FPI within the

45-day notice period.  *See* Second Amended Complaint, ECF No. 105, *Cannon v. Wells Fargo Bank*,

No. C 12-01376 EMC; Wells Fargo's Request for Judicial Notice Supp. Motion to Dismiss, ECF

No. 107.  For example, one time line is as follows:

> 4/6/06      WF sent a Notice Letter
> 5/30/06     WF sent Notice of Temporary Flood Insurance Placed by Lender.
> 5/26/06     Effective date of insurance

*Id.*  The other allegations similarly all involve FPI within the 45-day period.  *Id.*  After the hearing in

this matter, counsel for U.S. Bank sent the court a letter acknowledging this point.  *See* Letter, ECF

No. 238.

In sum, there are strong arguments that the Biggert-Waters amendment is substantive and thus

not retroactive.  If it is a clarifying amendment, at most it would be limited to allowing backdating

within the 45-day period.  Because Plaintiffs defined their claims to those backdated before January

1, 2013 by more than 60 days, the amendment does not preclude the backdating claims.

U.S. Bank also contends that even if the Biggert-Waters amendment is not retroactive, the

mortgage contracts permit lenders to take steps that are "reasonable or appropriate" to protect the

lender's interest in the property.  *See* U.S. Bank Motion, ECF No. 197 at 9; *supra* Statement, III

(excerpting paragraph 9 of the form mortgage contract).  The bank asserts that it would be

incongruous to hold that retroactive placement is unreasonable or inappropriate given that Congress

and the OCC have decided that it is reasonable and appropriate.  Motion, ECF No. 197 at 9.  It

points out that damage could happen during the lapse and become apparent only later.  *Id.* at n.4

UNITED STATES DISTRICT COURT
For the Northern District of California

1    (citing *Cannon*, 2013 WL 3388222, at *6).  Also, even though the allegations in *Cannon* are about

2    FPI in the 45-day period, the holding does not make that distinction, which shows that backdating is

3    reasonable as a matter of law.

4         Unlike the Plaintiffs in *Cannon*, who made no showing about reasonableness in the context of

5    allegations about force-placement in the 45-day period, Plaintiffs here have alleged

6    unreasonableness regarding backdating FPI more than 60 days based in part on U.S. Bank's own

7    assertions about its force-placement practices.  *See supra* Statement, II. (discussing how a policy that

8    is retroactive more than 60 days is the exception to the rule).  Under the circumstances, and on this

9    record, the court cannot rule as a matter of law on a 12(c) motion that the amendment manifests

10   Congress's intent to provide blanket permission to backdate insurance, no matter how far outside the

11   45-day notice period.

12                                    **CONCLUSION**

13        The court grants Plaintiffs' motion for class certification and certifies the classes with the

14   definitions set forth in the definitions section of this order.  *See* Statement, III.  The court also grants

15   the motion to appoint Ellsworth, Weaver, and the Skelleys as class representatives and to appoint

16   Plaintiffs' counsel as class counsel.

17        The court denies U.S. Bank's motion to dismiss and motion for judgment on the pleadings.

18        This disposes of ECF Nos. 190-4, 195, and 197.

19   Dated: June 13, 2014                          _____

20                                                 LAUREL BEELER
                                                   United States Magistrate Judge

21

22

23

24

25

26

27

28